# 25-384

## United States Court of Appeals
### *for the*
## Second Circuit

BRETT CHRISTIAN, FIREARMS POLICY COALITION,
SECOND AMENDMENT FOUNDATION,

*Plaintiffs-Appellants,*

JOHN BORON,

*Plaintiff,*

— v. —

STEVEN G. JAMES, MICHAEL J. KEANE, ACTING DISTRICT ATTORNEY,

*Defendants-Appellees,*

EVERYTOWN FOR GUN SAFETY,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF NEW YORK,
No. 1:22-cv-00695 (Sinatra, Jr., J.)

## BRIEF FOR PLAINTIFFS-APPELLANTS

Nicolas J. Rotsko
FLUET & ASSOCIATES PLLC
1751 Pinnacle Drive, Suite 1000
Tysons, VA 22102
(703) 590-1234
nrotsko@fluet.law

David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, DC 20036
(202) 220-9600
dthompson@cooperkirk.com

*Attorneys for Plaintiffs-Appellants*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Firearms Policy Coalition, Inc., does not have a parent corporation, and no publicly held corporation owns 10% or more of its stock.

Second Amendment Foundation does not have a parent corporation, and no publicly held corporation owns 10% or more of its stock.

Dated: March 21, 2025        /s/David H. Thompson
                                         David H. Thompson

                                         *Attorney for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT.............................................i

TABLE OF AUTHORITIES................................................................iv

INTRODUCTION ............................................................................. 1

JURISDICTIONAL STATEMENT ..................................................... 3

ISSUE PRESENTED ........................................................................ 3

STATEMENT OF THE CASE ............................................................ 4

   I.    The Parks Ban.......................................................................... 4

   II.   Procedural History .................................................................. 5

       A.   Preliminary Injunction Proceedings and Summary Judgment............................................................................. 5

       B.   This Court's Revised Decision in *Antonyuk*.................. 7

       C.   The District Court's Summary Judgment Decision. ... 10

STANDARD OF REVIEW.............................................................. 11

SUMMARY OF ARGUMENT ......................................................... 12

ARGUMENT................................................................................. 15

   I.    The Plain Text of the Second Amendment Covers Carrying Firearms In Parks................................................... 15

   II.   The Parks Ban Cannot Be Supported By Any Historical Tradition of Firearm Regulation. ......................................... 16

       A.   Principles Guiding Historical Analysis Under *Bruen* and *Rahimi*................................................................. 17

       B.   There Is No Historical Justification for the Parks Ban.................................................................... 23

           1.   *Antonyuk*'s Preliminary Historical Analysis Cannot Withstand Final Scrutiny........................... 23

           2.   *Antonyuk*'s Reconstruction-Era and Later Statutes Are Identifiable As Historical Outliers. ... 37

ii

3.   *Antonyuk*'s Reliance on 19th-Century Parks Restrictions Are Similarly Unavailing....................40

C.   No Historical Principle Supports Applying the Parks Ban in Parks Outside of Urban Areas. .........................51

CONCLUSION ........................................................................52

ADDENDUM

# TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*Andrews v. Tennessee,*
50 Tenn. 165 (1871) .................................................................... 39

*Antonyuk v. Chiumento,*
89 F.4th 271 (2d Cir. 2023) ............................................................ 6

*Antonyuk v. James,*
144 S. Ct. 2709 (2024) .................................................................... 7

*Antonyuk v. James,*
120 F.4th 941 (2d Cir. 2024) ........................... 1, 8, 9, 10, 15, 16, 18, 21, 23, 24, 25, 26, 31, 32, 37, 38, 40, 41, 43, 46, 52

*Atlas Air, Inc. v. Int'l Bhd. of Teamsters,*
943 F.3d 568 (2d Cir. 2019) .......................................................... 11

*Cayuga Indian Nation of N.Y. v. Seneca Cnty.,*
978 F.3d 829 (2d Cir. 2020)........................................................... 11

*Christian v. James,*
No. 22-cv-695 (JLS), 2025 WL 50413 (W.D.N.Y. Jan. 8, 2025) ....... 4

*Christian v. James,*
No. 24-2847 (2d. Cir. 2024) ............................................................ 7

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ..................................................... 15, 17, 35, 47

*English v. Texas,*
35 Tex. 473 (1871) ................................................................... 38, 39

*Espinoza v. Mont. Dep't of Revenue,*
591 U.S. 464 (2020) ...................................................................... 19

*Hague v. Comm. for Indus. Org.,*
307 U.S. 496 (1939) ...................................................................... 45

*Jones v. Bonta,*
34 F.4th 704 (9th Cir. 2022)........................................................... 34

*Jones v. Bonta,*
47 F.4th 1124 (9th Cir. 2022)......................................................... 34

iv

*Koons v. Platkin,*
    673 F. Supp. 3d 515 (D.N.J. 2023) ........................................... 21, 22

*Lara v. Comm'r Pa. State Police,*
    125 F.4th 428 (3d Cir. 2025) ................................................... 17, 20

*Missouri v. Shelby,*
    2 S.W. 468 (Mo. 1886) ................................................................... 39

*Missouri v. Wilforth,*
    74 Mo. 528 (1881) ......................................................................... 39

*Moore v. Madigan,*
    702 F.3d 933 (7th Cir. 2012) ....................................................... 20

*New York State Rifle & Pistol Association v. Bruen,*
    597 U.S. 1 (2022) .......................................... 1, 2, 15, 16, 17, 18, 19,
    20, 21, 22, 32, 37, 38, 39, 40, 50

*North Carolina v. Huntly,*
    25 N.C. 418 (1843) ................................................................. 30, 31

*Petrello v. White,*
    533 F.3d 110 (2d Cir. 2008) ............................................................ 3

*United States v. Rahimi,*
    602 U.S. 680 (2024) .......................... 7, 16, 18, 20, 21, 22, 29, 33, 51

*Wolford v. Lopez,*
    116 F.4th 959 (9th Cir. 2024) ................................................. 33, 34

*Worth v. Jacobson,*
    108 F.4th 677 (8th Cir. 2024) ................................................ 17, 20

## Constitutional Provisions, Statutes and Laws

28 U.S.C.
    § 1291 ............................................................................................. 3
    § 1331 ............................................................................................. 3
    § 1343 ............................................................................................. 3

MCKINNEY'S CONSOL. LAWS OF N.Y. ANN., ch. 37 (2022) ..................... 5

N.Y. ENV'T CONSERVATION LAW
    § 9-0101(6) .................................................................................... 5

N.Y. PENAL LAW
    § 265.01-e(2)(d) ............................................................................ 5

v

## Other Authorities

1786 Va. Acts 35, ch. 49 .......................................................................... 25

John Adams, *Adams' Argument for the Defense: 3–4 December 1770*, NAT'L ARCHIVES FOUNDERS ONLINE, https://perma.cc/C82Q-WT7R ........................................................ 35

A COLLECTION OF ALL THE PUBLIC ACTS OF ASSEMBLY OF THE PROVINCE OF NORTH-CAROLINA (Newbern: James Davis, 1752), https://perma.cc/AE62-RL2D .................................................... 28, 29

AN ACT FOR PUNISHMENT OF CRIMES AND OFFENCES, WITHIN THE DISTRICT OF COLUMBIA, § 40 (1816), https://perma.cc/88PB-Y654 ............... 25

WILLIAM ROOT BLISS, SIDE GLIMPSES FROM THE COLONIAL MEETING-HOUSE (1894), https://perma.cc/H7SG-RCYG .......................... 41, 42

*Boston Common: History*, *History of Early American Landscape Design*, NATIONAL GALLERY OF ART, https://perma.cc/U4MW-KKRM ................................................. 33, 34

Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 LIBERTY UNIV. L. REV. 653 (2014) ......... 34

Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. FIREARMS & PUB. POL'Y 1 (2004) ....................................................................... 34

RONALD FLEMING, ON COMMON GROUND (1982), *available at* https://perma.cc/WHB4-4K3X ........................................................ 45

David W. Gobel, *Planned Obsolescence? The Role of the Town Common in the Making of Savannah's Urban Plan*, 22 J. PLANNING HIST. 141 (2023), https://perma.cc/FYP5-2SCG, ...................................... 42

Stephen P. Halbrook, *Faux Histoire of the Right to Bear Arms:* Young v. Hawaii, SSRN (2021), https://perma.cc/AXF3-PHTF .......... 27, 28

FREDERICK LAW OLMSTED: LANDSCAPE ARCHITECT, 1822–1903 (Theodora Kimball & Frederick Law Olmsted, Jr. eds., 1928), https://perma.cc/6H32-URKH ........................................................ 44

THOMAS JEFFERSON, JEFFERSON'S LEGAL COMMONPLACE BOOK (David Thomas Konig et al. eds., Princeton Univ. Press 2019) .... 36

