# 25-384

## United States Court of Appeals for the Second Circuit

BRETT CHRISTIAN, FIREARMS POLICY COALITION, SECOND AMENDMENT FOUNDATION,

*Plaintiffs-Appellants,*

JOHN BORON,

*Plaintiff,*

v.

STEVEN G. JAMES, MICHAEL J. KEANE, Acting District Attorney,

*Defendants-Appellees.*

On Appeal from the United States District Court for the Western District of New York

## BRIEF FOR STATE APPELLEE

BARBARA D. UNDERWOOD
 *Solicitor General*
ESTER MURDUKHAYEVA
 *Deputy Solicitor General*
SARAH COCO
 *Assistant Solicitor General*
 *of Counsel*

LETITIA JAMES
 *Attorney General*
 *State of New York*
Attorney for State Appellee
28 Liberty Street
New York, New York 10005
(212) 416-6312

Dated: May 2, 2025

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................iii

PRELIMINARY STATEMENT ......................................................... 1

ISSUE PRESENTED .................................................................... 3

STATEMENT OF THE CASE ......................................................... 3

    A.   New York's Prohibition on Firearms in Public Parks ............. 3

    B.   This Court's Rejection of a Facial Constitutional
        Challenge to the Public-Parks Provision ................................ 4

    C.   Procedural Background ............................................................ 6

STANDARD OF REVIEW ............................................................ 10

SUMMARY OF ARGUMENT ........................................................ 11

ARGUMENT ............................................................................... 12

THE PUBLIC-PARKS PROVISION IS CONSISTENT WITH THE
SECOND AMENDMENT ............................................................... 12

    A.   The Public-Parks Provision Is Supported by Ample
        Historical Precedents. ........................................................... 12

        1.   Governments have long prohibited firearms in
            public parks. ................................................................ 14

        2.   Governments have long prohibited firearms in
            crowded public forums. ............................................... 22

        3.   Governments have long prohibited firearms in
            locations frequented by children. ............................... 25

i

**Page**

B.  Plaintiffs' Challenges to the State's Historical Evidence
Are Meritless. ..................................................................... 27

C.  This Court Should Reject Plaintiffs' Challenge to the
Public-Parks Provision As Applied to Rural Parks ............... 36

CONCLUSION ....................................................................................... 42

# TABLE OF AUTHORITIES

**Cases**                                                             **Pages**

*Andrews v. State*,
   50 Tenn. 165 (1871) ....................................................................... 24-25

*Antonyuk v. Chiumento*,
   89 F.4th 271 (2d Cir. 2023) .................................................................. 4

*Antonyuk v. James*,
   120 F.4th 941 (2d Cir. 2024) ....................................................... passim

*Antonyuk v. James*,
   No. 24-795, 2025 WL 1020368 (U.S. Apr. 7, 2025) ............................. 4

*Cayuga Indian Nation of N.Y. v. Seneca Cnty.*,
   978 F.3d 829 (2d Cir. 2020) ................................................................ 13

*Connecticut Citizens Def. League, Inc. v. Lamont*,
   6 F.4th 439 (2d Cir. 2021) .................................................................. 38

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ............................................................... 11, 20, 25

*English v. State*,
   35 Tex. 473 (1871) ............................................................................. 24

*Kipke v. Moore*,
   695 F. Supp. 3d 638 (D. Md. 2023) ................................................... 14

*LaFave v. County of Fairfax*,
   No. 1:23-cv-1605, 2024 WL 3928883 (E.D. Va. Aug. 23, 2024) .......... 14

*Maryland Shall Issue, Inc. v. Montgomery Cnty.*,
   680 F. Supp. 3d 567 (D. Md. 2023) ................................................... 14

*National Rifle Ass'n v. Bondi*,
   No. 21-12314, 2025 WL 815734
   (11th Cir. Mar. 14, 2025) ....................................................... 22, 30-31

**Cases**                                                                **Pages**

*New York State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022)............................................................... passim

*Olivieri v. Stifel, Nicolaus & Co.*,
  112 F.4th 74 (2d Cir. 2024) ......................................... 11

*State v. Huntly*,
  25 N.C. 418 (1843) ...................................................... 34-35

*State v. Shelby*,
  90 Mo. 302 (1886).......................................................... 24

*Thomas v. United Steelworkers Loc. 1938*,
  743 F.3d 1134 (8th Cir. 2014) .................................... 37

*Tolbert v. Smith*,
  790 F.3d 427 (2d Cir. 2015) ........................................ 10

*Town of Chester, N.Y. v. Laroe Ests., Inc.*,
  581 U.S. 433 (2017)....................................................... 37

*United States v. Rahimi*,
  602 U.S. 680 (2024)................................................. passim

*Wolford v. Lopez*,
  116 F.4th 959 (9th Cir. 2024) .......................... 14, 21, 28-29

**Laws & Regulations**

*Federal*

Every Kid Outdoors Act, Pub. L. No. 116-9, 133 Stat 580 (2019).......... 26

*New York*

Ch. 371, 2022 McKinney's N.Y. Laws 1447 .............................................. 3

Environmental Conservation Law § 9-0101 ............................................ 4

Parks, Recreation & Hist. Preserv. Law § 3.09 ...................................... 38

| Laws & Regulations | Pages |
|---|---|

### New York

Penal Law § 265.01-e ........................................................ 1, 3-4

6 N.Y.C.R.R. § 190.0 ............................................................ 38

### England

2 Edw. 3, c. 3 (1328) ............................................................ 22

26 Hen. 8, c. 6 (1534) ........................................................... 22

## Miscellaneous Authorities

*A Collection of the All the Public Acts of Assembly, of the Province of North-Carolina* (James Davis printer, 1752) ................. 34

By-Laws of the Commissioners of the State Reservation at Niagara, *in Report of the Commissioners of the State Reservation at Niagara, for the Year 1885* (N.Y. Sen. Doc. No. 32, 1886) ................................................................. 20-21

1 Henry Potter, *Laws of the State of North Carolina* (1821) ................. 34

James Iredell, *Laws of North Carolina* (1791) ....................................... 34

1 James Kent, *Commentaries on American Law* (4th ed. 1840) ........... 33

N.Y. State DEC, *Chautauqua Unit Management Plan* (Aug. 2013), https://extapps.dec.ny.gov/docs/lands_forests_pdf/cumpf.pdf ........... 39

N.Y. State DEC, *Frequently Asked Questions and Answers on Hunting and Hunting-Related Activities in Response to Recent Changes to New York State Firearm Laws* (Sept. 1, 2022), https://extapps.dec.ny.gov/docs/wildlife_pdf/ gunlawqanda2022.pdf ................................................................. 38-39

v

**Miscellaneous Authorities**                                     **Pages**

N.Y. State Parks, Recreation & Hist. Pres., Press Release, *New York State Parks Announces Funding Available for Connect Kids to Parks Field Trip Grant Program* (Feb. 27, 2025), https://parks.ny.gov/newsroom/press-releases/ release.aspx?r=2057#:~:text=The%20Connect%20Kids%20to %20Parks%20Field%20Trip%20Grant%20Program%20build s,%24500%2C000%20from%20the%20current%20year ............... 26-27

