# 25 - 384

## United States Court of Appeals

*for the*

## Second Circuit

───────────◆───────────

BRETT CHRISTIAN, FIREARMS POLICY COALITION,
SECOND AMENDMENT FOUNDATION,

*Plaintiffs-Appellants,*

JOHN BORON,

*Plaintiff,*

– v. –

STEVEN G. JAMES, MICHAEL J. KEANE,
Acting District Attorney,

*Defendants-Appellees.*

───────────────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

## BRIEF FOR *AMICUS CURIAE* THE FRESH AIR FUND IN SUPPORT OF APPELLEES

D. Brandon Trice
Michele C. Materni
Yaseen Morshed
Kaplan Martin LLP
*Attorneys for Amicus Curiae*
1133 Avenue of the Americas,
  Suite 1500
New York, New York 10036
(212) 316-9500

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), The Fresh Air Fund ("The Fund") submits this corporate disclosure statement. The Fund does not have a parent corporation, nor does The Fund have any stock, so no publicly held corporation owns 10% or more of The Fund stock.

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ..........................................................................1

PRELIMINARY STATEMENT ..............................................................................3

ARGUMENT ...........................................................................................................6

     I.     There Is a Long-Standing American Tradition of Regulating Firearms in Sensitive Places. ...................................................................6

     II.    Rural Parks Are Sensitive Places. ........................................................8

     III.   There Is an Unbroken History of Firearms Regulation in Parks. .........9

     IV.   Rural Parks Are Modern Spaces that Are Frequented by Children. ...15

     V.    Rural Parks Are Places of Educational Opportunity. ..........................18

CONCLUSION ......................................................................................................21

# TABLE OF AUTHORITIES

## CASES

*Antonyuk v. James*,
120 F.4th 941 (2d Cir. 2024)........................................................................ passim

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .......................................................................6, 10

*Gould v. Morgan*,
907 F.3d 406 (1st Cir. 2018) .................................................................10

*Kipke v. Moore*,
695 F. Supp. 3d 638 (D.Md. 2023).........................................................15

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) .............................................................................10

*New York State Rifle & Pistol Association v. Bruen*,
597 U.S. 1 (2022) ........................................................................ passim

*State v. Hill*,
53 Ga. 472 (1874)........................................................................7

*United States v. Rahimi*,
602 U.S. 680 (2024) ..........................................................................4, 12

## STATUTES

1778 Mass. Sess. Laws ch. V ................................................................6

18 Stat. 517 (1778–1875) (1875)..........................................................14

1869 Tenn. Pub. Acts 23–24 .................................................................11

1870 La. Acts 159–60 ..................................................................................5

1870 Tex Gen. Laws 63 .............................................................................11

1879 Mo. Laws 90 .......................................................................................7

1883 Mo. Sess. Laws 76 .......................................................................11, 18

1889 Ariz. Sess. Laws 17 .....................................................................11, 18

1890 Okla. Terr. Stats., Art. 47........................................................7, 11, 18

Executive Law § 481(7) .............................................................................16

ENV § 9-0101(6)...........................................................................................8

New York Penal Law § 265.01-e .................................................................8

## OTHER AUTHORITIES

*Allen Rostron, The Second Amendment on Campus, 14 GEO. J.L. & PUB. POL'Y 245, 255 (2016)* ...........................................................................................4

*Annual Reports of the Brooklyn Park Commissioners 1861 – 1873*, at 136 (1873), https://www.biodiversitylibrary.org/item/121410#page/5/mode/1up .................13

*Brief History of the National Parks*, LIBRARY OF CONG., https://www.loc.gov/collections/national-parks-maps/articles-and-essays/brief-history-of-the-national-parks/..............................................................................12

Camp Junior Homepage, https://freshair.org/learn-about-our-camps/camp-junior/ .............................. 18, 19

*Eighth Annual Report of the Commissioners of Prospect Park 161–62* (1868) included in *Annual Reports of the Brooklyn Park Commissioners* (1873), https://perma.cc/FZN3-K6Y8.............................................................................14

EVERYTOWN FOR GUN SAFETY, Preventable Tragedies: Unintentional Shootings by Children, https://everytownresearch.org/report/notanaccident/ ............................2

*Firearms Regulations in the National Parks: 1897–1936*, National Park Service (2008), https://npshistory.com/publications/ranger/np-firearms-regs-history.pdf............13