HENRY WANSEY AND HIS AMERICAN JOURNAL (David John Jeremy ed., 1794) (1970), https://perma.cc/YX34-HUZD ................................. 45

vi

NICHOLAS JOHNSON ET AL., FIREARMS LAW & THE SECOND AMENDMENT (2d ed. 2017) .............................................................................. 34, 35

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 CHARLESTON L. REV. 204 (2018) .................................. 34

ERIC D. LEHMAN, CONNECTICUT TOWN GREENS: HISTORY OF THE STATE'S COMMON CENTERS (2015), https://perma.cc/65SY-B38L ................ 42

*National Mall: History*, *History of Early American Landscape Design*, NAT'L GALLERY OF ART, https://perma.cc/J23S-KVXB ................... 43

MARY E. PERKINS, OLD HOUSES OF THE ANTIENT TOWN OF NORWICH, 1660–1800 (1895), https://perma.cc/5ACB-TE2U .......................... 42

Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://perma.cc/75MP-MHFS .......................... 17, 18

Mark W. Smith, *Enlightenment Thinker Cesare Beccaria and His Influence on the Founders*, 2020 PEPP. L. REV. 71 (2020) .............. 36

Dorceta E. Taylor, *Central Park as a Model for Social Control: Urban Parks, Social Class and Leisure Behavior in Nineteenth-Century America*, 31 J. OF LEISURE RSCH. 420 (1999) ................................. 48

THE BY-LAWS AND TOWN-ORDERS OF THE TOWN OF BOSTON (Boston: Edmund Freeman ed., 1786), https://perma.cc/HA9T-ST5M ........ 46

vii

# INTRODUCTION

In *New York State Rifle & Pistol Association v. Bruen*, the Supreme Court was clear: New York could not, consistent with the Second Amendment, "declare the island of Manhattan a 'sensitive place'" where firearms could be restricted, "simply because it is crowded and protected generally by the New York City Police Department." 597 U.S. 1, 31 (2022). Paying due regard to the letter, but not the spirit, of this instruction, New York proceeded to pass an omnibus firearms law that effectively declared Manhattan (and much of the rest of the state) a "sensitive place" piece-by-piece, rather than wholesale.

Then in *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024), this Court upheld—on a preliminary challenge and only specifically with respect to urban parks—the part of that piecemeal approach targeting New York's park land. In doing so, it relied on the specific justification the Supreme Court had rejected: that urban parks are often crowded. But that was error based on a faulty preliminary record. The Supreme Court got it right in *Bruen*; there is nothing in our nation's history of firearms regulation that would support banning firearms because a place is crowded. Indeed, the Supreme Court specifically rejected reliance on the

1

*Antonyuk* panel's foundational historical support—the Statute of Northampton—because the medieval statute itself "has little bearing on the Second Amendment adopted in 1791," and the understanding of the Statute that prevailed in America at the Second Amendment's ratification "was no obstacle to public carry for self-defense." *Bruen*, 597 U.S. at 41, 45.

The *Antonyuk* panel was at pains to distinguish this case from *Bruen* and revivify the Statute of Northampton as a prohibition on carrying in "crowded places," but as will be shown at length below, it only did so by relying on an alleged North Carolina law that was not a separate statute at all, but an erroneous reproduction of the Statute of Northampton, by a compiler whose work is untrustworthy, that never was the law in the United States.

That error infected the whole of the *Antonyuk* panel's decision with respect to the ban on firearms in parks. Without a Founding-era analogue to provide a unifying "principle" tying together these historical regulations, the Statute of Northampton is as irrelevant here as it was in *Bruen*. And the other sources *Antonyuk* relied upon—a trio of laws from former slave-states in the Reconstruction era, a pair of laws from the

2

western territories, and a set of municipal park rules dating to, at the earliest, the 1850s—are historical outliers of the sort on which the Supreme Court has repeatedly refused to rely. This Court should now do the same.

## JURISDICTIONAL STATEMENT

The district court had original subject-matter jurisdiction over this Second Amendment action under 28 U.S.C. §§ 1331 and 1343. This Court has appellate jurisdiction over the district court's order entering partial final judgment pursuant to Federal Rule of Civil Procedure 54(b). *See* 28 U.S.C. § 1291; *see also Petrello v. White*, 533 F.3d 110, 113 (2d Cir. 2008). The district court's judgment was entered on January 29, 2025, S.A. 4, and appellant timely filed a notice of appeal on February 14, 2025. S.A. 5.[1]

---

[1] References to "J.A." throughout this brief cite to the Joint Appendix filed in *Christian v. James*, No. 24-2847, currently pending before this Court. References to "S.A." cite to the Supplemental Appendix submitted with this brief. References to "Add." cite to the Statutory Addendum submitted with this brief.

3

## ISSUE PRESENTED

Whether New York's ban on carrying firearms in public parks is unconstitutional under the Second Amendment, either facially or as-applied.

## STATEMENT OF THE CASE

This case involves a challenge to the constitutionality of New York's ban on carrying firearms in parks. As detailed more fully below, Plaintiffs have challenged this, and other restrictions, under the Second Amendment to the United States Constitution, seeking preliminary and permanent relief. On the particular claim at issue in this appeal, the district court (Sinatra, J., W.D.N.Y.) held the request for a preliminary injunction in abeyance pending this Court's decision of the same issue in another case. Following this Court's decision denying a preliminary injunction on that issue, this case proceeded to summary judgment briefing. As relevant to the particular claim at issue in this appeal, the district court denied Plaintiffs' motion for summary judgment and granted Defendants' cross-motion in an unreported decision that is available at *Christian v. James*, No. 22-cv-695 (JLS), 2025 WL 50413

(W.D.N.Y. Jan. 8, 2025), and reproduced at S.A. 1–3. The Court subsequently entered judgment pursuant to Fed. R. Civ. P. 54(b). S.A. 4.

## I. The Parks Ban.

Immediately following the Supreme Court's decision in *Bruen*, New York enacted sweeping new restrictions on the right to carry firearms in public for self-defense. *See* McKinney's Consol. Laws of N.Y. Ann., ch. 37, 1447 (2022). Among the changes worked by the so-called Concealed Carry Improvement Act ("CCIA"), New York declared a wide variety of places "sensitive" and forbid carriage of firearms in those places, even by individuals otherwise licensed to carry in the State. This appeal specifically involves a challenge to N.Y. Penal Law § 265.01-e(2)(d), Add. 2, hereinafter the "Parks Ban," which bans carrying firearms in public parks, excluding privately held land contained within a public park or "forest preserve." N.Y. Env't Conservation Law § 9-0101(6), Add. 3 (defining "forest preserve").

## II. Procedural History

### A. Preliminary Injunction Proceedings and Summary Judgment

Plaintiffs Brett Christian and two organizations that seek to promote and defend the Second Amendment protected rights of their

5

members (including Plaintiff Christian)—Firearms Policy Coalition and Second Amendment Foundation—filed this suit shortly following the enactment of the CCIA, challenging the Parks Ban as well as the provisions of the law restricting carriage of firearms on private property open to the public (the "No-Carry Default") and on public transportation. *See* J.A. 13–43.

Plaintiffs moved for a preliminary injunction and, following expedited briefing, the district court granted Plaintiffs' motion in part, preliminarily enjoining enforcement of the No-Carry Default, and reserving ruling on the portions of the motion dealing with the Parks Ban and the public transit restrictions. *See* Decision & Order, Dist. Ct. Doc. 49 at 26–27 (W.D.N.Y. Nov. 22, 2022).

The State appealed that decision and in December 2023, this Court issued a single opinion addressing four appeals from district court injunctions implicating overlapping portions of the CCIA, including the Parks Ban. *See generally Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023). As relevant here, the Court reversed the decision of another lower court that had preliminarily enjoined the Parks Ban. *Id.* at 363–64.

6

Following the decision and remand in *Antonyuk*, the parties in this case filed cross-motions for summary judgment as to the Parks Ban and the No-Carry Default. *See* J.A. 9. The district court separately stayed litigation on Plaintiffs' challenge to the public transportation restrictions pending this Court's decision in *Frey v. Bruen*, No. 23-365 (2d Cir. argued Jan. 30, 2024). *See* Minute Entry, Dist. Ct. Doc. 72 (W.D.N.Y. Jan. 25, 2024). In October 2024, the district court entered a decision and order granting Plaintiffs' motion for summary judgment in part and permanently enjoining the No-Carry Default, while holding the portions of the parties' cross-motions for summary judgment relating to the Parks Ban in abeyance, pending further consideration of the issue by this Court. *See* Partial Summ. Judg. Order, Dist. Ct. Doc. 98 at 2 n.1, 42–43 (W.D.N.Y. Oct. 10, 2024). The State timely appealed that decision. *See Christian v. James*, No. 24-2847 (2d Cir. 2024).