Nat'l Gallery of Art, *Boston Common: History* (n.d.), https://perma.cc/U4MW-KKRM ......................................... 29

New York City Comptroller, *State of Play: A New Model for NYC Playgrounds* (2019), https://comptroller.nyc.gov/wp-content/uploads/documents/State_of_Play_A_New_Model_for _NYC_Playgrounds.pdf ........................................................ 26

Open Space Institute, *The Centennial Pulse of the Parks: State Park Visitor Insights & Recommendations for the Next Century* (2024), https://indd.adobe.com/view/publication/3c0f6c49-1b4b-4011-b7b3-6ec28210629b/1/publication-web-resources/pdf/OSI-CentennialPoP.pdf ............................................................. 26

## PRELIMINARY STATEMENT

In July 2022, the New York Legislature enacted the Concealed Carry Improvement Act (CCIA) to update New York's firearm licensing and possession laws following the U.S. Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). Among other changes, the CCIA enumerated several "sensitive locations" in which carrying a firearm, rifle, or shotgun is not allowed, including in "public parks." Penal Law § 265.01-e(1), (2)(d).

In this action under 42 U.S.C. § 1983, plaintiffs Brett Christian and two gun-advocacy organizations challenge the CCIA's public-parks provision as unconstitutional on its face under the Second and Fourteenth Amendments. The U.S. District Court for the Western District of New York (Sinatra, J.) granted summary judgment in favor of the State, denying plaintiffs' request for a permanent injunction barring enforcement of the provision. This Court should affirm.

As this Court recognized in *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024), the State's prohibition on carrying firearms in public parks is entirely consistent with the historical tradition of firearm regulation. The summary judgment record includes dozens of historical regulations pro-

hibiting firearms in city and town public parks, as well as rural state and national parks, which were enacted as soon as these parks came into being, beginning in the 1850s. The public-parks provision is further supported by enduring historical traditions already recognized by this Court banning firearms in similar sensitive places, such as crowded public forums and locations frequented by children.

Plaintiffs urge this Court to cast aside this mountain of historical evidence, arguing that *Antonyuk* misinterpreted a single founding-era law and that Reconstruction-era evidence should not be considered in the Second Amendment analysis. But the historical support for the public-parks provision extends far beyond a single historical law and this Court has already recognized that evidence from the Reconstruction era is a focal point in the analysis of state firearms laws.

Plaintiffs also miss the mark in asking, as alternative relief, that this Court construe their facial challenge as an as-applied challenge and enjoin the enforcement of the statute only with respect to rural parks. Plaintiffs did not bring an as-applied challenge in their complaint and the summary judgment record makes clear that plaintiffs lack standing to challenge the public-parks provision as to rural parks. Moreover, the

prohibition on firearms in rural parks is amply supported by historical precedent.

## ISSUE PRESENTED

Whether the public-parks provision, Penal Law § 265.01-e(2)(d), is consistent with the Second Amendment.

## STATEMENT OF THE CASE

### A.    New York's Prohibition on Firearms in Public Parks

In July 2022, the New York Legislature passed the Concealed Carry Improvement Act (CCIA), which made changes to New York's firearm licensing and carrying laws following the Supreme Court's ruling in *Bruen*. *See* Ch. 371, 2022 McKinney's N.Y. Laws 1447 (eff. Sept. 1, 2022). As pertinent to this appeal, the CCIA enumerated several "sensitive locations" in which carrying a firearm, rifle, or shotgun is not allowed, including in "public parks." Penal Law § 265.01-e(1), (2)(d). The statute specifically excludes from the prohibition "privately held land within a public park not dedicated to public use" and lands within the "forest pre-

serve" as defined in Environmental Conservation Law § 9-0101(6), which includes Adirondack Park and Catskill Park.[1] Penal Law § 265.01-e(2)(d).

## B. This Court's Rejection of a Facial Constitutional Challenge to the Public-Parks Provision

This Court previously found in *Antonyuk* that a facial constitutional challenge to the public-parks provision was unlikely to succeed on the merits.[2] *See* 120 F.4th at 1019. Specifically, *Antonyuk* concluded that the public-parks provision "is within the Nation's history of regulating firearms in quintessentially crowded areas and public forums." *Id*. Among

---

[1] The prohibition on carrying firearms in sensitive locations, including public parks, does not apply to law enforcement officers, military personnel, certain armed security guards, and persons lawfully hunting. Penal Law § 265.01-e(3).

[2] The *Antonyuk* decision was originally published in December 2023 and addressed four appeals from the granting of preliminary injunctions against enforcement of various provisions of the CCIA. *See Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023). After this Court largely reversed the preliminary injunction in *Antonyuk*, those plaintiffs petitioned for certiorari. In July 2024, the Supreme Court granted the petition, vacated this Court's decision as to *Antonyuk*, and remanded for further consideration in light of *United States v. Rahimi*, 602 U.S. 680 (2024). Four months later, this Court issued a revised decision reaffirming its prior conclusions and analysis. The *Antonyuk* plaintiffs filed a second petition for certiorari, which the Supreme Court denied last month. *See Antonyuk v. James*, No. 24-795, 2025 WL 1020368 (U.S. Apr. 7, 2025). This brief cites this Court's revised opinion.

other things, the Court relied on the State's evidence of an "long, unbroken line" of historical analogs in the founding era and through the Reconstruction era that prohibited weapons in crowded public forums like fairs and markets. *Id.* at 1020-21 (quotation marks omitted). The Court likewise credited examples of eight municipal ordinances banning firearms in public parks, enacted in the Reconstruction era shortly after public parks became common. *Id.* at 1022.

*Antonyuk* rejected various challenges to the quality and reliability of the State's historical evidence. For example, the Court rebuffed an argument that municipal ordinances are irrelevant in evaluating whether a historical tradition exists, recognizing that eight percent of the entire population and more than a third of the urban population were subject to restrictions on firearms in urban public parks in the 1890s based on eight municipal ordinances from seven States, including citizens in the nation's five most populous cities. *Id.* at 1023. The Court likewise rejected a claim that the use of the Boston Common in the founding era as a mustering place for militia and the absence of prohibitions on carrying firearms on other commons and greens in that era called into question the constitutionality of the public-parks provision. As the Court explained, the Boston

5

Common and similar commons and greens were in the founding era and for some time thereafter utilitarian spaces used for grazing livestock, not public parks used primarily for recreation. *See id.* at 1024-25.

Finally, because the *Antonyuk* plaintiffs had asserted a facial challenge to the public-parks provision, the Court held that it was not required to separately assess whether there was a historical tradition of banning firearms in rural public parks. *Id.* at 1025-26. Instead, it was sufficient that the public-parks provision was plainly constitutional in many of its proposed applications. *Id.*

## C. Procedural Background

Shortly after the CCIA took effect, plaintiffs Brett Christian and two gun-advocacy organizations filed suit under 42 U.S.C. § 1983 in the Western District of New York and sought a preliminary injunction against the Superintendent of the New York State Police and the district attorney of Erie County, arguing that the Second and Fourteenth Amendments prohibit the public-parks provision, as well as restrictions on possessing firearms on public transit and on private property open to the public without the consent of the owner. (*See* Joint Appendix (J.A.) 13-42.) As to the public-parks provision, plaintiffs asserted a facial challenge, seeking an

6

injunction prohibiting enforcement of the provision in all circumstances. (*See* J.A. 42.) To support standing, Christian claimed that the public-parks provision prevented him from carrying his firearm in four specific locations in Erie and Chautauqua Counties: Stiglmeier Park in the Town of Cheektowaga, the Clarence Bike Path, the Shoreline Trail, and Harris Hill State Forest. (*See* J.A. 334-335.) The district court reserved decision on the preliminary injunction motion with respect to public parks pending the outcome of the then-pending appeal in *Antonyuk*. (*See* Text Order (Dec. 21, 2022), WDNY ECF No. 60.)