James Wilson, 2 LECTURES ON LAW 109 (1789 to 1791)...........................................3

Karen Cumberland, NPF Increases its Commitment to Open OutDoors for Kids and Awards $5 Million in Grants, Nat'l Parks Foundation, https://www.nationalparks.org/news-and-updates/updates/npf-increases-its-commitment-to-open-outdoors-for-kids-and-awards-5-million-in-grants#:~:text=Open%20OutDoors%20for%20Kids%20inspires,our%20natural%20and%20cultural%20resources....................................................................20

Laws of Harvard College 1655 (1876) ....................................................................4

*Minutes of Proceedings of the Board of Commissioners of the Central Park for the Year Ending April 30, 1858* (1858), https://perma.cc/CV69-3WLZ............................................................................13

*Municipal Register of the City of Springfield for 1899* (1899), https://perma.cc/9D7Y-MK2U ..................................................................14

Olivia Li & *The Trace*, "When Jefferson and Madison Banned Guns on Campus," *The Atlantic*, May 6, 2016, https://bit.ly/2VvHL8E .........................................................................3

*Proceedings of the Common Council of the City of Chicago for the Municipal Year 1868, Being From May 4th, 1868 to December 6th, 1869* (1870), https://perma.cc/5BS5-JZVL.............................................................13

*San Francisco Municipal Reports for the Fiscal Year 1874–75* (1875),
    https://perma.cc/9GB8-B484 ................................................................14

*The Fresh Air Fund: A Force of Nature* (The Fresh Air Fund, Sept. 2024),
    https://freshair.org/wp-content/uploads/2025/04/The-Fresh-Air-Fund-Nature-
    Paper-September-2024.pdf. .................................................. 1, 3, 18, 20

U.S. DEPARTMENT OF THE INTERIOR, *Rules and Regulations of the Yellowstone
    National Park*, § 5, (Aug. 1, 1894),
    https:// perma.cc/R5MA-2XR4 ...........................................................14

*Youth and Adult Visitation and Physical Activity Intensity at Rural and Urban
    Parks*, INT J ENVIRON RES PUBLIC HEALTH (2018),
    https://pmc.ncbi.nlm.nih.gov/articles/PMC6121499 ..........................................16

## CONSTITUTIONAL PROVISIONS

Del. Const, art. 28 (1776)..............................................................6

U.S. CONST. Amend. II................................................................3

## INTEREST OF AMICUS CURIAE[1]

*Amicus curiae* The Fresh Air Fund ("The Fund") is a youth development organization whose mission is to provide transformative outdoor experiences, at no cost, for New York City children from underserved communities. Since its inception in 1877, The Fund has served more than 1.8 million children from New York City with opportunities to explore nature and to be changed by the social-emotional learning that only happens in the great outdoors. "Early time spent recreating, learning, and exploring in the outdoors empowers young people to develop resilience, leadership skills, and other competencies that will serve them throughout their lives."[2]

Today, The Fund's primary educational and recreational programming takes place at The Fund's six sleepaway camps in upstate New York. The Fund's camps are generally open to children between the ages of 8 and 18 who live and attend school in New York City. Nearly 2000 children each year will experience the beauty

---

[1] All parties have consented to the filing of this *amicus curiae* brief. No counsel for a party authored this brief in whole or in part. Apart from The Fund and its counsel, no person—including any party or party's counsel—made a monetary contribution to fund the preparation or submission of this brief.

[2] *The Fresh Air Fund: A Force of Nature* (The Fresh Air Fund, Sept. 2024), available at https://freshair.org/wp-content/uploads/2025/04/The-Fresh-Air-Fund-Nature-Paper-September-2024.pdf.

of the forests and the challenges of a new environment for free this summer at The Fund's summer camps.