## B. This Court's Revised Decision in *Antonyuk*.

While the parties in this case were proceeding to summary judgment, the plaintiffs in *Antonyuk v. James*, one of the other cases addressed in this Court's preliminary injunction decision, filed a petition for a writ of certiorari seeking Supreme Court review of that decision.

7

Following its decision in *United States v. Rahimi*, 602 U.S. 680 (2024), the Supreme Court granted that petition, vacated this Court's earlier decision, and remanded for further consideration. *See Antonyuk v. James*, 144 S. Ct. 2709 (2024) (Mem.).

In October 2024, this Court issued a revised decision in *Antonyuk*, finding that *Rahimi* did not significantly alter any of its analysis and reaching the same conclusion with respect to the Parks Ban. *See Antonyuk*, 120 F.4th at 955.[2] In *Antonyuk*, this Court held that, on a preliminary showing, the State was likely to succeed on the merits in showing that the Parks Ban was constitutional. Specifically, this Court found that the Parks Ban was consistent with the tradition of "regulating firearms in quintessentially crowded places," which was evidenced, the Court asserted, by the Statute of Northampton from 1328, and which had continued to be in force and effect in the colonies as evidenced by North Carolina, Virginia, and D.C. statutes from around the Founding. *Id.* at 1019–20 & nn.81–82. This tradition, the Court claimed, was also evidenced by later statutes, from Reconstruction in Texas, Missouri, and

---

[2] Hereinafter, all cites to "*Antonyuk*" refer to this Court's revised opinion, unless otherwise stated.

Tennessee, which banned firearms in "public forums and crowded places," and similar laws in the territories of Arizona and Oklahoma, which were particularly probative because, the Court explained, all three Reconstruction statutes had been upheld by the enacting state's supreme court. *Id.* at 1020–21.

The Court found further confirmation for its conclusions in the fact that public parks regulations from the latter half of the nineteenth century "continued the tradition of regulating firearms in historical public forums" by extending it into "these new public spaces"— referencing the fact that, on the preliminary record, the Court had been persuaded that "public parks" were essentially a novel invention of the nineteenth century and that "only 16 parks were created before 1800," while earlier public places like "commons and greens" were more properly thought of as "public grazing areas and not places of social recreation." *Id.* at 1022, 1025.

Based on these preliminary historical conclusions, *Antonyuk* found the State was likely to succeed on the merits, particularly noting that restricting firearms in modern urban parks was relevantly similar to the historical regulations that it construed to limit carrying firearms in

9

crowded places or in earlier city parks. *Id.* at 1025. The Court, however, noted it was doubtful that these same historic traditions could limit the carriage of firearms in nonurban parks that were more comparable to the historical wilderness areas and "commons" where firearms had never historically been banned. *Id.* Recognizing that this case was "in its early stages and that the State did not distinguish between rural and urban parks in its arguments to this Court or below," the Court made no decision, even preliminarily, as to whether the Parks Ban was constitutional as applied to parks outside of urban areas. *Id.*

## C. The District Court's Summary Judgment Decision.

Following the Second Circuit's decision in *Antonyuk*, the district court here granted the State's motion for summary judgment on the constitutionality of the Parks Ban and denied Plaintiffs' motion on the same issue. In its brief opinion, the district court noted that "[b]ased on the record and arguments in this case, the right to keep and bear arms enshrined in the Second Amendment would require this Court—as counseled by the Supreme Court's Second Amendment decisions—to declare the parks issue in Plaintiffs' favor." S.A. 2. However, recognizing this Court's decision in *Antonyuk* "in the preliminary injunction posture

10

and on a slightly different record," the district court held in the State's favor instead. S.A. 2–3. The court did not separately address the question of whether Plaintiffs had succeeded in showing, under *Antonyuk*, that at a minimum the Parks Ban was unconstitutional as applied to nonurban parks, stating that while "Plaintiffs here may press that distinction further on appeal .... [a]s *Antonyuk* is written … this Court is bound." S.A. 3.

The district entered judgment pursuant to Fed. R. Civ. P. 54(b) on January 29, 2025. S.A. 4. Plaintiffs timely appealed. S.A. 5.

## STANDARD OF REVIEW

This Court reviews "a district court's grant of summary judgment *de novo* where the parties filed cross-motions for summary judgment and the district court granted one motion but denied the other." *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 943 F.3d 568, 576–77 (2d Cir. 2019) (cleaned up). This Court's previous decision in a case consolidated with this one on appeal at the preliminary injunction stage are not binding now, since a preliminary injunction decision reflects merely a determination of "a likelihood of success on the merits" not "*actual* success." *Cayuga Indian*

*Nation of N.Y. v. Seneca Cnty., N.Y.*, 978 F.3d 829, 834 (2d Cir. 2020) (citation omitted).

## SUMMARY OF ARGUMENT

New York's Parks Ban infringes Plaintiffs' rights protected by the Second Amendment. Given that the Supreme Court has unequivocally stated that the "plain text" of the Amendment extends to cover carrying firearms in public, and the Parks Ban prevents carrying firearms in public parks, this case unquestionably passes *Bruen*'s threshold inquiry, and the Parks Ban is presumptively unconstitutional. The question then is one for history, and the history of firearms regulation demonstrates that the Parks Ban is neither facially constitutional nor, in the alternative, constitutional when applied to parks outside of urban areas.

As to the facial constitutionality of the law, while this Court previously held in *Antonyuk* that the State was likely to succeed in justifying the law by reference to history, its previous decision suffered from a central fatal flaw that tainted the entirety of the Court's analysis. In particular, *Antonyuk* holding that there was a historical tradition of banning firearms in crowded public spaces relied on the purported existence of a North Carolina law that, it claimed, purported to ban the

12

mere carriage of them in fairs or markets and, by extension, other crowded places. *Antonyuk* itself noted the singular nature of this law—the other similar laws it identified from the Founding only barred carrying in a terrifying manner, or with ill-intent. The problem with *Antonyuk*'s analysis is that the law in question was never enacted by the North Carolina legislature. It was, rather, simply the Statute of Northampton itself, contained in an unofficial compilation of English statutes that the compiler surmised remained in effect in North Carolina. While that conclusion was questionable, by the Founding, the Statute of Northampton (and the common law of affray it codified) generally covered only carrying with evil intent, a fact later confirmed by the North Carolina Supreme Court. The alleged North Carolina law, therefore, provides no support for New York's ban.

If the North Carolina law is removed, *Antonyuk*'s entire historical analysis is altered. Before *Antonyuk* could point to roots for its tradition at the Founding. Now not only is there no such tradition, there is a contrary tradition of *promoting* carriage of firearms in crowded spaces. From that, rest of the Court's supporting restrictions—state laws from postbellum former slave states, laws from western territories dating to

13

almost 1900, and municipal park regulations from the latter half of the 19th century—are identifiable not as continuations of Founding-era limitations on the right, but aberrations that deviated from the practices at the Founding in ways that were inconsistent with the Second Amendment. Therefore, contrary to *Antonyuk*'s preliminary assessment, the State's ban on carriage of firearms in State Parks is facially unconstitutional and without any legitimate historical support.

Even if that were not the case, the only historical tradition that *Antonyuk* identified was the aforementioned alleged tradition involving *crowded* public spaces. But as *Antonyuk* recognized, it does not make much sense to apply such a tradition to every park in New York; indeed it does not make sense to apply the tradition to most of the parks that Plaintiff Christian wishes to visit, which are more like wilderness areas than they are like Central Park. The district court, despite *Antonyuk* finding no tradition that would justify a ban in such a park, and itself finding no such tradition, nevertheless denied Plaintiffs' alternative request for narrower, as-applied relief. That decision, at least, was not justified and should be reversed.

14

# ARGUMENT

## I. The Plain Text of the Second Amendment Covers Carrying Firearms In Parks.

As the Supreme Court has explained, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government … must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. The threshold issue is, therefore, whether the conduct Plaintiffs wish to engage in falls within the "plain text" of the Second Amendment.

There can be no debate that carrying firearms in public parks is conduct within the Amendment's plain text. The Supreme Court has already defined the Second Amendment's key terms. "[T]he people" includes "all Americans"; "arms" includes "all firearms"; and, to "bear" simply means to "carry." *District of Columbia v. Heller*, 554 U.S. 570, 580–82, 584 (2008); *Bruen*, 597 U.S. at 32–33. Importantly, "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Bruen*, 597 U.S. at 32. As this Court has recognized, following *Bruen*, it is incontrovertible that the plain text covers a general "Second Amendment right to carry firearms

15

in self-defense outside the home." *Antonyuk*, 120 F.4th at 1044. Parks are, of course, public places outside the home where Plaintiffs therefore have a presumptive right to carry.