Following this Court's decision in *Antonyuk*, the parties cross-moved for summary judgment as to the public-parks provision.[3] (*See* Joint

---

[3] The parties also cross-moved for summary judgment with respect to plaintiffs' challenge to the CCIA's prohibition on carrying firearms on private property without the consent of the owner, as applied to property open to the public. In October 2024, the district court issued a decision and order permanently enjoining enforcement of the private-property provision as to private property open to the public. (*See* Decision & Order (Oct. 10, 2024), WDNY ECF No. 98.) The State filed an appeal of that decision, which has been fully briefed and will be argued together with this appeal. *See Christian v. James*, No. 24-2847 (2d. Cir.). The district court separately stayed adjudication of plaintiffs' challenge to the CCIA's restriction on possession of firearms on public transit pending this Court's decision in *Frey v. Bruen*, No. 23-365 (2d Cir. argued Jan. 30, 2024). (*See* Order (Jan. 25, 2024), WDNY ECF No. 72.)

Status Report at 2-3 (Jan. 18, 2024), WDNY ECF No. 71.) In their motion,
plaintiffs claimed for the first time that in addition to their facial challenge
to the public-parks provision, they were asserting a challenge to the provi-
sion as applied to rural parks. (*See* Pls.' Mem. in Supp. of Mot. for Summ.
J. at 20, 24 (Mar. 1, 2024), WDNY ECF No. 73-1.)

In its motion, the State cited the "long, unbroken line" of historical
analogs cited in *Antonyuk*, as well as additional historical evidence,
including more than one hundred historical analogs prohibiting the carry-
ing of firearms in public parks, including city parks, parks in small towns
and semirural areas, and state and national parks located outside towns
and cities. (*See* State's Mem. of Law in Opp'n to Pls.' Mot. for Summ. J &
in Supp. of Cross-Mot. (May 31, 2024) (State MSJ Mot.), WDNY ECF No.
77-1; J.A. 397-1171, 1284-1526, 1565-1592 (historical analogs).) The State
also submitted an expert report from Dr. Terence Young, a historian of
the development of public parks in the United States. (J.A. 361-390.) Dr.
Young explained that the public parks movement was launched in United
States in the 1850s to create both urban and rural parks that would serve
as havens for peaceful contemplation of natural scenery and recreation.
(J.A. 363-364, 373, 376-377, 380, 386.) As soon as public parks existed,

many banned the carrying of firearms, which were understood as incompatible with parks' core purposes. (J.A. 374-380, 382-384, 388-389.) The State further explained that any attempt to add an as-applied challenge to the case was improper because plaintiffs had not alleged that claim in their complaint and because plaintiffs lack standing to bring such a claim. (*See* State MSJ Mot. at 7-8.)

In January 2025, the district court issued a decision and order denying plaintiffs' motion for summary judgment and granting the State's cross-motion for summary judgment, concluding that it was bound by this Court's decision in *Antonyuk* to reject plaintiffs' facial challenge to the public-parks provision and deny plaintiffs' request for a permanent injunction of that provision. (*See* Supp. Appendix (S.A.) 2-3.) With the consent of the parties, the court entered an interim judgment pursuant to Federal Rule of Civil Procedure 54(b). (*See* S.A. 4.)

## STANDARD OF REVIEW

This Court reviews the district court's order granting summary judgment de novo and may affirm on any basis that finds support in the record. *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015). Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Id.*

A facial challenge, such as the one brought by plaintiffs, "is the most difficult challenge to mount successfully," because it requires the challenger "to establish that no set of circumstances exists under which the Act would be valid." *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (quotation marks omitted). To prevail, the State "need only demonstrate that [the public-parks provision] is constitutional in some of its applications." *Id.*; *see Antonyuk*, 120 F.4th at 1026.

### SUMMARY OF ARGUMENT

This Court should affirm the district court's order denying a permanent injunction against enforcing the public-parks provision.

Contrary to plaintiffs' argument (Br. for Pls.-Appellants (Br.) at 15-16), the Supreme Court has never held that that the Second Amendment guarantees a right to carry firearms in all places open to the public. Indeed, the Supreme Court has made clear that governments have latitude to prohibit firearms in various sensitive places, including schools, courts, and government buildings. *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008); *Bruen*, 597 U.S. at 30.

As this Court has already held in *Antonyuk*, the public-parks provision is a sensitive-place restriction that is consistent with "a well-established and representative tradition of firearm regulation."[4] 120 F.4th at 1025-26. The summary judgment record in this case contains over one hundred historical analogs prohibiting firearms in city, town,

---

[4] In the district court, plaintiffs argued that historically recognized sensitive places only include locations protected by government security. Plaintiffs failed to raise this argument in their opening brief and therefore have abandoned it. *See, e.g., Olivieri v. Stifel, Nicolaus & Co.*, 112 F.4th 74, 92 n.10 (2d Cir. 2024).

state, and national parks, both urban and rural, enacted in more than twenty States. In addition, the public-parks provision is supported by long-standing historical traditions, recognized in *Antonyuk*, prohibiting firearms in crowded public forums like fairs and markets and in locations frequented by children.

This Court should also reject plaintiffs' invitation to reframe their claim as an as-applied challenge to public parks outside urban areas. Plaintiffs never pleaded any such challenge, and they lack standing to pursue it. In any event, there is a longstanding tradition of prohibiting firearms in rural parks, including in state and national parks.

## ARGUMENT

### THE PUBLIC-PARKS PROVISION IS CONSISTENT WITH THE SECOND AMENDMENT

### A. The Public-Parks Provision Is Supported by Ample Historical Precedents.

In determining whether a modern law is consistent with historical tradition, courts evaluate whether the historical precedents supporting the modern law are "relevantly similar"; that is, whether they burden an individual's Second Amendment rights for comparable reasons and in comparable respects. *See Bruen*, 597 U.S. at 28-29 (quotation marks

12

omitted). A contemporary law may be "analogous enough to pass constitutional muster" even where it "does not precisely match its historical precursors"; in other words, the government need not identify a "dead ringer" or "historical twin" to support a modern firearm regulation, so long as the law "comport[s] with the principles underlying the Second Amendment." *Rahimi*, 602 U.S. at 692; *see Bruen*, 597 U.S. at 30.