One of these six camps, Camp Junior, was founded in memory of Lesandro "Junior" Guzman-Feliz, a teenage victim of gang violence from the Bronx. Camp Junior is located in Harriman State Park in Orange County, NY and is intended to be a safe space for youth from the Bronx. As such, The Fund has a strong interest in ensuring that reasonable gun regulations exist to prevent firearm possession in the vicinity of young campers, many of whom have been traumatized by gun violence in their communities. The Fund maintains detailed risk management and safety plans for various emergency scenarios, including the presence of an active shooter on camp territory. These plans, and the underlying safety concerns they address, will be compromised if this Court allows the carrying of firearms in rural parks.[3] "BIPOC and low-SES people have been systematically denied access to, or made to

---

[3] As the American Academy of Child and Adolescent Psychiatry explained, "[t]he best way to protect children against gun violence is to remove all guns." Children are especially prone to making impulsive or faulty decisions, which can be exacerbated by the presence of guns in their vicinity. To the extent that firearm possession is permitted near children or their places of educational opportunities, there will always be a risk of a dangerous firearm-related incident. As studies demonstrate, firearm possession around children increases the chance of dangerous incidents occurring. For example, one database illustrates that, on a daily basis, a child gains access to a loaded firearm and unintentionally shoots their selves or someone else. *See* EVERYTOWN FOR GUN SAFETY, Preventable Tragedies: Unintentional Shootings by Children, https://everytownresearch.org/report/notanaccident/.

feel unwelcome or unsafe in, nature and green spaces."[4]  Instead, in line with the Supreme Court's teachings in *New York State Rifle & Pistol Association Inc. v. Bruen*, 597 U.S. 1 (2022) concerning sensitive places discussed below, the Court should uphold America's long-standing and unbroken tradition of firearm prohibition in rural parks.

## PRELIMINARY STATEMENT

Since at least our Nation's founding, our legal system has acknowledged a special duty "to protect [children] according to the dictates of prudence."  James Wilson, 2 LECTURES ON LAW XII: 109 (1789 to 1791).  True to this sentiment, Congress and state legislatures have consistently carved out exceptions to general policies with the intention of promoting child welfare and safety.  One example of such endeavors is the regulation of firearms in places of educational opportunity. While the Second Amendment guarantees law-abiding individuals the right "to keep and bear [a]rms," U.S. CONST. Amend. II, that right, like all others, is neither absolute nor unencumbered—nor was it ever intended to be.  For example, James Madison, who wrote the Second Amendment, advocated against firearm possession and use on school campuses.  Olivia Li & *The Trace*, *When Jefferson and Madison*

---

[4] *The Fresh Air Fund: A Force of Nature*, *supra* note 2.

3

*Banned Guns on Campus*, THE ATLANTIC (May 6, 2016), https://bit.ly/2VvHL8E.[5] Recognizing that children are an especially vulnerable population, our Founders sought to protect them and keep deadly tools, including firearms, away from sensitive places that they frequent. Modern firearm regulations, like the ones challenged by Appellants, are simply the continuation of our Nation's longstanding and unbroken tradition of reducing the risk of harm to, and creating safe spaces for, America's youth.

In *New York State Rifle & Pistol Association Inc. v. Bruen*, 597 U.S. 1 (2022), the Supreme Court emphasized the importance of relying on our Nation's historical traditions when evaluating challenges to regulations based on the Second Amendment. Because society has changed significantly since the Constitution's enactment, the Supreme Court recognized that perfect historical parallels are unlikely to exist for modern problems and the regulations that try to address them. Thus, the historical analysis under *Bruen* does not require a "historical twin." *United States v. Rahimi*, 602 U.S. 680, 692 (2024). Instead, a challenged regulation that

---

[5] The American tradition of not just regulating but straight-out banning firearm possession in places of educational opportunity is an old one and even extends to private institutions: Harvard University banned students from having guns on campus sometime around 1655. Allen Rostron, *The Second Amendment on Campus*, 14 GEO. J.L. & PUB. POL'Y 245, 255 (2016) ("[N]oe students shall be suffered to have [a g]un in his or theire chambers or studies, or keeping for theire use anywhere else in the town.") (quoting a copy of the LAWS OF HARVARD COLLEGE 1655, at 10 (1876)).

"does not precisely match its historical precursors" may nonetheless "be analogous *enough* to pass constitutional muster." *Id.* at 692 (emphasis added). Applying the historical analysis prescribed by *Bruen*, this Court in *Antonyuk v. James* held that there was a well-established and representative tradition of prohibiting firearms in urban public parks. 120 F.4th 941, 1026 (2d Cir. 2024). Similarly, this Court held that firearm possession may be prohibited in zoos, because they are the type of spaces frequented by children and used as places of educational opportunity. *Id.* at 1027.

Although rural parks as we understand them today were not common until the second half of the nineteenth century, like urban parks and zoos, they are places frequented by children that offer abundant educational opportunities. In part, that is because organizations like The Fund use rural parks to provide children with nature-based courses, skills workshops, and educational programming. Thus, regulations prohibiting firearm possession in rural parks are in line with the Nation's tradition of protecting its youth, and they should accordingly be upheld as consistent with the Second Amendment.