## II. The Parks Ban Cannot Be Supported By Any Historical Tradition of Firearm Regulation.

Because the Parks Ban regulates conduct within the textual scope of the Second Amendment, the burden is on New York to prove that the Ban is "consistent with this Nation's historical tradition of firearm regulation," by reference to historical restrictions on the right that are "relevantly similar" to the Parks Ban both in "how" and "why" they restricted the carrying of weapons for self-defense. *Bruen*, 597 U.S. at 29, 34. As *Rahimi* made clear, this means that this Court must determine what historical "principle[] that underpin[s] our regulatory tradition" justified valid historical regulations, without undermining the "principles underlying the Second Amendment." 602 U.S. at 692. The modern, challenged law can only stand if there is a common historical principle, based on a well-established tradition of historical regulation, that extends to cover the challenged restriction. *See id.*

16

## A. Principles Guiding Historical Analysis Under *Bruen* and *Rahimi*.

*Bruen* and *Rahimi* provide significant guidance to this Court in carrying out its historical analysis. First, evidence from the Founding era, when the Second Amendment was ratified, has controlling weight. *Bruen*, 597 U.S. at 34–35; *accord Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 438–43 (3d Cir. 2025) (holding that 1791 is the most probative period); *Worth v. Jacobson*, 108 F.4th 677, 692 (8th Cir. 2024) ("*Bruen* strongly suggests that we should prioritize Founding-era history."). *Bruen* was explicit that "not all history is created equal." 597 U.S. at 34; *see also id.* at 36 (Sources originating "75 years after the ratification of the Second Amendment . . . do not provide as much insight into its original meaning as earlier sources." (quoting *Heller*, 554 U.S. at 614)). This is because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634–35. The people adopted the Second Amendment in 1791, so the public understanding of the right around that time is crucial to understanding any limits on the scope of that right. *Bruen*, 597 U.S. at 37; *see also* Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, not 1868*, HARV. J. L. & PUB. POL'Y PER

17

CURIAM (Dec. 7, 2022), https://perma.cc/75MP-MHFS. Consequently, evidence that long pre- or post-dates 1791 is less probative, *Bruen*, 597 U.S. at 35–37; and laws from the 20th-century are categorically too late to matter, *id.* at 66 n.28.

To be sure, this Court in *Antonyuk* concluded that the understanding of the right in 1868, at the Ratification of the Fourteenth Amendment, could also serve as a "focal point[]" of analysis and is another "relevant consideration" to be weighed in determining the meaning of the Second Amendment, 120 F.4th at 972, 974. But this is true only to the extent that evidence of the 1868 understanding *confirms* evidence of the 1791 understanding. *Bruen*'s reasoning underscores that evidence from 1868 cannot overcome evidence (or the lack thereof) from 1791 as to the permissibility of a given restriction on the right. After initially rejecting "medieval English regulations," *Bruen*, 597 U.S. at 40; *accord Rahimi*, 602 U.S. at 694 (rejecting English traditions that failed to make it to "this side of the Atlantic"), *Bruen* turned to sources leading up to the ratification of the Second Amendment, including the 1689 English Bill of Rights, *see* 597 U.S. at 44–45. But the Court placed notably less weight on these English sources than it did on "the history of the

18

Colonies and early Republic," or especially "the first decade after [the Second Amendment's] adoption." *Id.* at 46, 50. And it found that the challenged law had "no historical basis" because no analogue in that relevant historical period supported it. *Id.* at 50. Later evidence was much less important. After canvassing the historical evidence from English, Colonial, Early Republic, and Reconstruction periods the Court separately discussed post-1868 sources and the late-19th century. *Id.* at 60–70. But the Court found that much of this later evidence "conflict[s] with the Nation's earlier approach to firearm regulation" and is "most unlikely to reflect 'the origins and continuing significance of the [Second] Amendment.'" *Id.* at 67 (quoting *Heller*, 554 U.S. at 614). Thus, the Court declined to rely on such laws and regulations. *See Bruen*, 597 U.S. at 66–68; *accord Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 482 (2020) (holding that "more than 30" provisions of state law enacted "in the second half of the 19th Century" could not "evince a tradition that should inform our understanding of the Free Exercise Clause" when those provisions were not grounded in Founding era practice). *Bruen* thus cautioned lower courts to "guard against giving postenactment history more weight than it can rightly bear." 597 U.S. at 35.

19

*Bruen*'s reasoning therefore strongly supports the conclusion that the Founding era is the primary benchmark against which historical evidence from later time periods must be measured, even if the Court formally left open the question whether 1791 or 1868 is the controlling date for constitutional analysis. *See id.* at 37 (noting that "19th-century evidence [has been] treated as mere confirmation of what the Court thought had already been established" (internal quotation marks omitted)); *accord Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012); *Lara*, 125 F.4th at 438–43; *Worth*, 108 F.4th at 692. Restrictions on the right to keep and bear arms adopted prior to or during the Reconstruction era may confirm earlier history but cannot alone establish the historical tradition of regulation required by *Bruen*. *See* 597 U.S. at 36 ("*Heller*'s interest in mid- to late-19th-century commentary was secondary" to the more important Founding-era evidence about the scope of the right.). Only "enduring" and "well-established" restrictions with roots in the Founding are relevant in assessing whether the challenged restrictions comport with the text's "unqualified command." *Id.* at 17, 30–31 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)); *see also Rahimi*, 602 U.S. at 692.

20

Second, *Bruen* held that forming a historical tradition requires proof of representative, relevantly similar analogues. As *Rahimi* explained, such historical laws must evidence the "principles that underpin our regulatory tradition" and conform to those that "underly[] the Second Amendment." 602 U.S. at 692. Analogues are representative, therefore, if they are broadly applicable and widely accepted. This Court noted in *Antonyuk* that it is possible that it would be inappropriate in some cases to infer from legislative silence that legislators necessarily viewed a type of regulation as inconsistent with the right to bear arms, 120 F.4th at 972. But on the other hand, a couple of state laws that are disconnected, in principle, to earlier or later enactments is not a "historical tradition" of regulation sufficient to inform the original public meaning of the right at the Founding. *Bruen*, 597 U.S. at 65 (rejecting restrictions in one state statute and two state court decisions as not representative); *id.* at 46 (doubting that "three colonial regulations could suffice to show a tradition of public-carry regulation" (emphasis omitted) and rejecting regulations applying to only 1% of the population). Put differently, laws existing in only a few jurisdictions—historical "outliers"—should be disregarded. *Id.* at 30 (internal quotation marks

21

omitted); *see also Koons v. Platkin*, 673 F. Supp. 3d 515, 621–22 (D.N.J. 2023) (finding three Reconstruction era laws non-representative); *see also id.* at 642 (finding one state law and 25 local ordinances, covering less than 10% of nation's population, insufficient).

Third, any analogues must be "relevantly similar" based on "how and why [they] burden a law-abiding citizen's right to armed self-defense." *Bruen,* 597 U.S. at 29. In other words, the modern regulation must impose a "comparable burden on the right of armed self-defense" as did the historical regulation, and for a similar reason. *Id.* The "principles" to be applied in assessing a modern statute's constitutionality come from the analysis of this relevant similarity. *Rahimi*, 602 U.S. at 692. Thus, Founding era laws arising in different contexts, and for different reasons, are inapt comparators to a modern law, since they are not motivated by the same underlying principles. *See, e.g.*, *id.* ("Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding.").

## B. There Is No Historical Justification for the Parks Ban.

*Antonyuk* held, on a limited record and in a preliminary posture, that the Parks Ban was likely to be facially constitutional. In doing so, *Antonyuk* relied on a variety of disparate regulations from across a nearly 600-year period that it claimed amounted to an enduring tradition of banning firearms from "quintessentially crowded places"—a tradition it found applicable at least to urban parks. *Antonyuk*, 120 F.4th at 1020, 1024.

### 1. *Antonyuk*'s Preliminary Historical Analysis Cannot Withstand Final Scrutiny.

The record in this case now shows that *Antonyuk*'s preliminary historical analysis arrived at a mistaken conclusion, and that there was no Founding-era tradition of banning firearms from "quintessentially crowded places." The cornerstone of *Antonyuk*'s conclusion that the Parks Ban was likely constitutional was the existence, at the Founding, of a tradition the panel described as having restricted mere carriage of firearms in "often-crowded public forums" like "fairs and markets." 120 F.4th at 1019–21. Though there were other, later laws that the Court could fit into this tradition, these Founding-era restrictions carried the most weight. As *Antonyuk* explained, "[c]ritically, the [district] court

23

failed to consider the medieval English law and Founding-era laws. This initial error tainted the rest of the district court's analysis by obscuring that the later territorial and municipal laws, far from being outliers" could be "situated within the line of English, Founding-era, and Reconstruction state statutes." *Id.* at 1023–24. In other words, though there was other evidence the Court cited to support its proposition, the thing that held it together as a unified tradition of regulation was the existence, at the Founding, of restrictions that amounted to carriage bans in public squares and similar crowded public venues.