*Antonyuk* has already determined that the public-parks provision is consistent with historical tradition, *see* 120 F.4th at 1019, and this Court should follow that holding. While conclusions of law made in a preliminary injunction decision are not binding as "law of the case" on subsequent decisions in the same action, *see Cayuga Indian Nation of N.Y. v. Seneca Cnty.*, 978 F.3d 829, 834 (2d Cir. 2020), plaintiffs have cited no authority for the proposition that the conclusions reached in a prior published panel opinion may be disregarded by a subsequent panel— in the same case or a separate case—absent an adequate reason, such as a relevant change in the record or applicable law, *contra* Br. 11.

In addition, *Antonyuk* is correctly decided. The historical record shows that States and municipalities have prohibited the carrying of firearms in public parks since public parks came into existence. Accordingly,

13

federal courts across the country have rejected constitutional challenges to prohibitions on firearms in public parks. *See, e.g., Wolford v. Lopez*, 116 F.4th 959, 983 (9th Cir. 2024); *Kipke v. Moore*, 695 F. Supp. 3d 638, 654-55 (D. Md. 2023); *Maryland Shall Issue, Inc. v. Montgomery Cnty.*, 680 F. Supp. 3d 567, 585 (D. Md. 2023); *LaFave v. County of Fairfax*, No. 1:23-cv-1605, 2024 WL 3928883, at *4 (E.D. Va. Aug. 23, 2024). Moreover, the public-parks provision is supported by the historical traditions recognized in *Antonyuk*, prohibiting firearms "in quintessentially crowded places and public forums," 120 F.4th at 1019, and in areas frequented by children, *id.* at 1026.

## 1. Governments have long prohibited firearms in public parks.

The record in this case contains more than one hundred examples of historical regulations prohibiting the carrying of firearms in public parks. (*See generally* J.A. 397-1171.) The regulations in the record represent state and local laws from more than twenty States, and prohibitions that apply in city and town parks, as well as in large state and national parks outside urban areas. The record also contains a declaration from Dr. Terence Young, the State's expert on the history of public parks in

America. (J.A. 361-390.) Collectively, the record amply supports the constitutionality of prohibitions on firearms in public parks.

As Dr. Young explained, prior to the mid-nineteenth century, publicly owned commons or greens were used primarily for utilitarian rather than contemplative and recreational purposes. (J.A. 363-368.) In early America, for instance, these spaces served as sites for meeting-houses, workhouses, "pest houses" for the treatment of smallpox victims, cemeteries, military drills, and common grazing land for livestock. (J.A. 364-366.) In the 1850s, however, governments began to create public parks specifically to be places of recreation and peaceful contemplation. (J.A. 370, 373, 376-377.)

Firearms were expressly prohibited in public parks from the beginning of the creation of such institutions. For example, as soon as the plan for Central Park in New York City was approved in 1858, the Board of Commissioners adopted regulations, to be posted where they would be seen by all visitors, stating that it was "forbidden. . . [t]o carry fire-arms" in the park. (J.A. 399; *see* J.A. 374.) Prospect Park in Brooklyn adopted the same rule upon opening in 1867. (*See* J.A. 375, 413.) In 1868, Pennsyl-vania's legislature prohibited the carrying of firearms in Philadelphia's

new Fairmount Park. (J.A. 418.) Chicago, San Francisco, Buffalo, St. Louis, and Boston followed suit. (J.A. 424 (S.F., Cal., 1872), 429 (Chi., Ill., 1866), 436 (Buffalo, N.Y., 1874), 463 (St. Louis, Mo., 1883), 472 (Bos., Mass. 1886).[5]) Cities and towns in more than twenty States quickly enacted similar ordinances, including at least six additional jurisdictions in the 1870s and 1880s,[6] twenty in the 1890s,[7] and dozens more in the early twentieth century.[8]

---

[5] In some instances, the record on appeal contains multiple versions of the same law. For ease of reference, this brief cites only one example.

Litigants in other cases have identified similar examples in additional jurisdictions not contained in the record here. *See* Addendum of Defs.-Appellants, *LaFave v. County of Fairfax*, No. 24-1886 (4th Cir. Dec. 16, 2024), ECF No. 30-2 (identifying more than thirty additional examples).

[6] (J.A. 443 (Hyde Park, Ill., 1875), 449 (Phoenixville, Pa., 1878), 468 (Danville, Ill., 1883), 479 (Reading, Pa., 1887), 485 (St. Paul, Minn., 1888), 490 (Salt Lake City, Utah, 1888).)

[7] (J.A. 493 (Trenton, N.J., 1890), 498 (Berlin, Wis., 1890), 506 (Williamsport, Pa., 1890), 510 (Grand Rapids, Mich., 1891), 516 (Milwaukee, Wis., 1891), 521 (Springfield, Mass., 1891), 525 (Cincinnati, Ohio, 1892), 530 (Lynn, Mass., 1891), 534 (Peoria, Ill., 1892), 540 (Spokane, Wash., 1892), 544 (Pittsburgh, Pa., 1893), 552 (Wilmington, Del., 1893), 562 (Canton, Ill., 1894), 575 (Centralia, Ill., 1896), 579 (Indianapolis, Ind., 1896), 586 (Rochester, N.Y., 1896), 596 (Kansas City, Mo., 1898), 601 (New Haven, Conn., 1898), 605 (Boulder, Colo., 1898); *see also* J.A. 567, 569 (1895 Michigan statute prohibiting the carrying of firearms in Detroit parks).)

[8] (J.A. 611 (Hartford, Conn., 1902), 616 (New Bedford, Mass., 1902), 622 (Springfield, Ill., 1902), 628 (Lowell, Mass. 1903), 633 (N.Y.C., N.Y.,

(*continued on the next page*)

Many of these ordinances were enacted as part of a municipal code. (*See, e.g.*, J.A. 540 (Spokane, Wash., 1892); 544 (Pittsburgh, Pa., 1893).) Others were created by local park commissions, pursuant to authority delegated by a state or local government. (*See, e.g.*, J.A. 436 (Buffalo, N.Y. ordinance created pursuant to authority delegated by state statute); J.A. 442-443 (same as to 1875 Hyde Park, Ill. ordinance).) And other similar prohibitions were expressly enacted by state legislatures, directly banning the carrying of firearms in parks in certain towns or cities. (*See, e.g.*, J.A. 416, 418 (1868 Pennsylvania statute prohibiting the carrying of firearms in Philadelphia parks); J.A. 567, 569 (1895 Michigan statute prohibiting the carrying of firearms in Detroit parks).)