The Fund respectfully submits this *amicus* brief in support of affirmance of the District Court's January 8, 2025 order denying Appellants' summary judgment motion.

## ARGUMENT

### I. There Is a Long-Standing American Tradition of Regulating Firearms in Sensitive Places.

Even as the Supreme Court announced an individual right to bear arms in *District of Columbia v. Heller*, it recognized that right is "not unlimited." 554 U.S. 570, 626 (2008). Thus, while the Second Amendment affords individuals the right to carry and use firearms, States may nonetheless choose to regulate firearms within their borders. *New York State Rifle & Pistol Ass'n Inc. v. Bruen*, 597 U.S. 1 (2022). Moreover, regulations that are part of a longstanding American tradition, like those that forbid firearm possession in "sensitive places such as schools," do not offend the Second Amendment. *Heller*, 554 U.S. 570, 626; *Bruen*, 597 U.S. at 30.

Although the "sensitive places" doctrine did not develop much in the aftermath of *Heller*, the *Bruen* court expanded the concept by observing that 18th- and 19th-century sensitive places included "legislative assemblies, polling places, and courthouses." *Bruen*, 597 U.S. at 30. Founding-era firearm regulations concerning sensitive places include Delaware's Constitution, which prohibited people from coming armed to polling places, and Massachusetts' Session Laws, which prohibited firearm discharge in town. Del. Const, art. 28 (1776); 1778 Mass. Sess. Laws ch. XVII.

In the nineteenth century, legislatures continued to enact firearm regulations with the intent of protecting certain vulnerable locations. For example, in 1870 Louisiana prohibited firearm possession when polls opened on Election Day, and within a half-mile radius of voter registration sites. 1870 La. Acts 159–60. In 1874, the Georgia Supreme Court upheld a statute that prohibited carrying weapons into a court of justice. *State v. Hill*, 53 Ga. 472 (1874). Similarly, Missouri enacted a statute that prevented the discharge of firearms near "any court house, church or building used for school or college purposes." 1879 Mo. Laws 90. Oklahoma, meanwhile, enacted legislation prohibiting firearm possession in any "place where persons are assembled . . . for amusement or for educational or scientific purposes." 1890 Okla. Terr. Stats., Art. 47, § 7. Thus, in the American tradition, places of public assembly, such as polling places; judicial buildings, like courthouses; and places of educational opportunity, like schools, have historically been considered sensitive places. As the Supreme Court explained, these historically sensitive places are not an exhaustive list; rather, they are meant to serve as baselines for determining whether "modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Bruen*, 597 U.S. at 30 (emphasis in original).

## II.     Rural Parks Are Sensitive Places.

Appellants bring a constitutional challenge against a New York regulation criminalizing possession of a firearm, rifle, or shotgun in "libraries, public playgrounds, public parks, and zoos."  New York Penal Law § 265.01-e(2)(d).  This provision expressly carves out from the definition of public parks (i) any privately held land within a public park not dedicated to public use, and (ii) the forest preserves as defined in subdivision six of section 9-0101 of the environmental conservation law—namely, the Adirondack Park, and the Catskill Park. Nonetheless, Appellants maintain that the application of § 265.01-e(2)(d) to public parks, and specifically rural parks, is unconstitutional on its face.  (Br. for Pls.-Appellants (Br.) at 4; 12-14).  Appellants' facial challenge is inconsistent with this Court's and the Supreme Court's precedents.

In *Antonyuk v. James*, this Court held that firearm regulation for urban public parks was in line with the Nation's history of "regulating firearms in often-crowded public squares, including, specifically, city parks."  120 F.4th 941, 1026 (2024). Likewise, the Court explained that although zoos were "relatively modern institutions," they nonetheless qualified as sensitive places subject to firearm regulation under the *Bruen* analysis because they were "spaces that provide

educational opportunities." *Id.* at 1026-27.[6]  Although the Court did not conduct a detailed analysis under *Bruen* with respect to rural parks because the parties did not make a distinction between urban and rural parks in their briefings, it observed in dicta that "rural parks much more resemble the commons of yore than the historical and often-crowded public squares." *Id.* at 1025.  But there is more to rural parks than their classification as "rural" might imply, and a closer look reveals that many of the activities that are common in urban parks likewise take place in rural parks.  Put simply,  despite having a smaller number of visitors than urban parks, rural parks are places where parents gather to picnic with their children, and kids play tennis, learn to kayak, and practice archery, among other activities.  Hence, this Court's analysis finding that urban parks and—as especially relevant here—zoos are sensitive places subject to firearm regulation, remains equally applicable to rural parks, and the District Court did not err when it granted summary judgment in Appellee's favor.