The Court's analysis of the alleged Founding-era tradition similarly hinged on a single piece of critical evidence. The Court's analysis stretched back to the 1328 Statute of Northampton, which forbade anyone other than one of the King's servants or ministers or those assisting them to

> be so hardy to come before the King's Justices, or other of the King's Ministers doing their office with force and arms, nor bring no force in an affray of the peace, *nor to go nor ride armed by night nor by day, in fairs, markets,* nor in the presence of the King's Justices, or other ministers, nor in no part elsewhere.

2 Edw. III, ch. 3 (J.A. 251–52) (emphasis added). But the panel only went so far back because it believed that the "evidence shows that medieval

24

law survived to become our Founders' law." *Antonyuk*, 120 F.3d at 1019 (quoting *Bruen*, 597 U.S. at 35). That evidence was a set of three restrictions, from Virginia, North Carolina, and the District of Columbia. *Id.* at 1019–20 & n.81. Of those, the critical restriction for the *Antonyuk* panel was the North Carolina statute, because the Virginia law and D.C. law both deviated from the language of the Statute of Northampton by making it clear that it was only a crime to go armed in those public places in a terrifying manner, or with the intent of terrorizing the people. *See* 1786 Va. Acts 35, ch. 49, https://perma.cc/JG2J-DQDZ (prohibiting going or riding "armed by night nor by day, in fairs or markets, … *in terror of the county*" (emphasis added)); AN ACT FOR PUNISHMENT OF CRIMES AND OFFENCES, WITHIN THE DISTRICT OF COLUMBIA, § 40 (1816), https://perma.cc/88PB-Y654 (including the same "terror of the county" limitation). Very importantly for the panel, the North Carolina law omitted this language and "like the Northampton statute, appears to have prohibited firearm carriage in general at fairs and markets regardless of conduct." *Antonyuk*, 120 F.4th at 1020 n.82. Faced with a choice between the two meanings of the Northampton-style prohibition in Founding-era America, the panel chose the North Carolina option,

25

holding that "despite the Virginia law's 'in terror of the county' language, we do not interpret the national tradition of regulating firearms in quintessentially crowded places to require a conduct element," noting that this helped make sense of the later restrictions, which the Court viewed as having "evolved in the direction of the North Carolina statute, *i.e.*, the prohibition of carriage without any reference to conduct." *Id.* (discussing COLLECTION OF STATUTES OF THE PARLIAMENT IN ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA 60–61 ch. 3 (F. Martin ed. 1792) (J.A. 251–52)).

Thus, despite all of the historical sources ultimately cited by the *Antonyuk* panel, the cornerstone of the whole edifice, the only evidence from the Founding of *any* putative historical tradition of banning firearms from "quintessentially crowded places," was this single North Carolina statute. And the first of several very significant problems with that evidence was that the cited statute never was never enacted by the North Carolina—rather, it *was* the 1328 Statute of Northampton. Like a building with a disintegrating cornerstone, failing that statute, the rest of the *Antonyuk* panel's conclusions regarding the Parks Ban crumbles.

26

The *Antonyuk* panel's statement that "North Carolina … passed [a] statute[] at the Founding that replicated the medieval English law prohibiting firearms in fairs and markets" was wrong even on its own terms. The title of the source cited by *Antonyuk*—COLLECTION OF STATUTES OF PARLIAMENT IN ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA—makes clear that it is not a compilation of statutes passed by the North Carolina legislature, but rather a compilation of *English* statutes that the compiler believed were in force in the state. Indeed, the law's repeated references to the King make clear that the specific law cited was merely a copy of the 14th-century Statute of Northampton. MARTIN, COLLECTION OF STATUTES OF THE PARLIAMENT, *supra,* at 60–61 (J.A. 251–52).

Moreover, it is not even clear that this statute *was* in effect in North Carolina in 1792. Later compilers criticized this collection as "utterly unworthy" and faulty for "omitting many statutes, always in force, and inserting many others, which never were, and never could have been in force …." Stephen P. Halbrook, *Faux Histoire of the Right to Bear Arms: Young v. Hawaii* at 21, SSRN (2021), https://perma.cc/AXF3-PHTF

(quoting *Preface of the Commissioners of 1838*, *in* REVISED CODE OF NORTH CAROLINA at xiii (1855) (J.A. 255)).

Other evidence confirms that the Statute of Northampton was inserted into this collection of laws in error. The author himself conceded in the preface to his work that it was over-inclusive: "I have, perhaps, suffered a few statutes to creep in, which might have been suppressed …. [and] many, even among the most respectable, professors of the law disagree in regard to the applicability of a number of British statutes." MARTIN, A COLLECTION OF THE STATUTES OF THE PARLIAMENT, *supra*, at iii (J.A. 251–52). In fact, his methodology guaranteed that would be the case, as he included every statute from the Magna Carta to "the seventeenth year of Charles the Second" assuming every one was in force in North Carolina unless it had been subsequently repealed or it "appear[ed] so glaringly repugnant to our system of government as to warrant its suppression." *Id.* When the North Carolina General Assembly passed an act in 1749 selecting specific English statutes that should be treated as having "as full Force, Power, and Virtue, as if the same had been specially Enacted and made for this Province," it omitted the Statute of Northampton. *See* A COLLECTION OF ALL THE PUBLIC ACTS

28

OF ASSEMBLY, OF THE PROVINCE OF NORTH-CAROLINA 293 (Newbern: James Davis, 1752), https://perma.cc/AE62-RL2D; *see id.* at 295–304. The reason for that omission is readily understandable. North Carolina evidently considered the common law prohibition on "affray" to be a part of its law anyway, and it had inserted what amounted to a Statute of Northampton analogue into a 1741 "Act to appoint Constables" was explicitly limited in a similar way to the Virginia statute. It charged that constables should swear an oath to "arrest all such Persons as, in your Sight, shall ride or go armed *offensively*, or shall commit or make any Riot, *Affray, or other Breach of his Majesty's Peace*[.]" *Id.* at 131 (emphases added); *see Rahimi*, 602 U.S. at 698 (recognizing this statute as the relevant Northampton analogue statute in North Carolina). And when James Iredell—who would go on to sit on the Supreme Court—was commissioned by the North Carolina General Assembly to revise and compile all the laws that remained in force in the state following the Declaration of Independence, he did not include the Statute of Northampton, but did include the 1741 statute prescribing the constables' oath. *See* JAMES IREDELL, LAWS OF THE STATE OF NORTH-CAROLINA 70 (Edenton: Hodge & Wills, 1791) (J.A. 262).

In any event, even if the Statute of Northampton was in effect in North Carolina in 1792, that still would not help New York's case. When the North Carolina Supreme Court in 1843 was confronted with the question of whether the Statute of Northampton was the law of the state, it noted its doubts, stating that "whether this statute was or was not formerly in force in this State, it certainly has not been since the first of January, 1838," because as of that date the state had formally repealed any remaining English or British laws that remained in force. *North Carolina v. Huntly*, 25 N.C. 418, 420 (1843). But more fatally for the *Antonyuk* panel's position, even if it had been, the North Carolina court held that the statute did no more than "provide[] … special penalties and modes of proceeding for [the] more effectual suppression" of the *common law* crime of "affray." *Id*. The North Carolina court then quoted from a litany of sources describing that crime, all of which emphasized that to commit an affray, a person must not only carry arms, but carry them in a terrifying or offensive manner. *See id.* at 420–21. Thus, notwithstanding *Antonyuk's* statements to the contrary, in North Carolina, as in Virginia and D.C., "carrying of a gun *per se* constitute[d] no offence," even in crowded fairs and markets, "[f]or any lawful

30

purpose—either of business or amusement—the citizen is at perfect liberty to carry his gun. It is the wicked purpose—and the mischievous result—which essentially constitute the crime." *Id.* at 422–23.

This change entirely alters the *Antonyuk* analysis. Just as the *Antonyuk* panel claimed that the district court's contrary decision was downstream of its "error" in not linking various Reconstruction laws, territorial laws, and urban park rules to the Statute of Northampton through this non-existent North Carolina analogue, 120 F.4th at 1023–24, the *Antonyuk* panel's error in wrongly identifying this distinct North Carolina law casts the rest of the evidence from the opinion in an entirely different light. No longer are there separate North Carolina and Virginia traditions from the Founding regarding how and whether carriage itself could be restricted in public places, of which the North Carolina wound up carrying the day. *See id.* at 1020 n.82. Rather, the Founding tradition is monolithic; there is zero evidence of any state *ever* banning peaceable carry in unsecured crowded places like fairs or markets.