These provisions were enacted for the same purposes as the public-parks provision: to protect public safety and order and to ensure that

---

1903), 637 (Pasadena, Cal. 1903), 643 (Troy, N.Y., 1903), 649 (Hous., Tex., 1904), 655 (Neligh, Neb., 1904), 663 (Pueblo, Colo., 1904), 671 (Harrisburg, Pa., 1905), 676 (Haverhill, Mass., 1905), 682 (Saginaw, Mich., 1905), 694 (Denver, Colo., 1906), 702 (L.A., Cal., 1906), 708 (Portland, Or., 1907), 713 (Oil City, Pa., 1907), 719 (Olean, N.Y., 1907), 728 (Seattle, Wash., 1907), 747 (Memphis, Tenn., 1909), 754 (Oakland, Cal., 1909), 762 (Paducah, Ky., 1909), 768 (Jacksonville, Ill., 1910), 773 (Staunton, Va., 1910), 778 (Colorado Springs, Colo., 1911), 819 (Birmingham, Ala., 1917), 825 (Joplin, Mo., 1917), 840 (Burlington, Vt., 1921), 845 (Chattanooga, Tenn., 1922).)

public parks remain peaceable spaces for contemplation of nature and recreation. *See Antonyuk*, 120 F.4th at 1022, 1024. For example, Pennsylvania's 1868 law granted Fairmount Park's commissioners authority to make rules to "maintain [the park] in good order" and "repress all disorders therein." (J.A. 418.) Similarly, Hyde Park's 1875 rule was created by the park commission pursuant to power granted by the Illinois state legislature to "govern, manage and direct" public parks and "to appoint . . . a police force, as may be necessary" to enforce such rules. (*See* J.A. 443.) Phoenixville, Pennsylvania's 1878 ordinance was enacted with an "appeal to all peaceable, law-abiding citizens" to "diligently co-operate in the enforcement of all lawful measures for the care and preservation" of the park. (J.A. 450.)

Many provisions prohibiting the carrying of firearms appeared alongside other rules intended to protect public order and safety. For example, Centralia, Illinois's 1896 provision made it unlawful to "lounge or loiter in said park after eleven o'clock of any night." (J.A. 575.) Michigan's 1895 provision prohibits "throw[ing] stones or other missiles" and "set[ting] off any rocket, cracker, torpedo, squib or other fireworks" in the park (J.A. 569), and many other ordinances similarly banned fireworks

18

or throwing stones (*see, e.g.*, J.A. 596, 611, 616, 622, 628, 637, 1092). Others prohibited the use of "threatening" and "abusive" language within the park. (*See* J.A. 611, 617, 628; *see also* J.A. 1092.)

Around the same time that public parks in towns and cities proliferated, a movement started to establish larger national and state parks outside urban areas. (*See* J.A. 380-383.) As soon as these parks were created, similar regulations were promulgated banning firearms in those parks. For example, firearms were banned at Mackinac National Park as early as 1882. (J.A. 870.) In 1890, Sequoia National Park prohibited the carrying of firearms without written permission from the park superintendent or the Secretary of the Interior (J.A. 865), followed by Yellowstone National Park in 1894 (J.A. 857) and Yosemite National Park by 1897 (J.A. 875). These bans were enforced against tourists and other visitors. For example, an 1897 Department of the Interior report explains that "[a]ll the firearms are taken from their owners" at Yosemite's principal entrances by a U.S. Army unit designated to guard the park, and that "patrols take all the firearms found in possession of tourists and campers who have entered the park by unguarded routes." (J.A. 875.) An 1897 report on Yellowstone detailed that "[o]ver 200 stand of arms have

19

been taken from persons entering the park." (J.A. 885.) As Congress created new national parks at the turn of the twentieth century, similar bans proliferated. (*See, e.g.*, J.A. 911-912 (1902 Crater Lake National Park regulation); J.A. 916 (1903 Mount Rainier National Park regulation).) In 1936, the National Park Service adopted a rule prohibiting the carrying of firearms in all national parks. (J.A. 949.) The tradition of banning firearms in national parks is particularly relevant because national parks are federal land where the Second Amendment has always been understood to apply. *Cf. Heller*, 554 U.S. at 625.

State parks followed a similar trajectory, beginning to appear in the late nineteenth and early twentieth centuries and quickly banning firearms as inconsistent with their purposes as places of recreation and enjoyment of natural scenery. (*See* J.A. 386-388.) New York's Niagara Falls State Reservation, which opened in 1885, was one of the earliest state parks. Immediately upon opening, the park's commissioners, with authority delegated by the state legislature, made it unlawful to "fire or discharge any gun, pistol or other firearm" in the park. By-Laws of the Commissioners of the State Reservation at Niagara 26, 28, *in Report of the Commissioners of the State Reservation at Niagara, for the Year 1885*

20

(N.Y. Sen. Doc. No. 32, 1886). Subsequently, firearms were banned entirely in the park. (J.A. 1092.) Other state and county parks in New York, including Taconic State Park (J.A. 1122), Palisades State Park (J.A. 1129), Westchester County parks (J.A. 1140), and Long Island State Parks (J.A. 1150) likewise banned firearms. State parks elsewhere in the country enacted similar rules. For example, Minnesota banned firearms in state parks in 1901. (J.A. 1004.) By 1936, state parks in at least fourteen States and Washington, D.C. had followed suit.[9]

Critically, these dozens of national, state, or local prohibitions, "were apparently accepted without any constitutional objection by anyone." *See Antonyuk*, 120 F.4th at 1022; *see also Wolford*, 116 F.4th at 983. Indeed, there is no evidence that a single one of the prohibitions identified by the State was ever challenged, much less found unconstitutional by a court. As Justice Kavanaugh recently explained, it is highly unlikely that purportedly "unconstitutional acts" would have been "allowed to be so

---

[9] (*See* J.A. 965 (Conn., 1918), 975 (Ind., 1927), 980 (Kan., 1930), 986 (Md., 1917), 1000 (Mich., 1927), 1014 (N.J., 1935), 1020 (N.C., 1921), 1034 (S.D., 1927), 1039 (firearms prohibited in Washington state parks by 1926), 1049 (Wis., 1933), 1052 (Wash., D.C., 1907).) A 1936 digest recognized regulations in five additional States. (*See* J.A. 1058 (Va.), 1066 (Ala.), 1077 (Cal.), 1085 (Fla.), 1170 (R.I.).)

often repeated as to crystallize into a regular practice." *Rahimi*, 602 U.S. at 724 (Kavanaugh, J., concurring) (quotation marks omitted); *see also National Rifle Ass'n v. Bondi*, No. 21-12314, 2025 WL 815734, at *18 (11th Cir. Mar. 14, 2025) (Rosenbaum, J., concurring) ("[R]egular or longstanding practices can imply constitutionality.").

## 2. Governments have long prohibited firearms in crowded public forums.

As *Antonyuk* recognized, the public-parks provision is also consistent with a broader tradition of prohibiting firearms "in public forums and quintessentially crowded places." 120 F.4th at 1019. The Statute of Northampton of 1328, 2 Edw. 3, c. 3 (1328), provided that Englishmen were generally not permitted to bring "force in affray of the peace, nor to go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers . . . upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure." Two centuries later, the prohibition was extended to Wales, making it unlawful to bring dangerous weapons before any "church, fair, market, or other congregation." 26 Hen. 8, c. 6, § 4 (1534).

As *Antonyuk* recognized, that tradition continued in America. *See* 120 F.4th at 1020. In the Founding era, Virginia and North Carolina had provisions mirroring the Statute of Northampton, prohibiting arms in crowded public forums like "fairs" and "markets."[10] *Id.* at 1019-20 (discussing 1786 Virginia law, 1792 North Carolina law). By the second half of the nineteenth century, at least seven States and territories had adopted similar prohibitions. (*See* J.A. 1284 (Okla., 1890), 1567-1568 (Tenn., 1869), 1571 (Tex., 1870), 1575 (Ga., 1870), 1579 (Mo., 1883), 1583 (Idaho, 1889), 1587 (Ariz., 1889).)