## III.    There Is an Unbroken History of Firearms Regulation in Parks.

A review of historical regulations of firearms in public parks along the lines drawn by *Bruen* shows an unbroken history of firearm regulations in public parks

---

[6] As this Court previously observed, the first zoo did not open until 1874—two years after the opening of the first national park.  *Antonyuk v. James*, 120 F.4th 941, 1026 n. 98.

that do not, and were never thought to, violate the Second Amendment. Appellants maintain that the assessment of historical, analogous regulations ought to essentially be limited to the point in time when the Second Amendment was ratified. Br. at 17-18. But the year 1791 does not represent the outer limit of a Second Amendment historical inquiry, least of all under *Bruen*. Accepting Appellants' self-serving contention to that effect would lead to the wrong conclusion: that the lack of rural parks, and, therefore, the lack of firearm regulations applicable to rural parks in 1791, means there is no historical tradition of firearm regulation in rural parks.

Instead, in *Bruen* the Supreme Court itself specifically identified the Fourteenth Amendment's ratification in 1868 as another key point—beyond 1791—for the historical inquiry into the Second Amendment. *Bruen*, 597 U.S. at 34 ( "[T]he Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates *either* date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years."); *see also District of Columbia v. Heller*, 554 U.S. 570 (2008) (reviewing Second Amendment analogues in the early nineteenth century and considering the interpretation of nineteenth century courts and commentators). And after all, the Second Amendment did not constrain the States until the Fourteenth Amendment was adopted in 1868. *See McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010); *see also Gould v.*

10

*Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) (explaining that "[b]ecause the challenge here is directed at a state law, the pertinent point in time would be 1868").

In line with Supreme Court precedent up to and including *Bruen*, this Court has previously turned to the nineteenth century for historical analogues. In *Antonyuk*, this Court explained that "[g]iven the continuity of the tradition of regulating firearms in crowded public forums, there was no reason . . . to discount . . . laws from the late 19th century." 120 F.4th at 1023-24. For instance, recognizing that zoos were "relatively modern institutions," this Court considered historical analogues from as recently as 1890. *Id.* at 1027. Because rural parks are relatively modern institutions that are also, in many ways, places of educational opportunity, this Court should likewise review firearm regulations for places of educational opportunity, in place around the ratification of the Fourteenth Amendment, as historical analogues to the regulations challenged here.[7] In short, consistent with *Bruen*, 1791 should be the *starting point* of the historical inquiry, not the end of it.

If state firearm regulations are challenged on a constitutional basis, the analysis must start with the threshold inquiry of whether the "plain text" of the Second Amendment covers the conduct proscribed by the challenged regulations.

---

[7] In *Antonyuk*, this Court considered the following laws as historical analogues supporting firearm regulation in places of educational opportunity: 1870 Tex Gen. Laws 63, ch. 46; 1869 Tenn. Pub. Acts 23–24; 1883 Mo. Sess. Laws 76; 1889 Ariz. Sess. Laws 17; 1890 Okla. Terr. Stats., Art. 47, § 7.

*Bruen*, 597 U.S. at 24. If it does, the next step is to analyze the challenged regulations against historical analogues from the Founding and Reconstruction periods. *Id.* These analogues need not be "historical twins" to the challenged regulations. *United States v. Rahimi*, 602 U.S. 680, 692 (2024). Instead, *Bruen* requires that courts consider whether the historical analogues had a *similar purpose* and imposed *comparable burdens* relative to the challenged regulations. *Bruen*, 597 U.S. at 29.