This interpretation is confirmed by the way that the Supreme Court has interpreted the Second Amendment's scope and the relevancy of the Statute of Northampton to it. To start with, the Supreme Court in *Bruen*

31

specifically rejected "crowding" as a basis for declaring a place "sensitive," noting that there was no "historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded." 597 U.S. at 31; *see also id.* at 58 (rejecting the argument that historically "merely carrying firearms in populous areas breached the peace *per se*" (internal quotation marks omitted)). Furthermore, with respect to the Statute of Northampton specifically, *Bruen* unequivocally held that the restriction, "has little bearing on the Second Amendment adopted in 1791," because, in significant part, it merely confirmed and echoed the common law "affray" prohibition on going armed with evil intent or to terrify others. *Id.* at 41; *see also id.* at 50–51 (quoting *Huntly*, 25 N.C. at 421–22, on this point).

In *Antonyuk*, the panel was at pains to distinguish *Bruen*'s refusal to rely on the law as coming "in a different context." 120 F.4th at 1020 n.82. This was necessitated by the fact that the panel believed that Northampton had come to mean at the Founding, at least in North Carolina, that simple bans on carriage could be justified if a place was sufficiently crowded. But failing that erroneous belief, there is no reason to treat *Bruen*'s rejection of Northampton as anything other than entirely

32

applicable to this case. Later, in *Rahimi*, the Supreme Court reaffirmed its prior assessment of the statute in similarly categorical terms, classing all the relevant Founding-era Northampton-style laws (including the correct North Carolina 1741 law referenced above as well as the *Antonyuk* panel's 1786 Virginia law) as affray laws and explaining that "[a]lthough the prototypical affray involved fighting in public, commentators understood affrays to encompass the offense of 'arm[ing]' oneself '*to the Terror of the People*.' " *Rahimi*, 602 U.S. at 697 (quoting THEODORE BARLOW, THE JUSTICE OF THE PEACE: A TREATISE 11 (1745)) (emphasis added). Those interpretations, binding on this Court and uncontradicted by *any* historical evidence, limit the Statute of Northampton's and its successors' viability as an analogue as much for a case about carry limits in discrete locations as for a case, like *Bruen*, about carry more generally. *See Wolford v. Lopez*, 116 F.4th 959, 998 n.12 (9th Cir. 2024) (declining to rely on the Statute of Northampton and its successors in a similar challenge to California and Hawaii locational restrictions because "[t]he Supreme Court has explained that those laws prohibited the carry of firearms only to the 'terror' of the people or for a 'wicked purpose'; lawful carry was permitted").

33

That is not to say that Founding-era legislation has nothing to teach us about the right to carry in crowded public places. While of course the default under the Second Amendment and *Bruen* is protection and in the absence of evidence of a restriction, Plaintiffs prevail, this is a case where "there is not just a vacuum at the founding era[,]" but rather affirmative evidence of carrying in public, even in crowded places. *Jones v. Bonta*, 34 F.4th 704, 722 (9th Cir. 2022), *reh'g granted, op. vacated in light of* Bruen, 47 F.4th 1124 (9th Cir. 2022) (Mem.). Beginning in the colonial period, and continuing through the Founding, there was a robust tradition of not restricting (and sometimes requiring) firearm carriage when people entered crowded places of public assembly. *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 CHARLESTON L. REV. 204, 232–34 & n.108 (2018); Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. FIREARMS & PUB. POL'Y 1 (2004); Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 LIBERTY UNIV. L. REV. 653, 697–99 (2014); NICHOLAS JOHNSON ET AL., FIREARMS LAW & THE SECOND AMENDMENT 183–85 (2d ed. 2017) (summarizing laws requiring carriage either at church or at places of public assembly from Virginia in 1619, 1632, and 1665; Connecticut in

34

1643 and 1644; Massachusetts Bay in 1637 and 1643; Rhode Island in 1639; Maryland in 1642; South Carolina in 1740 and 1743; and Georgia in 1770). For example, *Heller* cited a 1770 Georgia law that required men to carry firearms "to places of public worship." 554 U.S. at 601 (quotation marks omitted). At one public gathering, now remembered as the Boston Massacre, British soldiers opened fire on a crowd of colonists in 1770. In defending the soldiers at trial, John Adams conceded that, in this country, "every private person is authorized to arm himself, and on the strength of this authority, I do not deny the inhabitants had a right to arm themselves at that time, for their defence." John Adams, *Adams' Argument for the Defense: 3–4 December 1770*, NAT'L ARCHIVES FOUNDERS ONLINE, https://perma.cc/C82Q-WT7R.

The Founders well knew that requiring disarmament *because* a place is crowded or frequented by the public would not deter criminals intent on violence and instead would merely leave law-abiding citizens defenseless. Indeed, Thomas Jefferson transcribed in his commonplace book, in the original Italian, a passage by influential criminologist Cesare Beccaria explaining that "laws that forbid the carrying of arms" are based on a "[f]alse … idea of utility. … They disarm those only who are neither

inclined nor determined to commit crimes" and therefore "make things worse for the assaulted and better for the assailants[.]" Mark W. Smith, *Enlightenment Thinker Cesare Beccaria and His Influence on the Founders*, 2020 PEPP. L. REV. 71, 83 (2020) (quoting CESARE BECCARIA, AN ESSAY ON CRIMES AND PUNISHMENTS 87–88 (Henry Paolucci, tr., Bobbs-Merrill, 1963) (1764)); *see* THOMAS JEFFERSON, JEFFERSON'S LEGAL COMMONPLACE BOOK 521 (David Thomas Konig et al. eds., Princeton Univ. Press 2019).

In sum, *Antonyuk*'s preliminary conclusion that the Founders restricted firearms in "quintessentially crowded" public spaces not only lacks support, it is contrary to the Founders' actual approach of encouraging, and even *requiring* on occasion, law-abiding citizens to carry arms for protection in crowded spaces. The evidence from this most critical period of history is, therefore, fatal to the constitutionality of the Parks Ban.

### 2. *Antonyuk*'s Reconstruction-Era and Later Statutes Are Historical Outliers.

As noted above, the *Antonyuk* panel's misunderstanding of the laws in effect at the Founding "tainted the rest of [the panel's] analysis by obscuring that the later territorial and municipal laws" were, in fact the

outliers the district court had originally thought. 120 F.4th at 1023. Rather than continuing in a "long, unbroken line," through the Founding era, *id.* at 1021 (quoting *Bruen*, 597 U.S. at 35), the panel's next set of laws—three Reconstruction era laws from 1869 Tennessee, 1870 Texas, and 1883 Missouri, and two territorial laws from 1890 Oklahoma and 1889 Arizona, that putatively banned public carry at a variety of locations, *id.* at 1020–21—are significant *deviations* from the Founding-era rules that uniformly permitted law-abiding citizens to carry firearms in crowded places and, in some cases, *required* carriage in those places. These laws cannot support the Parks Ban under *Bruen*.

First, they come too late. The earliest of these laws dates to *after* the Civil War and *after* the Fourteenth Amendment's ratification, with the territorial laws in particular dating to the late 19th century, time periods that *Bruen* held "cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." 597 U.S. at 66. Second, these laws come from places that *Bruen* treated as particularly suspect and deserving of less weight in its analysis. For instance, the postbellum South is an inauspicious place to look to define the content of fundamental rights. *See id.* at 64–65 (discounting

37

unrepresentative postbellum Texas law). And *Bruen* expressly discounted restrictive territorial laws as "transitory" and "temporary." *Id.* at 67–69. Third, despite listing several places where firearms could be banned, none of these statutes restricted them in public parks. Even under the State's and *Antonyuk*'s view that parks only came into being in the 1850s and 1860s (a notion Plaintiffs refute below), they undisputedly existed at this time. Finally, even if all five of these statutes were considered, three state and two territorial laws enacted by 1900 are insufficient to establish a tradition of regulation— especially given there were 45 states in the Union at that time (Oklahoma and Arizona still not among their number).

The *Antonyuk* panel placed significant emphasis on the fact that in each of the Reconstruction-era states, the state courts "upheld this type of statute as constitutional." 120 F.4th at 1021. But that significantly overstates the support that historical caselaw provides. Of the three cases cited by *Antonyuk*, only one, *English v. Texas*, 35 Tex. 473 (1871), actually supports the panel's position, but Texas at the time had a constitutional right to bear arms that permitted broad state regulation and *Bruen* specifically called *English* an "outlier" that "provide[s] little

38

insight into how postbellum courts viewed the right to carry protected arms in public." 597 U.S. at 64–65. In *Missouri v. Shelby*, 2 S.W. 468, 469 (Mo. 1886), the court relied upon *Missouri v. Wilforth*, 74 Mo. 528 (1881), as establishing the constitutionality of the state law restricting carriage at public assemblies. *Wilforth*, in turn, construed the predecessor to that law as limited to restricting *concealed* carriage only, which it held meant that the law was consistent with the right to keep and bear arms. 74 Mo. at 531. Finally, *Andrews v. Tennessee* stated in dicta that restrictions on the carrying of firearms in places of "public assemblage[ ]" may well be constitutional, but to the extent the challenged law, which made no distinctions with regard to "time or place, or circumstances" applied to the types of arms that the court considered protected, it held the law unconstitutional. 50 Tenn. 165, 186–87 (1871).