Texas made it unlawful to carry "fire-arms, whether known as a six shooter, gun or pistol of any kind" in any "place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen." (J.A. 1571.) Arizona and Oklahoma enacted nearly identical laws. (J.A. 1283-1284 (Okla.), 1587 (Ariz.).) Tennessee, Georgia, Missouri, and Idaho went further, prohibiting the carrying of weapons in any public assembly. (J.A. 1567-1568 (Tenn.), 1575 (Ga.), 1579 (Mo.), 1583 (Idaho).)

---

[10] The *Antonyuk* panel identified a similar provision in the District of Columbia. 120 F.4th at 1020 n.81.

Moreover, state courts repeatedly affirmed the constitutionality of these laws. *See Antonyuk*, 120 F.4th at 1021. *English v. State* upheld an amendment to Texas's 1870 statute and observed "it appears to us little short of ridiculous, that any one should claim the right to carry upon his person" a pistol "into a peaceable public assembly, as, for instance into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together." 35 Tex. 473, 478-79 (1871). Similarly, *State v. Shelby* recognized the "mischief to be apprehended . . . from one who goes into an assemblage of persons" with a firearm. 90 Mo. 302, 305 (1886).[11] *Andrews v. State* considered a challenge to a separate Tennessee law banning public carry entirely. 50 Tenn. 165, 171 (1871). The court held that while the law might be unconstitutional in *some* circumstances, a law prohibiting the carrying of firearms in public gatherings would not be subject to the same objection: "the private right to keep and use" arms "is limited by the duties and proprieties of social life" and

---

[11] Plaintiffs argue that Missouri's law applied only to concealed carry (Br. 39), but *Shelby* explicitly recognized that "concealment is made no part" of the prohibition on entering a social gathering with a firearm. *See* 90 Mo. at 305.

therefore "a man may well be prohibited from carrying his arms to . . . [a] public assemblage." *Id.* at 181-82.

As this Court recognized, these historical analogs make "a robust showing of a well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places, enduring from medieval England to Reconstruction America and beyond." *Antonyuk*, 120 F.4th at 1019. The public-parks provision fits squarely within that tradition. *See id.*

### 3. Governments have long prohibited firearms in locations frequented by children.

*Antonyuk* also recognized a historical tradition of prohibiting firearms in schools and other locations frequented by children. 120 F.4th at 1026. As the Supreme Court recognized in *Heller*, the Second Amendment should not be interpreted in a way that "cast[s] doubt" on "long-standing" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." 554 U.S. at 626. *Bruen* reiterated *Heller*'s description of schools as "sensitive places." *See* 597 U.S. at 30; *see also id.* at 81 (Kavanaugh, J., concurring). Indeed, the tradition of

25

prohibiting firearms "in spaces frequented by children is . . . well-established and representative." *Antonyuk*, 120 F.4th at 1026.

It is beyond dispute that children are frequent visitors of public parks. In New York City, public parks contain more than one thousand playgrounds, which are used primarily by children. *See* New York City Comptroller, *State of Play: A New Model for NYC Playgrounds* 4 (2019).[12] The same is true of parks in towns and cities across New York, including parks that plaintiff seeks to visit while armed. (*See* J.A. 1191 (six playgrounds at Stiglmeier Park).)

Likewise, children are frequent visitors to state parks. In a recent survey of New York state park visitors, twenty-five percent of respondents were visiting with children. *See* Open Space Institute, *The Centennial Pulse of the Parks: State Park Visitor Insights & Recommendations for the Next Century* 14 (2024). Indeed, New York encourages visits by children through state funding.[13] *See* N.Y. State Parks, Recreation & Hist.

---

[12] For sources available online, all URLs appear in the Table of Authorities. All websites were last visited on May 2, 2025.

[13] The federal government has similar programs encouraging children to visit national parks. *See* Every Kid Outdoors Act, Pub. L. No. 116-9, § 9001, 133 Stat 580 (2019) (federal law providing free access to national parks for all fourth graders).

Pres., Press Release, *New York State Parks Announces Funding Available for Connect Kids to Parks Field Trip Grant Program* (Feb. 27, 2025).

## B. Plaintiffs' Challenges to the State's Historical Evidence Are Meritless.

Plaintiffs do not address in detail the bulk of the State's historical evidence, including the dozens of historical twins for the public-parks provision from more than twenty States. In fact, plaintiffs fail to consider nearly all of the additional historical evidence adduced by the State at summary judgment, focusing primarily on attacking this Court's conclusions in *Antonyuk*. *See, e.g.*, Br. 23. As to those conclusions, plaintiffs' objections are without merit.

*First*, plaintiffs miss the mark in urging the Court to reject prohibitions on carrying firearms in public parks (Br. 40-51), on the grounds that these regulations are historical outliers. As an initial matter, plaintiffs focus primarily on the eight regulations addressed in *Antonyuk*, failing to recognize that the State has since adduced evidence of more than one hundred regulations from more than twenty States at summary judgment, including both municipal ordinances and laws passed by state

legislatures, which proliferated over a period of many years without challenge. See *supra* at 21-22.

Plaintiffs contend that these dozens of prohibitions came too late because they were enacted beginning in the second half of the eighteenth century. As an initial matter, this Court has already rejected that argument, holding that "the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points" in the analysis of state laws like the public-parks provision. *Antonyuk*, 120 F.4th at 972. Moreover, plaintiffs' argument ignores that these prohibitions were created as soon as public parks came into being in the 1850s. (*See* J.A. 363.) Many prohibitions were promulgated contemporaneously with the opening of the first public parks in a jurisdiction. (*See, e.g.*, J.A. 399 (1858 ordinance prohibiting carrying firearms in Central Park); 418 (1868 law prohibition carrying firearms in Philadelphia's Fairmount Park).)

Plaintiffs attempt to avoid this conclusion by incorrectly asserting (Br. 41-45) that public parks first appeared in the founding era, but that claim is wholly without historical support in the record. To the contrary, "[t]he modern idea of the park emerged in the nineteenth century." *Antonyuk*, 120 F.4th at 1024 (quotation marks omitted); *see Wolford*, 116

28

F.4th at 982. As the State's historical expert explained, founding era commons and greens were used primarily as grazing spaces for livestock and other utilitarian purposes. (*See* J.A. 363-368.) Plaintiffs did not rebut this expert testimony below, and instead belatedly attempt to support their contrary contention on appeal with a handful of citations to journal articles and websites. *See* Br. 41-46. However, these sources similarly acknowledge that founding-era commons were used for "whipping post[s]," "public executions," "agricultural fairs," and "churches . . . and watchtowers" (Br. 41-42), purposes incompatible with the historical development of public parks in the 1850s as places for contemplation of natural scenery and peaceful recreation. As Dr. Young explained, any occasional leisure use of commons and greens in earlier eras was incidental to their primary utilitarian uses. (*See* J.A. 364-368.)