Here, a properly conducted historical inquiry under *Bruen* will show that regulating firearms in rural parks is part of a longstanding, unbroken American tradition that goes back to the early days of the Republic. Of course, public parks—whether urban or rural—didn't actually exist, at least as we understand them today, in 1776 or 1791. Indeed, the very first place to be designated as a national park—Yellowstone—was made so only in 1872. *See* LIBRARY OF CONGRESS, *Brief History of the National Parks*, https://www.loc.gov/collections/national-parks-maps/articles-and-essays/brief-history-of-the-national-parks/ (last visited May 8, 2025). Because of this, Plaintiffs claim that there can be no historical tradition of firearms regulation that is consistent with the Second Amendment under *Bruen*. But Plaintiff's myopic reading of *Bruen*'s teaching is misleading, and the self-serving conclusions that Plaintiffs draw from it are incorrect.

As parks were developed and their number grew, states and cities imposed accompanying firearm regulations. For example, when New York opened Central Park to the public in 1858, it prohibited visitors from carrying firearms within the Park. *See Minutes of Proceedings of the Board of Commissioners of the Central Park for the Year Ending April 30, 1858*, at 166 (1858) (https://perma.cc/CV69-3WLZ) ("Be it ordained by the Commissioners of the Central Park: All persons are forbidden . . . [t]o carry fire-arms . . . within it."). Likewise, in 1866, the Commissioners of Prospect Park enacted rules forbidding firearm possession in the Park. *See Annual Reports of the Brooklyn Park Commissioners 1861–1873*, at 136 (1873) (enacted 1866) ("All persons are forbidden . . . [t]o carry fire- arms . . . within [Prospect Park.]").[8]

This tradition of firearm regulation developed further towards the end of the nineteenth century—after the Fourteenth Amendment was ratified—when several jurisdictions implemented firearm regulations and rules for parks. *See generally* National Park Service, *Firearms Regulations in the National Parks: 1897–1936*, (2008) (https://npshistory.com/publications/ranger/np-firearms-regs-history.pdf). For instance, in 1869, Chicago passed an ordinance banning firearm possession in city parks. *Proceedings of the Common Council of the City of Chicago for the Municipal Year 1868, Being From May 4th, 1868 to December 6th, 1869*, at 342

---

[8] *Available at* https://www.biodiversitylibrary.org/item/121410#page/5/mode/1up).

(1870) (https://perma.cc/5BS5-JZVL) ("All persons are forbidden to carry firearms . . . within any one of the said public parks"). In 1872, firearm possession was restricted in Golden Gate Park and Buena Vista Park in San Francisco. *See San Francisco Municipal Reports for the Fiscal Year 1874–75*, at 887 (1875) (https://perma.cc/9GB8-B484) ("Within [Golden Gate and Buena Vista Parks] all persons are hereby forbidden: . . . To carry . . . firearms."). In 1875, Congress enacted legislation prohibiting firearm possession in Mackinac National Park. *See* 18 Stat. 517 (1778–1875) (1875).[9] In 1894, firearm possession was restricted in Yellowstone National Park. U.S. DEPARTMENT OF THE INTERIOR, *Rules and Regulations of the Yellowstone National Park*, § 5, (Aug. 1, 1894), (https:// perma.cc/R5MA-2XR4). These regulations, like other regulations of public parks, were enacted to promote peace and public safety in parks.[10]

---

[9] This federal regulation stayed in effect until Congress transferred the park to the State of Michigan and it fell outside of Congress' scope of authority. *See* Kari Still et al., *The History and Tradition of Regulating Guns in Parks*, 19 HARV. L. & POL'Y REV. 201 (2024).

[10] *See, e.g.*, *Eighth Annual Report of the Commissioners of Prospect Park 161–62* (1868) included in *Annual Reports of the Brooklyn Park Commissioners* (1873), https://perma.cc/FZN3-K6Y8 (park regulations were "carefully framed, with a view of imposing the least possible restraint upon personal liberty which is consistent with the safety and freedom of others"); *Municipal Register of the City of Springfield for 1899* (1899), https://perma.cc/9D7Y-MK2U ("Public grounds are owned by the citizens, and every man, woman, and child should fully realize and feel their interests in such ownership, and know that they are freely and heartily welcome to enjoy the many blessings that their grounds afford, restricting themselves only to such result and regulations as are necessary for the parks and their visitors.").

In *Bruen*, the Supreme Court made clear that its decision was not intended to create a "regulatory straightjacket" that abrogated the states' ability to govern firearm possession and use. *Bruen*, 597 U.S. at 30. Accordingly, if there are historical analogues that are *comparable* to the challenged regulations in magnitude and burden, the challenged regulations can survive constitutional scrutiny. *Id.* at 29 (explaining that "to determine whether a firearm regulation is consistent with the Second Amendment, *Heller* and *McDonald* point toward at least two relevant metrics: first, whether modern and historical regulations impose a comparable burden on the right of armed self-defense, and second, whether that regulatory burden is comparably justified.")