The foregoing is enough to show that *Antonyuk* was wrong, on the preliminary record before it, to hold the Parks Ban was likely constitutional. The panel assembled just five statutes (with *Shelby* and *Andrews* casting doubt as to the utility of two of the statutes to the State) that are possible analogues for the Parks Ban because they actually restricted carry in a set of discrete public and crowded places. But five

restrictions, from such late dates and marginal locations is insufficient for the State to carry its burden here. *See Bruen*, 597 U.S. at 46 ("[W]e doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation."). They are, instead, exactly the sort of outliers that the Supreme Court has instructed courts and litigants to disregard.

### 3. *Antonyuk*'s Reliance on 19th-Century Parks Restrictions Are Similarly Unavailing.

The *Antonyuk* panel had one additional source of support for its conclusion that the Parks Ban was constitutional: municipal park regulations from the latter half of the 19th century that restricted the use or carrying of firearms in public parks. *See* 120 F.4th at 1022. That these regulations no longer have a "well-established, representative, and longstanding tradition of regulating firearms in places that serve as public forums" into which they can be slotted is reason enough to reject them as analogues for the Parks Ban. *Id.* at 1023. But there is more. The historical record discloses more clearly now than it did in *Antonyuk* that these restrictions in urban parks were conscious *deviations* from the accepted historical traditions of our country, and to the extent they have evidentiary value, it is as *negative* evidence of what sort of activities were common in parks before these late-in-time restrictions appeared.

40

To begin with, however, it must be made clear that there *were* parks before this time. The *Antonyuk* panel was not bothered by the lateness of these restrictions not only because it claimed they were consistent with a tradition reaching back to Founding-era North Carolina but also because it claimed that there simply were not public parks until the middle of the 19th century. Predecessor locations like Boston Common, the Court surmised, were not akin to parks but rather were simply "grazing areas open to all," with "little if any idea [Boston Common] would ever be a park" before the 1850s. *Id.* at 1024 (quotation marks and citations omitted).

This claim was incorrect. Commons were used for far more than grazing. Even in colonial times they were the sites of celebrations, *see* WILLIAM ROOT BLISS, SIDE GLIMPSES FROM THE COLONIAL MEETING-HOUSE 166 (1894), https://perma.cc/H7SG-RCYG (describing a party thrown for a parson's ordination "when fifers and drummers came in from all parts of the county … and played stirring music to idlers gathered around the whipping post on the Common"), open spaces intended to promote "the health and security of the Town as well as … the conveniency of the Inhabitants," David W. Gobel, *Planned Obsolescence?*

41

*The Role of the Town Common in the Making of Savannah's Urban Plan*, 22 J. PLANNING HIST. 141, 143 (2023), https://perma.cc/FYP5-2SCG, burial grounds, *id.* at 144, and sites for public executions, agricultural fairs, and even various public structures like schools, churches, pumps, wells, and watchtowers, ERIC D. LEHMAN, CONNECTICUT TOWN GREENS: HISTORY OF THE STATE'S COMMON CENTERS 121 (2015), https://perma.cc/65SY-B38L (discussing New Haven Green). They played host to parades, games like cricket and wrestling, and other "boyish sports" (like, as this author relates, the building of large snow forts and the hosting of snowball fights). MARY E. PERKINS, OLD HOUSES OF THE ANTIENT TOWN OF NORWICH, 1660–1800 at 395–402 (1895), https://perma.cc/5ACB-TE2U. In other words, these were multipurpose town centers, used in all the ways that modern parks are used, plus some more.

By the time of the Founding, Americans were well aware of—and used to—public parks existing as a communal recreational space providing citizens an opportunity to enjoy a natural environment in the midst of a city or town. To take one timely example, the National Mall, which was not realized until at least 1845, was originally included in

Thomas Jefferson's plans for the city, sketched out in 1791, as a series of "public walks." *National Mall: History*, *History of Early American Landscape Design*, NAT'L GALLERY OF ART, https://perma.cc/J23S-KVXB. When Pierre-Charles L'Enfant expanded Jefferson's plan into the initial plan for the city, he included the Mall as a European-style "wide urban avenue," intended to be a "place of general resort" and "attractive to the l[e]arned and afford diver[s]ion to the idle." *Id.* (quotation marks omitted).

Or take Boston Common, which the *Antonyuk* panel asserted had only "gained th[e] distinction" of being America's first urban public park "in retrospect." 120 F.4th at 1024. While it is true that Boston Common's long history shows a variety of uses, both practical and recreational, by "the late 18th and early 19th centuries, however, the various judicial, religious, and military roles of Boston Common were gradually overshadowed by its use as a recreational green space." *Boston Common: History*, *History of Early American Landscape Design*, NAT'L GALLERY OF ART, https://perma.cc/U4MW-KKRM. To that end, improvements were made on the ground well before the Founding, including by planting trees and designing shaded walks throughout the 18th century, and continued

after, when, for instance, the city converted Frog Pond from a natural body of water into a paved manmade basin in 1826. *Id.* Those improvements were made not to turn the Common *into* a "park," but to improve it for a use it already had. *See* FREDERICK LAW OLMSTED: LANDSCAPE ARCHITECT, 1822–1903 at 14 (Theodora Kimball & Frederick Law Olmsted, Jr. eds., 1928), https://perma.cc/6H32-URKH ("In 1728 [Boston Common's] improvement began *in recognition of its long use as a recreation ground*." (emphasis added)).

Specific examples of its use underscore that, indeed, Boston Common was treated in much the same way that modern parks are treated, or the way that the "parks movement" reformers like Frederick Law Olmsted hoped that Central Park would be treated, from even before those physical improvements were made. For instance, as far back as 1700, it was customary for young couples to walk the Common in the evenings, BLISS, *supra*, at 114, and accounts from immediately around the ratification of the Second Amendment confirm that the Common still afforded the opportunity for such activity then, as it was adjoined to "a pleasant promenade, called the Mall, … consisting of a long walk shaded by trees, about half the length of the Mall in St. James's Park [in

44

London]." HENRY WANSEY AND HIS AMERICAN JOURNAL 60 (David John Jeremy ed., 1794), https://bit.ly/4iEMxth.

None of this should be surprising. As the Supreme Court has explained, "[w]herever the title of streets and parks may rest, they have *immemorially* been held in trust for the use of the public and, *time out of mind,* have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939) (emphasis added). And indeed, we see that these pre-parks movement green spaces were used exactly that way. *See, e.g.*, RONALD FLEMING, ON COMMON GROUND 21 (1982), *available at* https://perma.cc/WHB4-4K3X (reporting that when English revivalist preacher George Whitfield visited Boston in 1740, the crowds were too great to be accommodated in meetinghouses, leading Whitfield to preach instead in Boston Common to crowds that reached 23,000 people).

Despite the Founders' long familiarity with public recreation spaces, even urban spaces like Boston Common, there is no evidence that they ever banned firearms in such places. *Antonyuk* reveals no such restrictions until the 1850s, 120 F.4th at 1022, and by banning the *firing*

45

of "any Gun or Pistol … from the Commons or Hills in any part of this Town … unless in just and legal defence of himself, some one or more of his family, or his or her goods or property," the Boston city restrictions on firearm use from the Founding strongly suggest carrying *was* permitted in Boston Common (since defensive use of firearms there was not forbidden). THE BY-LAWS AND TOWN-ORDERS OF THE TOWN OF BOSTON 50 (Boston: Edmund Freeman ed., 1786), https://perma.cc/HA9T-ST5M.

With this historical backdrop in view, as with the Reconstruction and territorial laws banning firearms in places like ballrooms, the municipal park rules on which *Antonyuk* relied take on a different meaning. Rather than being outgrowths of an existing historical tradition, these firearm restrictions now appear to be conscious departures from existing and longstanding American traditions of freely carrying arms in parks.

To the extent there was anything new and different about what Frederick Law Olmsted did in designing Central Park, it was a difference of philosophy more than anything. The parks movement he led represented a conscious attempt, as the State's own expert has explained, at "social transformation" that was "backed by a Romantic ideology." J.A.

46

363 (Expert Rep. of Terence Young). That counts against using park rules from this period as analogues to understand what the Second Amendment meant "when the people adopted" it in 1791, since they represent an attempt to break from tradition, not to continue it. *Heller*, 554 U.S. at 634–35.