For the same reason, plaintiffs' reliance on evidence regarding the founding-era uses of the Boston Common is misplaced. As the sources plaintiffs cite recognize, "cattle and sheep continued to roam the Common . . . until the 1830s" and executions are believed to have continued on the Common until at least 1812. Nat'l Gallery of Art, *Boston Common: History* (n.d.). The Boston Common, as it existed in the founding era, like other

commons and greens of the era, was primarily used for utilitarian purposes and was not analogous to modern parks. It was not until 1859 that the Common was identified as a public park and designated as a place primarily used for recreation. *See Antonyuk*, 120 F.4th at 1024.

The State was not required to provide evidence of prohibitions on carrying firearms on founding-era commons and greens because these spaces were not analogous to today's parks, and founding era legislatures would have had no reason to preserve and protect them for peaceable contemplation and recreation, as later state and local governments did. "[I]t is not necessarily the case that, if no positive legislation from a particular time . . . is in the record, it must be because the legislators then or there deemed such a regulation inconsistent with the right to bear arms." *Antonyuk*, 120 F.4th at 969; *see Rahimi*, 602 U.S. at 739-40 (Barrett, J., concurring); *Bondi*, 2025 WL 815734, at *18, 20 (Rosenbaum, J., concurring). To the contrary, regulations may be enacted at a particular point in history to confront "unprecedented societal concerns," *Bruen*, 597 U.S. at 27, like the rapid proliferation of public parks in the 1850s and the need to preserve those parks as peaceable spaces. *See Bondi*, 2025

WL 815734, at *20 (Rosenbaum, J., concurring) (applying the same logic to prohibitions on minors owning firearms).

Plaintiffs are also incorrect in contending (Br. 50) that the dozens of historical prohibitions on carrying firearms in public parks were not enacted to keep public parks "peaceable" and to maintain public order, as the public-parks provision was. *See Antonyuk*, 120 F.4th at 1022; see *supra* at 17-19. Plaintiffs argues that these prohibitions were simply intended to prevent hunting, but many of the dozens of historical regulations identified by the State made no reference whatsoever to hunting. (*See, e.g.*, J.A. 506, 516, 530, 534, 540, 562, 569, 605, 1092.) Boulder's 1899 ordinance, for instance, is titled "No firearms or shooting in" and made it unlawful to "take or carry or cause to be taken or carried into any of the parks . . . any gun, pistol, revolver, or other firearm." (J.A. 605.) Similarly, the prohibition on carrying firearms in Niagara state park prohibited "the possession of any firearms" in the park without reference to hunting. (J.A. 1092.) These prohibitions were enacted, not to prevent hunting, but to protect public safety and public order, and to preserve public parks as places of peaceful contemplation and recreation. Consistent with that conclusion, many of these ordinances also prohibited other behavior that

might be deemed a threat to public order and peaceable use of the park, like setting off fireworks and using threatening and abusive language. See *supra* at 18-19. Moreover, even when bans on firearms in public parks *were* enacted alongside provisions prohibiting hunting, that does not mean that those provisions were not enacted to protect public order and safety. Cities like St. Paul (*see* Br. 50 (citing J.A. 485)) might have reasonably concluded that hunting in a crowded park would endanger, frighten, and disturb people utilizing the park.

*Second*, plaintiffs are mistaken in arguing that *Antonyuk* erred in recognizing a tradition of banning firearms in fairs, markets, and other public forums on the grounds that the Court purportedly misinterpreted a single historical example—North Carolina's founding era provision mirroring the Statute of Northampton. *See* Br. 23-36. Plaintiffs' arguments respecting the North Carolina law are wholly unpersuasive, for the reasons discussed below. More fundamentally, *Antonyuk*'s analysis did not turn on a single law. Instead, the Court recognized "a well-established, representative, and longstanding tradition" of banning firearms in public parks supported by numerous pieces of historical evidence. 120 F.4th at 1023.

32

As to the North Carolina provision, plaintiffs contend that there was no evidence that the colonial legislature separately enacted a prohibition on firearms in fairs and markets; instead, North Carolina merely observed such a prohibition based on adherence to the English Statute of Northampton. Br. 26-27. Such an argument is no bar to considering North Carolina's practice as historical evidence. In the founding era, many States continued to observe English laws. *See* 1 James Kent, *Commentaries on American Law* 472 (4th ed. 1840) ("It is also the established doctrine, that English statutes, passed before the emigration of our ancestors, and applicable to our situation, and in amendment of the law, constitute a part of the common law of this country."). Where "medieval law survived to become our Founders' law," *Antonyuk*, 120 F.4th at 1019 (quoting *Bruen*, 597 U.S. at 35), it sheds light on the scope of the Second Amendment at the time it was adopted.

Plaintiffs also argue that this Court should ignore historical evidence that this statute was observed in North Carolina because the 1792 compilation in which the statute appeared was later criticized as being both under- and overinclusive. Br. 27-28. But the same statute appeared again in another compilation of English statutes in force in

North Carolina law, published in 1821 by order of the state legislature and compiled by a federal judge, indicating that its inclusion in the first compilation was no error. *See* 1 Henry Potter, *Laws of the State of North Carolina* 87 (1821) (listing among English statutes in force "2 Edward 3, 1328, Chap. 3," i.e. the Statute of Northampton).

Plaintiffs point to another compilation published in 1791 that did not include the Statute of Northampton (Br. 29), but that collection includes only statutes passed by the North Carolina legislature (alongside other legal documents) and does not purport to include English statutes in effect in North Carolina at all. *See* James Iredell, *Laws of North Carolina* (1791) (table of contents). Similarly, plaintiffs point to a 1749 act of the North Carolina Assembly enumerating certain English statutes in force in the State, which did not name the Statute of Northampton. Br. 28-29. But the 1749 Act recognized that the enumerated list was not meant to be exhaustive and that many additional English laws remained in effect in the state. *See A Collection of the All the Public Acts of Assembly, of the Province of North-Carolina* 301-02 (James Davis printer, 1752).

Plaintiffs' reliance on *State v. Huntly*, 25 N.C. 418 (1843), is similarly unavailing. As an initial matter, plaintiffs contend that *Huntly* casts

34

doubt on the conclusion that the Statute of Northampton was in effect in North Carolina prior to 1838, but they erroneously quote a portion of the decision describing the defendant's argument, which the *Huntly* court rejected. *See* Br. 30 (quoting *Huntly*, 25 N.C. at 420). In any event, *Huntly* dealt with a conviction for carrying a firearm "upon the public highway, and upon the premises of" a private individual while threatening that individual, 25 N.C. at 419. *Huntly* was therefore focused on the statute's prohibition on bringing "force in affray of the peace" and had no occasion to consider the separate prohibition on carrying arms "in fairs, markets" and other public forums deemed a sensitive place.

Plaintiffs also miss the mark in arguing (Br. 31-33) that *Bruen* rejected reliance on the Statute of Northampton and its founding-era equivalents. *Bruen* simply concluded that the Statute of Northampton was not sufficient historical support for New York's licensing scheme, 597 U.S. at 45-46, but that was "in a different context" and the Supreme Court had no occasion to consider "the more specific prohibitions in the statute such as carriage in fairs and markets," *Antonyuk*, 120 F.4th at 1020 n.82; *see also Rahimi*, 602 U.S. at 609-700 (recognizing that it was appropriate to rely on the same surety laws rejected as historical analogs in *Bruen*).