Rural state parks were "not established in significant numbers until after the ratification of the Fourteenth Amendment." *Kipke*, 695 F.Supp.3d at 655. But the historical record is abundantly clear that, as soon as parks—including the founding-era equivalents of rural parks, such as the Boston Common—were established, regulations limiting the carrying of firearms thereto were swiftly promulgated. Thus, the regulations that Appellants challenge today are but the current chapter in an unbroken history of regulation of firearms in public parks.

## IV. Rural Parks Are Modern Spaces that Are Frequented by Children.

As this Court observed in *Antonyuk*, *Bruen* supports the proposition that "the tradition of regulating firearms in spaces frequented by children is . . . well-

15

established and representative." 120 F.4th at 1026. Because children frequent rural parks, firearm regulations in the parks are consistent with the American historical tradition of regulating firearms in sensitive places and, as *Bruen* has made clear, do not offend the Second Amendment. 597 U.S. at 30.

For the 20% of Americans that live in rural areas,[11] today's rural parks are havens for families, providing children with space to engage in recreational activities and serving a critical role in facilitating children's development through physical activity and family engagement. In that regard, rural parks are akin to urban parks. Indeed, one peer-reviewed study found that while rural parks had a "lower percentage of 0–5 yrs old child visitors than urban parks, [there were] no differences in the percentage of visitors from the other age groups." James N. Roemmich et al., *Youth and Adult Visitation and Physical Activity Intensity at Rural and Urban Parks*, INT'L J. ENV'T RSCH PUB. HEALTH at 5 (2018).[12] In other words, on a proportional basis, rural park visitors were of similar ages to urban park visitors. Moreover, more than half of the rural parks' visitors in the study's sample size were aged 0–18. *Id.* at 6. The study further confirmed that—like urban parks—rural parks were equipped with a variety of amenities, including tennis courts and baseball fields where young visitors play. Indeed, researchers recorded that in rural parks, "children aged 0–12

---

[11] In New York, "rural areas" are defined as "counties within the state having less than two hundred thousand population." N.Y. Exec. Law 481(7).

[12] *Available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC6121499/.

years were more likely to be observed engaged in sports than their urban counterparts." *Id.* at 7.

When this Court found that zoos qualified as sensitive places amenable to firearms regulations consistent with the Second Amendment, it did so not by looking at the actual numbers of zoo visitors, but rather, by assessing zoo visitors on a proportional basis. *See Antonyuk*, 120 F.4th at 1026-27 (explaining that since "70 percent of zoo visitors come accompanied by children, the tradition of prohibiting firearms in places frequented by children straightforwardly supports the regulation of firearms in zoos."). The proportion of young visitors to rural parks is similar to the proportion of young visitors to urban parks. And more than half of the study's sample size were under eighteen years old, suggesting that a large proportion of rural park visitors are children. *See* Roemmich et al., *supra* at 13. The Fund's own experience is well in line with the study's results. The Fund operates Camp Junior in Harriman State Park in Orange County, NY. Since its inception in 2019, Camp Junior has served over 700 individual campers, aged 8-15, from the Bronx, providing more than 900 summer experiences in total. Last year, Camp Junior welcomed 264 campers and, in 2025, The Fund expects this number to increase to 288 children.

Thus, under *Antonyuk*'s proportional analysis, rural parks qualify as "places frequented by children." 120 F.4th at 1026.

17

## V.     Rural Parks Are Places of Educational Opportunity.

Demographics of their visitors aside, rural parks also qualify as sensitive places subject to firearm regulation because they are places of educational opportunity.  As this Court has previously observed, firearm regulation in places of educational opportunity "makes sense" because educational spaces "inherently presume orderly and peaceable assembly."  *Antonyuk*, 120 F.4th at 1027.[13]

Camp Junior is a useful illustration of how rural parks can—and do—house educational opportunities for children.  The Fund camps offer a wide variety of activities designed to introduce campers to new experiences, strengthen existing skills, and build social-emotional skills.  2025 Camp Staff Manual at 11.  Camp Junior challenges campers to continuously try new activities throughout their summer experience.  85% of camper parents/guardians said their child "learned important skills at camp."[14]  From swimming lessons to dance classes and martial