Indeed, the 19th-century parks movement was not particularly shy about the ways it tried to mold and change American practices and norms, including with respect to firearm carriage. Olmsted viewed parks, especially Central Park, where firearms were restricted in the analogues relied on by *Antonyuk*, not as neutral places for Americans to recreate but "as important tools of social control," "designed to maximize desired behavior and limit or eliminate undesirable ones" and chiefly "to accommodate the interest and desires of the middle class." Dorceta E. Taylor, *Central Park as a Model for Social Control: Urban Parks, Social Class and Leisure Behavior in Nineteenth-Century America*, 31 J. LEISURE RSCH. 420, 441 (1999), https://perma.cc/GRB9-ZSHR; *see also id.* at 442 ("Olmsted also wanted the parks to be taken seriously both as works of art and as public spaces where people followed prescribed behavior."). As such, the rules of parks from this period on which

47

*Antonyuk* relied were aimed at conforming Americans' leisure activities to an idealized, European standard, making parks into places effectively designated for refined strolling and nothing else. For instance, in Chicago's city parks in 1873, park rules forbid playing ball games of any sort, going fishing, playing instruments without prior permission, posting bills, or walking on the grass outside of common areas. J.A. 429, 431; *see also, e.g.*, J.A. 413 (banning picnics or games "except by permission derived from the Board of Commissioners" in Prospect Park). That these rules were, as the State's own expert admits, required because "[t]he public did not necessarily know how to behave in their new park," highlights that these rules are perhaps most useful to the present inquiry as *negative* evidence of what sort of activities were common in parks in the period leading up to the 1860s and the parks movement. And those activities, playing ball games, walking on the grass, and playing musical instruments—are much more aligned with the ways that people use modern parks, highlighting the fact that these park rules represented a deviation—and a short lived one at that, *see* J.A. 363 (Expert Rep. of Terence Young) (noting that by 1880s the Romantic ideology-backed parks movement had given way to new fashions with respect to park

48

use)—from our national traditions with respect to parks that prevailed both before and after.

There are other good reasons to treat these municipal regulations skeptically in terms of their ability to describe the limits of constitutional protections in parks today. For instance, the 1858 Central Park regulation cited by *Antonyuk* also barred "convers[ing] with . . . those engaged in its construction." J.A. 399; *see also* J.A. 455 (Chicago, IL parks); J.A. 463 (Tower Grove Park, St. Louis, MO); J.A. 473 (Boston, MA parks). And the regulations governing Fairmount Park in Pennsylvania not only banned firearms but also "indecent language" and public gatherings or meetings for political purposes. J.A. 419. Indeed, restrictions on "indecent language" or similar speech abounded in these park rules. *See, e.g.*, J.A. 408 (Central Park); J.A. 424 (San Francisco, CA parks); J.A. 429 (Chicago, IL parks); J.A. 437 (Buffalo, NY parks); J.A. 449 (Phoenixville, PA parks); J.A. 464 (Tower Grove Park, St. Louis, MO); J.A. 469 (Danville, IL parks); J.A. 478 (Reading, PA parks); J.A. 492 (Trenton, NJ parks); J.A. 505 (Brandon Park, Williamsport, PA). Just as the Supreme Court rejected various analogues in *Bruen* that were unconstitutional for other reasons than because they infringed the

49

Second Amendment right, this Court should do the same here and ignore these rules that obviously contravene other rights. *See* 597 U.S. at 127 (rejecting reliance on regulations "designed or enforced in a [racially] discriminatory manner" (Breyer, J., dissenting)); *see also id.* at 63 n.26 (rejecting reliance on analogue because it also violated the Constitutional right to a jury trial).

Finally, the restrictions are not similar in "why" they restrict the right to carry arms in public. While the State has putatively enacted the Parks Ban as a public safety measure, the motivating concern in banning firearms in these historical regulations appears almost always to have been for the protection of wildlife or birds in the park. At least one of the State's examples was explicit about that point, J.A. 459–60 (St. Louis, MO parks) (stating that intent of restrictions was to protect "all varieties of birds except hawks, vultures and owls"), but even where it was less clearly stated, many firearms restrictions were paired with prohibitions on shooting birds, *see, e.g.*, J.A. 485 (St. Paul, MN parks) ("No person shall carry firearms or shoot birds in any Park."). That also defeats any attempt at analogy to these restrictions. *See Rahimi*, 602 U.S. at 692, 700 (emphasizing that a shared reason for restricting firearm rights, or

50

"why," is "a strong indicator" that historical and contemporary laws conform to the same historical principle).

## C. No Historical Principle Supports Applying the Parks Ban in Parks Outside of Urban Areas.

Finally, even if there were some way to preserve *Antonyuk*'s analysis in light of the foregoing—and there is not—that would still not resolve this case as fully in the State's favor as the district court did. Many of the parks where Plaintiff Christian wishes to carry his firearm at are a far cry from Central Park. J.A. 334–36. They include wooded hiking trails, wooded and open nature areas, *see* J.A. 1620–28 and even a state forest area where the State permits *hunting* while simultaneously barring Christian from carrying for self-defense. *See* J.A. 335 (discussing Harris Hill State Forest, Gerry, NY). Plainly, laws restricting firearm access in "quintessentially crowded places" have no application in these places, and Plaintiff Christian is entitled to at least partial summary judgment in his favor on that issue.

Indeed, even on its flawed view of the record, the *Antonyuk* panel "doubt[ed] that the evidence … could set forth a well-established tradition of prohibiting firearm carriage in rural parks." 120 F.4th at 1025. While the Court did not rule on that question because it was

51

procedurally not before the Court, it is now, and the record is considerably weaker for the State now, not stronger. The district court, despite finding no historical tradition that would extend beyond those identified in *Antonyuk* (indeed, it did not even find those) nevertheless denied Plaintiffs' motion for summary judgment even as to nonurban parks, apparently thinking itself foreclosed by *Antonyuk*, and noting that "Plaintiffs here may press that distinction further on appeal." S.A. 3. That was error. Because *Antonyuk* suggests there is no basis to bar carrying firearms in parks outside of urban settings, Plaintiffs are entitled to judgment at least as applied to such parks.

## CONCLUSION

For the foregoing reasons, this Court should reverse the decision below and remand with instruction to enter judgment in Plaintiffs' favor.

Dated: March 21, 2025

Respectfully submitted,

/s/David H. Thompson

Nicolas Rotsko
FLUET & ASSOCIATES, PLLC
1751 Pinnacle Drive, Suite 1000
Tysons, VA 22102
(703) 590-1234
nrotsko@fluet.law

David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com

52

*Counsel for Plaintiffs-Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B) because this brief contains 10,461 words.

Pursuant to FED. R. APP. P. 32, this brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: March 21, 2025                    /s/ David H. Thompson
                                    David H. Thompson

                                    *Attorney for Plaintiffs-Appellants*

# ADDENDUM

# TABLE OF CONTENTS

**Page**

U.S. Const. amend. II ............................................................. Add. 1

N.Y. Penal Law
    § 265.01-e (1).................................................................... Add. 2
    § 265.01-e (2)(d) ............................................................... Add. 2

N.Y. Environmental Conservation Law
    § 9-0101(6) ...................................................................... Add. 3

**United States Constitution, amend. II**

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

**New York Penal Law Section 265.01-E**

**Criminal possession of a firearm, rifle or shotgun in a sensitive location**

1. A person is guilty of criminal possession of a firearm, rifle or shotgun in a sensitive location when such person possesses a firearm, rifle or shotgun in or upon a sensitive location, and such person knows or reasonably should know such location is a sensitive location.

2. For the purposes of this section, a sensitive location shall mean:

   ...

   d. libraries, public playgrounds, public parks, and zoos, provided that for the purposes of this section a "public park" shall not include (i) any privately held land within a public park not dedicated to public use or (ii) the forest preserve as defined in subdivision six of Environmental Conservation Law § 9-0101 (Definitions);

**New York Environmental Conservation Law Section 9-0101(6)**

**Definitions**

**6.** The "forest preserve" shall include the lands owned or hereafter acquired by the state within the county of Clinton, except the towns of Altona and Dannemora, and the counties of Delaware, Essex, Franklin, Fulton, Hamilton, Herkimer, Lewis, Oneida, Saratoga, Saint Lawrence, Warren, Washington, Greene, Ulster and Sullivan, except:

    **a.** Lands within the limits of any village or city;

    **b.** Lands not wild lands and not situated within either the Adirondack park or the Catskill park acquired by the state on foreclosure of mortgages made to loan commissioners; and

    **c.** Lands acquired under the provisions of sections 9-0107 and 9-0501.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 21st day of March 2025, I filed the foregoing via the Court's ACMS appellate system, which will electronically notify all counsel requiring notice.

Dated: March 21, 2025        <u>/s/ David H. Thompson</u>
David H. Thompson

*Attorney for Plaintiffs-Appellants*