35

Finally, plaintiffs argue that this Court should reject as too late evidence of the same tradition from seven historical analogs enacted close in time to the ratification of the Fourteenth Amendment. Br. 36-40. But this Court has recognized that such evidence should be a focal point of the analysis when it comes to state laws. *See Antonyuk*, 120 F.4th at 972. Similarly, plaintiffs contend that these analogs do not provide sufficient evidence of a tradition, but this Court has recognized that comparable historical regulations from just three States can be sufficient to establish a historical tradition.[14] *See Antonyuk*, 120 F.4th at 1010.

## C. This Court Should Reject Plaintiffs' Challenge to the Public-Parks Provision As Applied to Rural Parks

Plaintiffs ask this Court to treat their argument, in the alternative, as a challenge to the public parks-provision as applied to "parks outside of urban settings." Br. 50-53. This Court should not reach that issue for at least two reasons: plaintiffs failed to plead an as-applied challenge,

---

[14] Plaintiffs address only five of these laws (Br. 37), ignoring the additional prohibitions from Georgia and Idaho adduced by the State at summary judgment. (*See* J.A. 1575, 1583.)

and they lack standing to bring one. In any event, there is ample historical support for a prohibition on firearms in rural parks as well.

First, plaintiffs' complaint, "the best evidence of the relief [they] seek[]," *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 440 (2017), alleges only a facial challenge to the public-parks provision, specifically asking the court to enjoin the State from enforcing the provision in all its applications (*see* J.A. 42). Plaintiffs' preliminary injunction briefing in the district court likewise asserted only a facial challenge to the public-parks provision. (*See* Pls.' Mem. in Supp. of Mot. for Prelim. Inj. (Sept. 28, 2022) at 14-18, 23-24, WDNY ECF No. 19-1.)

It was only after *Antonyuk*'s holding that a facial challenge to the public-parks provision is unlikely to succeed on the merits, *see* 120 F.4th at 1019, that plaintiffs argued that the public-parks provision should be enjoined only as applied to rural parks. But it is well established that parties may not amend their complaint to seek new forms of relief in briefing a motion for summary judgment. *See, e.g., Thomas v. United Steelworkers Loc. 1938*, 743 F.3d 1134, 1140 (8th Cir. 2014) (collecting cases). This Court should reject plaintiffs' request for as-applied relief for that reason alone.

Second, and relatedly, plaintiffs failed to allege any facts showing that they have standing to challenge the public-parks provision as applied to rural parks. The organizational plaintiffs lack standing to pursue § 1983 claims on behalf of their members as a matter of law. *See Connecticut Citizens Def. League, Inc. v. Lamont,* 6 F.4th 439, 447 (2d Cir. 2021). And contrary to plaintiffs' claims (Br. 51), Christian has never alleged an intent to visit any rural public park to which the public-parks provision applies. When Christian was deposed regarding his standing, he stated that he has been prevented from carrying at Harris Hill State Forest (Br. 51; *see* J.A. 335), but the public-parks provision does not apply to state forests, which are managed by the State's Department of Environmental Conservation (DEC) separately from state parks under state law. *Compare* 6 N.Y.C.R.R. § 190.0(a) (describing DEC's authority to manage state forests), *with* Parks, Recreation & Hist. Preserv. Law § 3.09 (describing the Office of Parks, Recreation and Historic Preservation's authority to manage state parks). Indeed, after the public-parks provision was enacted but before plaintiffs filed this lawsuit, DEC issued guidance making clear that hunting and target shooting continue to be expressly permitted at state forests, including Harris Hill. *See* N.Y. State DEC, *Frequently Asked*

38

*Questions and Answers on Hunting and Hunting-Related Activities in Response to Recent Changes to New York State Firearm Laws* 2-5 (Sept. 1, 2022); *see also* N.Y. State DEC, *Chautauqua Unit Management Plan* 30-31, 34 (Aug. 2013) (authorizing hunting and target shooting at Harris Hill).

In the district court, Christian also contended that he had been prevented from carrying at Stiglmeier Park (*see* J.A. 335), a town park located in a densely populated area of the town of Cheektowaga, New York, "sandwiched between two major thoroughfares" and "surrounded by residential housing developments" (J.A. 1191; *see* J.A. 1195, 1197). On a recent visit, a State investigator observed "more than fifty parked cars" at Stiglmeier Park by 10:15 a.m., and more than one hundred people using the park to play on playgrounds, walk, bike, play tennis, basketball, and baseball, and hold family gatherings. (J.A. 1191.) Stiglmeier Park is a "communal," "often-crowded public space[]"—i.e., an urban park—not a "wilderness area[]" held for "utilitarian purposes." *Antonyuk*, 120 F.4th at 1025 (quotation marks omitted).

Finally, Christian claimed that he had been prevented from carrying on the Clarence Bike Path and Shoreline Trail (*see* J.A. 335), but those

39

areas are not "parks" to which the challenged provision applies. Moreover, to the extent these trails pass *by* public parks, those parks, like Stiglmeier Park, are town parks located in populated areas, replete with playgrounds, band shells, and ball fields, not wilderness areas. (*See* J.A. 1214-1216.) In any event, Christian has not stated that he intends to visit the parks situated along these paths.

The pleading and standing requirements for an as-applied challenge are particularly important here because it is not clear what plaintiffs mean when they say that they seek a permanent injunction of the prohibition as applied to all "parks outside of urban settings." Br. 52. For instance, plaintiffs' proposed injunction appears to include Jones Beach, a state park that receives millions of visitors and is a "quintessentially crowded area[]," *Antonyuk*, 120 F.4th at 1019. Any as-applied challenge must be properly pleaded and adjudicated based on the facts of the specific conduct the challenger claims is prohibited at a particular location. It cannot take the form of a statewide quasi-facial injunction like that plaintiffs ask this Court to endorse, which would allow plaintiffs to obtain broad relief while circumventing the stringent requirements of a facial challenge. *See Rahimi*, 602 U.S. at 693.

40

In any event, even if plaintiffs' as-applied challenge were properly brought—which it plainly is not—it would fail on the merits. As discussed above, there is ample evidence of a historical tradition of prohibiting firearms in rural state and national parks that began as soon as those parks came into existence. See *infra* at 19-21. And many of the same principles underlying a tradition of prohibiting firearms in urban parks likewise apply to rural parks, which are frequently crowded and visited by large numbers of children. See *infra* at 22-27.

## CONCLUSION

This Court should affirm the district court's order granting defendants' motion for summary judgments, denying plaintiffs' motion for summary judgment, and denying plaintiffs' motion for a permanent injunction.

Dated:  New York, New York
   May 2, 2025

<div style="margin-left: 3em;">

Respectfully submitted,

LETITIA JAMES
 *Attorney General*
 *State of New York*
Attorney for Appellee


By: <u> */s/ Sarah Coco* </u>
  SARAH COCO
  Assistant Solicitor General

</div>

BARBARA D. UNDERWOOD    28 Liberty Street
 *Solicitor General*      New York, NY 10005
ESTER MURDUKHAYEVA    (212) 416-6312
 *Deputy Solicitor General*
SARAH COCO
 *Assistant Solicitor General*
*of Counsel*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Emily Paule, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 8,270 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

  /s/ *Emily Paule*