---

[13] In *Antonyuk*, this Court considered several historical analogues that suggested firearm regulation was appropriate in places of educational opportunity.  120 F.4th at 1011 (citing 1870 Tex Gen. Laws 63, ch. 46) (proscribing guns in "place[s] where persons are assembled for educational, literary or scientific purposes,"); 1883 Mo. Sess. Laws 76 (prohibiting guns where people assemble for educational purposes); 1889 Ariz. Sess. Laws 17, § 3, 1890 Okla. Terr. Stats., Art. 47, § 7 (prohibiting gun possession in any "place where persons are assembled for amusement or for educational or scientific purposes.")

[14] The Fresh Air Fund. *The Fresh Air Fund: A Force of Nature* at 3 (Sept. 2024), https://freshair.org/wp-content/uploads/2025/04/The-Fresh-Air-Fund-Nature-Paper-September-2024.pdf.

18

arts lessons, Camp Junior provides its campers with ample opportunities to receive instruction and engage in activities.[15]  The Fund provides access to campers from underserved communities to specialized equipment and facilities, like kayaking and high ropes courses, under the supervision of trained and certified professionals.  For instance, the high ropes courses are staffed with specially trained instructors; archery specialists must have certification demonstrating their ability to teach archery safely; and swim lessons and tests must be administered by a certified Water Safety Instructor.  2025 Camp Staff Manual at 18.  Camp Junior typically employs 18 specially-trained staff members each summer, a ratio of one qualified staff member for every four campers during each camping session, to teach swimming, boating, high ropes courses, dancing, martial arts, and other recreational skills.

Finally, Camp Junior focuses on building social emotional learning skills with campers during each session. Campers participate in leadership development programs and skill-building workshops.[16] A dedicated staff of support services experts assist campers with behavioral issues, mental health concerns, and emotional well-being.  Support services staff also help troubleshoot and problem-solve ways

---

[15] Campers carry these lessons beyond their time at camp.  As Jaylen, a thirteen-year old camper stated:  "[The counselors] taught me how to play chess, and I still play now."  *Camp Junior Homepage*, https://freshair.org/learn-about-our-camps/camp-junior/.

[16] *Camp Junior Homepage*, https://freshair.org/learn-about-our-camps/camp-junior/.

19

to work with campers experiencing challenging emotions or behaviors and address group dynamics and conflict resolution issues. In general, people who have attended a camp report "sustained improvements in a number of environmental social-emotional skills, including confidence, teamwork, life skills, independence, and communication."[17] Indeed, camps are a venue for a wide range of educational experiences for campers.

Nor is The Fund alone in terms of providing educational opportunities to its youth. For example, the Open OutDoors for Kids Program, sponsored by the National Park Foundation, provides children with grants to go visit national parks and engage in educational activities. The Open OutDoors program has facilitated educational opportunities for more than 2 million children since 2011. Similarly, the Every Kid Outdoors Program facilitates free annual passes for fourth graders, with the goal of increasing youth engagement with nature.[18]

---

[17] *The Fresh Air Fund: A Force of Nature* (The Fresh Air Fund, Sept. 2024), available at https://freshair.org/wp-content/uploads/2025/04/The-Fresh-Air-Fund-Nature-Paper-September-2024.pdf

[18] Karen Cumberland, *NPF Increases its Commitment to Open OutDoors for Kids and Awards $5 Million in Grants*, National Park Foundation (September 5, 2024) https://www.nationalparks.org/news-and-updates/updates/npf-increases-its-commitment-to-open-outdoors-for-kids-and-awards-5-million-in-grants.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's

January 8, 2025, order denying Appellants' summary judgment motion.


Dated:  May 9, 2025                                   Respectfully submitted,


                                                      */s/ D. Brandon Trice*
                                                      D. Brandon Trice
                                                      Michele C. Materni
                                                      Yaseen Morshed
                                                      KAPLAN MARTIN LLP
                                                      1133 Avenue of the Americas,
                                                      Suite 1500
                                                      New York, New York 10036
                                                      Tel: (212) 316-9500
                                                      btrice@kaplanmartin.com
                                                      mmaterni@kaplanmartin.com
                                                      ymorshed@kaplanmartin.com


                                                      *Attorneys for Amicus Curiae*
                                                      *The Fresh Air Fund*

21