# 25-384

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

BRETT CHRISTIAN, FIREARMS POLICY COALITION, and SECOND
AMENDMENT FOUNDATION,

*Plaintiffs-Appellants,*

JOHN BORON,

*Plaintiff,*

v.

STEVEN G. JAMES, MICHAEL J. KEANE, Acting District Attorney,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of New York

**BRIEF OF EVERYTOWN FOR GUN SAFETY AS AMICUS CURIAE
IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE**

Freya Jamison
Sana S. Mesiya
Everytown Law
P.O. Box 14780
Washington, D.C. 20044

Janet Carter
William J. Taylor, Jr.
Priyanka Gupta Sen
Everytown Law
450 Lexington Avenue,
 P.O. Box 4184
New York, NY 10163
jcarter@everytown.org
(646) 324-8174

May 9, 2025

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ..................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ..................... 1

ARGUMENT .......................................................................................... 4

I. Plaintiffs Cannot Evade *Antonyuk* ............................................ 4

A. *Antonyuk* Correctly Recognized that New York's Law Continues Regulatory Traditions Traceable to the Founding Era and Earlier ......................................................... 4

    i. North Carolina ............................................................ 5

    ii. Virginia ....................................................................... 8

B. Plaintiffs Improperly Disregard *Antonyuk*'s Methodological Conclusions ............................................... 11

    i. *Antonyuk* made clear that Reconstruction-era evidence is a critical part of the *Bruen-Rahimi* historical analysis ......................................................... 12

    ii. *Antonyuk* relied on consistent later history ................. 17

II. This Court Should Consider Historical Context in Evaluating New York's Parks Law .............................................. 19

CONCLUSION ..................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Alger v. Commonwealth,*
  590 S.E.2d 563 (Va. 2004) .................................................................. 9

*Antonyuk v. James,*
  120 F.4th 941 (2d Cir. 2024), *cert. denied,* --- S. Ct. ----, 2025 WL
  1020368 (U.S. Apr. 7, 2025) ......................................................*passim*

*Bianchi v. Brown,*
  111 F.4th 438 (4th Cir. 2024) (en banc), *petition for cert. filed sub
  nom. Snope v. Brown,* No. 24-203 (U.S. Aug. 23, 2024) .....................18

*Browne v. Turberville,*
  6 Va. 390 (1800) ..................................................................................10

*Cook v. Commonwealth,*
  597 S.E.2d 84 (Va. 2004) ....................................................................10

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ..........................................................................7, 8

*Dobbs v. Jackson Women's Health Organization,*
  597 U.S. 215 (2022) ............................................................................15

*Kipke v. Moore,*
  No. 1:23-cv-01293, 2024 WL 3638025 (D. Md. Aug. 2, 2024), *appeal
  docketed,* No. 24-1799 (4th Cir. Aug. 22, 2024) ..................................16

*LaFave v. County of Fairfax,*
  No. 1:23-cv-01605, 2024 WL 3928883 (E.D. Va. Aug. 23, 2024),
  *appeal docketed,* No. 24-1886 (4th Cir. Sept. 16, 2024) .........20, 22, 24

*Lara v. Commissioner Pennsylvania State Police,*
  125 F.4th 428 (3d Cir. 2025).........................................................16, 17

*McCullen v. Coakley,*
  573 U.S. 464 (2014) .............................................................................24

*Nev. Comm'n on Ethics v. Carrigan,*
  564 U.S. 117 (2011) .............................................................................18

*New York State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. 1 (2022) ................................................................. 1, 7, 8, 10

*Pinales v. Lopez*,
    No. 1:24-cv-00496, 2025 WL 653980 (D. Haw. Feb. 7, 2025) ............16

*Rupp v. Bonta*,
    723 F. Supp. 3d 837 (C.D. Cal. 2024), *appeal docketed*, No. 24-2583
    (9th Cir. Apr. 24, 2024) ........................................................................16

*Sims' Lessee v. Irvine*,
    3 U.S. 425 (1799) ................................................................................. 9

*Sprint PCS L.P. v. Conn. Siting Council*,
    222 F.3d 113 (2d Cir. 2000) ................................................................10

*United States v. Masciandaro*,
    648 F. Supp. 2d 779 (E.D. Va. 2009), *aff'd on other grounds*, 638 F.3d
    458 (4th Cir. 2011)...............................................................................23

*United States v. Rahimi*,
    602 U.S. 680 (2024) ...........................................................2, 14, 15, 19

*Wolford v. Lopez*,
    116 F.4th 959 (9th Cir. 2024), *petition for cert. filed*, No. 24-1046
    (U.S. Apr. 1, 2025) ................................................................2, 20, 24

*Worth v. Jacobson*,
    108 F.4th 677 (8th Cir. 2024), *cert. denied*, --- S. Ct. ----, 2025 WL
    1151242 (U.S. Apr. 21, 2025) ......................................................16, 17

## Other Authorities

1786 Va. Acts 35, ch. 49......................................................................8, 9

"Preface of the Commissioners of 1838," *Revised Code of North Carolina*
    (1855), *available at* https://tinyurl.com/5n83xnc3 ............................. 7

*Big Basin Redwoods State Park*, California State Parks (2025),
    https://www.parks.ca.gov/bigbasin......................................................23

*Campers May Enjoy Life in the Big Basin*, Santa Cruz Sentinel (July 15,
    1904), *available at* https://tinyurl.com/4zs6bdb6 ...............................22

*Laws of the State of North Carolina, Including the Titles of Such Statutes and Parts of Statutes of Great Britain as are in Force in Said State* (Potter, Taylor, & Yancey ed. 1821), *available at* https://tinyurl.com/mtmxakwf............................................................ 6

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization, with nearly eleven million supporters across the country. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

New York's law prohibiting firearms in public parks is constitutional under the approach to Second Amendment analysis established in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission. All parties consent to this brief's submission.

(2022), and *United States v. Rahimi*, 602 U.S. 680 (2024). This Court correctly upheld this prohibition against Plaintiffs' facial challenge at the preliminary-injunction stage, holding that it was supported by a "well-established and representative tradition of firearm regulation"—including "[t]he proliferation" of laws specifically prohibiting firearms in parks that "coincide[d] with the rise of public parks … over the latter half of the 19th century." *Antonyuk v. James*, 120 F.4th 941, 1018-26 (2d Cir. 2024), *cert. denied*, --- S. Ct. ----, 2025 WL 1020368 (U.S. Apr. 7, 2025); *accord Wolford v. Lopez*, 116 F.4th 959, 970, 982-84 (9th Cir. 2024) (rejecting challenges to similar California and Hawai'i laws prohibiting firearms in parks), *petition for cert. filed*, No. 24-1046 (U.S. Apr. 1, 2025). Now, on a more developed record, the State's position has only gotten stronger. Accordingly, for the reasons set out in the State's brief, Dkt. 34 ("State Br."), this Court should again reject Plaintiffs' attempt to invalidate New York's common-sense prohibition on carrying firearms in public parks. Everytown submits this amicus brief to expand on several points that support the constitutionality of that prohibition.

2

*First*, Plaintiffs' efforts to undermine *Antonyuk* are unavailing. *Antonyuk* correctly recognized that New York's parks law is firmly rooted in this nation's history, including a tradition from the founding era and earlier of prohibiting firearms in "quintessentially crowded areas and public forums." 120 F.4th at 1019. Plaintiffs' attacks on *Antonyuk*'s analysis of this tradition—particularly regarding laws in North Carolina and Virginia—are not grounded in fact, law, or the historical record. Moreover, the additional record and arguments advanced in support of summary judgment only further cement *Antonyuk*'s conclusions.

Plaintiffs' challenges to *Antonyuk*'s methodological conclusions are similarly baseless. *Antonyuk* confirmed that the historical analysis encompasses 19th-century history and made clear that consistent historical evidence from the early twentieth century remains probative. *See id.* at 972-74, 989 & n.41, 1019. Plaintiffs' arguments to the contrary are foreclosed by this binding (and correct) circuit precedent.

*Second*, this Court should consider the historical context surrounding the emergence of public parks in evaluating the constitutionality of New York's parks law. History demonstrates that

3

the creation of parks in both urban and rural settings was quickly
accompanied by laws prohibiting firearms in those parks.

## ARGUMENT

## I.    Plaintiffs Cannot Evade *Antonyuk*

Plaintiffs' efforts to relitigate *Antonyuk*'s conclusions have no
merit. Among other errors, they have provided no sound reason to
overturn *Antonyuk*'s recognition that the New York law's roots include
the founding-era regulatory tradition of prohibiting firearms in public
forums and quintessentially crowded places. Nor can they evade
*Antonyuk*'s conclusions regarding the proper methodology governing
Second Amendment cases.

### A.    *Antonyuk* Correctly Recognized that New York's Law
Continues Regulatory Traditions Traceable to the
Founding Era and Earlier

Regulatory traditions from the founding era and earlier
demonstrate the constitutionality of New York's prohibition on firearms
in public parks. *Antonyuk* correctly observed that New York's law
continues "a well-established and representative tradition of regulating
firearms in public forums and quintessentially crowded places." 120
F.4th at 1019. This tradition is evidenced by a "'long, unbroken line,'" of
regulation, "beginning from medieval England and extending beyond

4

Reconstruction." *Id.* at 1021 (quoting *Bruen*, 597 U.S. at 35); *see* State Br. 13-14, 22-25, 32-36.

Undeterred by *Antonyuk* and the historical record, Plaintiffs question the founding-era roots of this tradition. Specifically, they dispute the existence of a law observed in North Carolina during the founding era and relied on by this Court in *Antonyuk*, which "appears to have prohibited firearm carriage in general at fairs and markets regardless of conduct," 120 F.4th at 1020-21 & n.82; *see* Pls. Br. 24-31. And they dismiss a similar Virginia law as irrelevant because, they contend, it applied only to those publicly carrying firearms "in a terrifying manner, or with the intent of terrorizing the people." Pls. Br. 25. Plaintiffs are wrong on both fronts.

###    i.    North Carolina

*Antonyuk* was correct to recognize that North Carolina's prohibition on "rid[ing] armed … in fairs [and] markets" was in effect at the founding. 120 F.4th at 1020. *Antonyuk* cited Francois-Xavier Martin's 1792 compilation of English laws in force in North Carolina, JA249-52, as a source for this tradition. 120 F.4th at 1020. Much of Plaintiffs' critique is aimed at the reliability of this source. Pls. Br. at

5

27-29. But, as the State explains, Martin's compilation is credible, and Plaintiffs offer no convincing reason to doubt its inclusion of the Statute of Northampton. *See* State Br. 32-34.[2]

Most significantly, North Carolina's observance of the Statute of Northampton was catalogued not only by Martin, but also in an 1821 compilation prepared by a committee of three prominent legal and political figures appointed by the North Carolina legislature to "enumerate and specify those Statutes and parts of Statutes of Great-Britain, which are in force in the state." *Laws of the State of North Carolina, Including the Titles of Such Statutes and Parts of Statutes of Great Britain as are in Force in Said State* iii (Potter, Taylor & Yancey ed. 1821), *available at* https://tinyurl.com/mtmxakwf; *see id.* at 87, *available at* https://tinyurl.com/y7cajw4a (listing the Statute of Northampton, "2 Edward 3, 1328, Chap. 3"). The appointees were John Lewis Taylor, Chief Justice of the Supreme Court of North Carolina; Henry Potter, a federal district court judge; and Bartley Yancey, Speaker of the North Carolina Senate. *See id.* at vi. Not only do

---

[2] Plaintiffs' other efforts to downplay the existence and import of this North Carolina law are similarly unavailing, for the reasons the State sets out. *See* State Br. 34-36.

6

Plaintiffs offer no basis for disbelieving this committee's work, but it was implicitly *endorsed* by the commentators whose criticism of Martin is the centerpiece of Plaintiffs' claims. Specifically, Plaintiffs' source of criticism (*see* Pls. Br. 27-28) is the "Preface of the Commissioners of 1838," *Revised Code of North Carolina* xiii (1855), *available at* https://tinyurl.com/5n83xnc3. Immediately after the passage Plaintiffs cite, the same Preface discusses the Potter, Taylor, and Yancey compilation without any hint of criticism. *See id.* at xiii-xiv.

In any event, even if there were any merit to Plaintiffs' claim that the prohibition on firearms in fairs and markets was not in effect in North Carolina, the fact that these prominent jurists and commentators concluded that it was demonstrates that they also considered it to be entirely constitutional. That is itself compelling evidence of the historical principle *Antonyuk* identified, because the Supreme Court has confirmed that "a variety of legal and other sources" are relevant to determining the original meaning of the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008); *see Bruen*, 597 U.S. at 21, 60. In *Heller*, the Court gave weight to a range of documents, including 18th- and 19th-century commentaries and treatises. *See, e.g.*, 554 U.S.

7

at 582-83, 585, 593-95, 605-10, 616-19; *see also Bruen*, 597 U.S. at 45, 56, 61-63 (similarly crediting 18th- and 19th-century commentary and treatises). At the very least, the Martin source and the Potter, Taylor, and Yancey source are contemporaneous commentaries entitled to the same weight *Bruen* and *Heller* gave to commentaries, and their inclusion of the Statute of Northampton is compelling evidence that early Americans believed that it was permissible to prohibit firearms in crowded places and public forums without a separate showing of fear or terror.

ii. **Virginia**

Founding-era Virginia law also evidences the tradition of regulating firearms in quintessentially crowded places and public forums. Virginia forbade going armed "before the justices of any court … with force and arms," and going armed "in fairs or markets, or in other places, in terror of the count[r]y." 1786 Va. Acts 35, ch. 49, *available at* https://perma.cc/ZJ78-JCQT. Plaintiffs dismiss this law as irrelevant because, in their view, it did not fully prohibit firearms in sensitive places, and instead only barred carriage "in a terrifying manner, or with the intent of terrorizing the people." *See* Pls. Br. 25.

*Antonyuk*, however, correctly cited Virginia's statute in support of its conclusion that this nation's tradition includes banning guns in fairs and markets even without an additional "terror" element. *See* 120 F.4th at 1019-21. In fact, based on Virginia principles of statutory interpretation, its basis for doing so is even stronger than the panel appears to have thought.[3]

The statute forbade carrying weapons both in specifically enumerated places ("before the justices of any court" and "in fairs or markets") and generally ("in other places"). *See* 1786 Va. Acts 35, ch. 49. Under Virginia interpretive principles—which *Antonyuk* does not appear to have considered—"qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent." *See, e.g.*, *Alger v. Commonwealth*, 590 S.E.2d 563, 565-66 (Va. 2004); *see also* *Sims' Lessee v. Irvine*, 3 U.S. 425, 444 n.* (1799) (opinion of Ellsworth, C.J.) (stating last-antecedent rule in interpreting 1779 Virginia

---

[3] In some passages, *Antonyuk* appears to have endorsed Plaintiffs' reading of the Virginia statute, under which "in terror of the country" qualified not only its last antecedent, "in other places," but also the phrase before that, "in fairs or markets." *See* 120 F.4th at 1021 n.82, 1039. But it is not at all clear that it accepted Plaintiffs' reading definitively. *See id.* at 1039 ("*Even if we accept* that the Virginia law was solely aimed at people who terrorize ...." (emphasis added)).

statute).[4] Accordingly, the Virginia statute is best understood as
forbidding carrying arms "in other places," in terror of the country; or
"in fairs or markets," *period*. There was thus no need to make a special
showing of terrorizing effect with respect to someone carrying in fairs
and markets—just as there was no need to make such a showing with
respect to someone carrying "before the justices of any court." *Cf. Bruen*,
597 U.S. at 30 (making clear that firearms may be prohibited in
courthouses without a separate terror requirement). This conclusion is
further confirmed by the Virginia interpretive principle that "a statute
should be interpreted, if possible, to avoid rendering words
superfluous." *Cook v. Commonwealth*, 597 S.E.2d 84, 86 (Va. 2004);
*Browne v. Turberville*, 6 Va. 390, 405 (1800) (opinion of Pendleton, J.)
("A statute ought upon the whole to be so considered, that if it can be
prevented, no clause, sentence or word shall be superfluous, void, or
insignificant."). If "in terror of the country" were required in *all* places,
then naming "fairs and markets" would be superfluous. Accordingly, the
Virginia statute is properly understood as providing even better

---

[4] Federal courts interpret state laws as the highest court in the
state would. *See, e.g.*, *Sprint PCS L.P. v. Conn. Siting Council*, 222 F.3d
113, 115-16 (2d Cir. 2000).

evidence for the "national tradition of regulating firearms in often-crowded public squares," *Antonyuk*, 120 F.4th at 1026, that justified upholding New York's public-parks provision at the preliminary-injunction stage.[5]

In short, Plaintiffs cannot avoid *Antonyuk*'s correct holding that New York's prohibition on firearms in public parks has among its roots the founding-era prohibitions on firearms in "quintessentially crowded areas and public forums," 120 F.4th at 1019, including the founding-era laws observed in North Carolina and Virginia. The tradition evidenced by these and later laws compels affirmance.

### B. Plaintiffs Improperly Disregard *Antonyuk*'s Methodological Conclusions

Plaintiffs devote much of their brief to relitigating methodological questions about Second Amendment historical analysis that were squarely decided in *Antonyuk*. *See* Pls. Br. 17-22, 36-40. This Court should reject those efforts because they are foreclosed by *Antonyuk* (and

---

[5] This same interpretation would apply to the District of Columbia provision discussed in *Antonyuk*. *See* 120 F.4th at 1020 n.81 (citing An Act for Punishment of Crimes and Offences, within the District of Columbia, § 40 (1816) (prohibiting going or riding "armed by night nor day, in fairs or markets, or in other places, in terror of the county")).

are, in any event, incorrect). We highlight two of Plaintiffs' erroneous arguments: contrary to *Antonyuk*, they discount Reconstruction-era evidence and dismiss later history. *See also* State Br. 27-28, 30, 36 (discussing Plaintiffs' flawed methodological arguments).

### i. *Antonyuk* made clear that Reconstruction-era evidence is a critical part of the *Bruen-Rahimi* historical analysis

Plaintiffs contend that founding-era evidence must have "controlling weight" in the historical analysis and that Reconstruction-era evidence is "less probative." Pls. Br. 17-18. But *Antonyuk* specifically held the opposite: "evidence from the Reconstruction Era regarding the scope of the right to bear arms incorporated by the Fourteenth Amendment is *at least as relevant* as evidence from the Founding Era regarding the Second Amendment itself." 120 F.4th at 988 n.36 (emphasis added). Plaintiffs' argument is thus foreclosed by *Antonyuk*. Faced with this insurmountable roadblock, Plaintiffs try to minimize and ignore *Antonyuk*'s conclusions as to the importance of Reconstruction-era evidence. Their arguments are erroneous for several reasons.

*First*, Plaintiffs insist that, even under *Antonyuk*, Reconstruction-era evidence is relevant only when it *confirms* the founding-era understanding. Pls. Br. 18; *see id.* at 20 (Reconstruction-era evidence is relevant only where it "confirm[s] earlier history," or is part of an "enduring" and "well-established" tradition "with roots in the Founding"). But nowhere in its lengthy opinion did *Antonyuk* condition the relevance of Reconstruction-era evidence on its connection to or confirmation of founding-era history. To the contrary, the Court repeatedly affirmed the *independent* relevance of Reconstruction-era evidence. *See Antonyuk*, 120 F.4th at 988 n.36 (explaining Reconstruction-era evidence is "at least as relevant" as founding-era evidence); *id.* at 972 (concluding that "the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of [the] analysis"); *id.* at 974 (deeming 1868 and the surrounding period "fertile ground" for "seek[ing] evidence of our national tradition of firearms regulation").

*Second*, Plaintiffs incorrectly submit that Reconstruction-era evidence "cannot overcome evidence … from 1791 as to the permissibility of a given restriction on the right." Pls. Br. 18. *Antonyuk*

13

squarely rejected this position: it explained that while "evidence nearest to 1791 can differ from that nearest to 1868, such discrepancy does not mean that the right to keep and bear arms was calcified in either 1791 or 1868." 120 F.4th at 974. Even in an instance where the founding and Reconstruction understandings differ, the Court held that "1791 *and 1868 are both fertile ground*" in conducting the historical inquiry. *Id.* (emphasis added).

*Third*, Plaintiffs wrongly argue that Reconstruction-era evidence "cannot overcome" a "lack" of evidence from the founding. Pls. Br. 18. Thus, in their view, courts should ignore Reconstruction-era evidence where it is preceded by legislative silence. *See id.* But *Antonyuk* expressly warned against reasoning from historical silence as "risky," explaining: "it is not necessarily the case that, if no positive legislation from a particular time or place is in the record, it must be because the legislators then or there deemed such a regulation inconsistent with the right to bear arms." 120 F.4th at 969. That is because "[l]egislatures past and present have not generally legislated to their constitutional limits." *Id.*; *see also, e.g.*, *Rahimi*, 602 U.S. 739-40 (Barrett, J., concurring) (dismissing "flawed" assumption that "founding-era

14

legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority"); *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 217 (2022) (explaining that "the fact that many States in the late 18th and early 19th century did not criminalize pre-quickening abortions does not mean that anyone thought the States lacked the authority to do so"). Indeed, "[t]here are many reasons why the historical record may not evidence statutory prohibitions on a given practice," such as "'a lack of political demand rather than constitutional limitations.'" *Antonyuk*, 120 F.4th at 969-70 (citation omitted).

Illustrating this point, in *Rahimi*, the Supreme Court was undeterred by legislative silence: it upheld a modern law prohibiting individuals under domestic violence restraining orders from possessing firearms, even though the founding generation—which was well aware of domestic violence—did not pass laws specifically disarming domestic abusers. *See* 602 U.S. at 695-98; *see also id.* at 704 (Sotomayor, J., concurring) ("[T]he Government has not identified a founding-era or Reconstruction-era law that specifically disarmed domestic abusers, but it did not need to do so." (citation omitted)). Plaintiffs are thus wrong to

suggest that Reconstruction-era evidence should be ignored in the face of earlier legislative silence.

*Fourth*, apparently recognizing that their arguments contradict *Antonyuk*, Plaintiffs cite to the Third and Eighth Circuit decisions in *Lara v. Commissioner Pennsylvania State Police*, 125 F.4th 428, 438-43 (3d Cir. 2025), and *Worth v. Jacobson*, 108 F.4th 677, 692 (8th Cir. 2024), *cert. denied*, --- S. Ct. ----, 2025 WL 1151242 (U.S. Apr. 21, 2025), which both prioritized founding-era evidence. Pls. Br. 17. But this Court has already rejected the reasoning underlying these decisions. *See Antonyuk*, 120 F.4th at 974 (rejecting similar reasoning in earlier opinion in *Lara*); *accord Pinales v. Lopez*, No. 1:24-cv-00496, 2025 WL 653980, at *11-13 (D. Haw. Feb. 7, 2025) (disagreeing with *Lara* and *Worth*); *Kipke v. Moore*, No. 1:23-cv-01293, 2024 WL 3638025, at *5 (D. Md. Aug. 2, 2024) (finding earlier opinion in *Lara* "unconvinc[ing]"), *appeal docketed*, No. 24-1799 (4th Cir. Aug. 22, 2024); *Rupp v. Bonta*, 723 F. Supp. 3d 837, 877-78 (C.D. Cal. 2024) (reaching same conclusion), *appeal docketed*, No. 24-2583 (9th Cir. Apr. 24, 2024).[6]

---

[6] Regardless, even *Lara* acknowledged that "laws 'through the end of the 19th century' … can be 'a "critical tool of constitutional interpretation"'" because they can be evidence of a historical tradition

Plaintiffs' attempts to discount Reconstruction-era evidence thus cannot be squared with *Antonyuk* and should be rejected. In any event, the scores of Reconstruction-era parks restrictions the State presented, as well as the additional laws highlighted *infra* at 21 n.7, 22-23, are firmly rooted in the founding era as well. *See Antonyuk*, 120 F.4th at 1019; *see also* State Br. 22-25; *supra* Section I.A. Accordingly, as in *Antonyuk*, this Court should reject Plaintiffs' challenge to New York's law.

### ii. *Antonyuk* relied on consistent later history

Plaintiffs also incorrectly claim that "laws from the 20th-century are categorically too late to matter." Pls. Br. 18. *Antonyuk* already rejected that argument and considered 20th-century evidence as part of its historical analysis. *See, e.g.*, 120 F.4th at 989 n.41 (rejecting argument that 20th-century evidence is "weightless" in the historical analysis); *id.* at 989 (discussing discretionary licensing regimes from "the early-twentieth century and beyond"). And although *Antonyuk*

---

and shed important light on the meaning of the Amendment as it was originally understood," 125 F.4th at 441 (quoting *Bruen*, 597 U.S. at 35)—so long as those laws do not "contradict[] earlier evidence," *id.* (quoting *Bruen*, 597 U.S. at 66); *see also Worth*, 108 F.4th at 696-98 (considering Minnesota's Reconstruction-era sources).

acknowledged that later evidence may not be "as probative as nineteenth-century evidence," particularly when it is "*inconsistent* with prior practices," *id.* at 989 n.41 (citing *Bruen*, 597 U.S. at 36), 20th-century evidence that "reflect[s] previously settled practices and assumptions[ ] remain[s] probative as to the existence of an American tradition of regulation," *id*; *see also, e.g.*, *Bianchi v. Brown*, 111 F.4th 438, 469-70 (4th Cir. 2024) (en banc) (describing consistent 20th-century enactments as "steps trod along a well-worn path" that "remain relevant in tracing the broader and consistent story of our nation's regulation"), *petition for cert. filed sub nom. Snope v. Brown*, No. 24-203 (U.S. Aug. 23, 2024).

Indeed, there is no reason to apply any strict limit when later laws are consistent with earlier understandings. After all, as both the Supreme Court and this Court have recognized, "[p]rinciples of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness." *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122 (2011) (citation omitted); *see Antonyuk*, 120 F.4th at 973 (finding it "implausible that [a] public understanding would promptly dissipate whenever [one] era gave

18

way to another"). And, as explained next, this later history is particularly important where—as here—a case involves "unprecedented societal concerns." *Antonyuk*, 120 F.4th at 970 (quoting *Bruen*, 597 U.S. at 27-28).

## II. This Court Should Consider Historical Context in Evaluating New York's Parks Law

In conducting its historical analysis, this Court should continue to recognize the importance of historical context in ascertaining the "principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. Close historical cousins to a modern regulation will not exist before the societal or technological condition that prompted regulation arose. Accordingly, regulations that emerged alongside or soon after a new condition should carry particular weight, and to the extent that a court seeks additional, older historical analogues, it must accept more distant cousins as sufficient. Historical context thus provides important insight into past legislative action—and inaction. *See Antonyuk*, 120 F.4th at 994 (considering historical growth of licensing scheme regulations "in the context of [] larger changes in criminal justice"). This is particularly so when a case involves "new circumstances" and "unprecedented societal concerns" that demand a "more nuanced" analysis. *Antonyuk*,

19

120 F.4th at 970 (quoting *Bruen*, 597 U.S. at 27-28); *see id.* at 1022 n.86 (recognizing that the "relative novelty of public parks … justifies a flexible approach" but finding it unnecessary because the historical parks analogues were "relatively simple to draw"). Here, historical context shows that the creation of parks of all types—from parks in urban areas to state and national parks in more rural and wilderness areas—was quickly accompanied by laws prohibiting firearms in those parks.

To start, as this Court explained in *Antonyuk*, "[t]he modern idea of the park emerged in the nineteenth century," before which "open spaces that were not privately owned ... consisted of grazing areas open to all." *id.* at 1024 (citation omitted); *accord, e.g.*, *Wolford*, 116 F.4th at 970, 982 (agreeing with *Antonyuk* that "[p]arks in modern form … first arose in the middle of the 19th century," and that founding-era green spaces like Boston Common "were not relevantly similar to parks in their modern form"). And this "rise of public parks … over the latter half of the 19th century" "coincide[d] with" the "proliferation" of "urban public park regulations." *Antonyuk*, 120 F.4th at 1022; *accord, e.g.*, *Wolford*, 116 F.4th at 982; *LaFave v. County of Fairfax*, No. 1:23-cv-

20

01605, 2024 WL 3928883, at *10 (E.D. Va. Aug. 23, 2024), *appeal docketed*, No. 24-1866 (4th Cir. Sept. 16, 2024); *see also* JA374 (State's expert Dr. Terence Young explaining that "America's large urban parks embraced firearms prohibitions shortly after they came into existence"). *Antonyuk*'s analysis was correct based on the preliminary-injunction record that the Court had before it—and, as the Court anticipated, *see* 120 F.4th at 1023 n.90, it stands on even firmer ground now, with an even more comprehensive record of park regulations. *See* State Br. 14-22, 27-28.[7]

This is true not only for urban parks, but also for rural or wilderness parks. In *Antonyuk*, this Court expressed skepticism that the State had compiled a sufficient record at that stage to show the constitutionality of firearms prohibitions in "rural" parks, where the State's preliminary record contained just eight restrictions for city parks and none for national or state parks. 120 F.4th at 1022, 1025.

---

[7] In addition to the well over 100 parks laws presented in the joint appendix, JA397-1171, undersigned counsel compiled 55 additional examples in a case challenging Fairfax County, Virginia's parks law. *See* Defs.' Addendum to Op. Br., *LaFave v. County of Fairfax*, No. 24-1886, Dkt. 30-2 (4th Cir. Dec. 16, 2024); Joint Appendix at 889-979, *LaFave v. County of Fairfax*, No. 24-1886, Dkt. 26-1 (4th Cir. Nov. 14, 2024); *see also* State Br. 16 n.5 (referencing the *LaFave* Addendum).

21

This Court, however, recognized that "the litigation [was] still in its early stages." *Id.* at 1025. The record is now significantly more extensive. It shows that the same cycle of park creation and firearms prohibition seen in urban parks also happened in wilderness parks, starting with the creation of the first national parks in the late nineteenth century. JA380, JA382 (expert report of Dr. Young); *see* State Br. 19-20. The national park at Mackinac Island prohibited guns as early as 1882, JA382-83; Sequoia did so in 1890, JA383; Yellowstone had a prohibition by 1894, and Yosemite by 1897. JA383; *see also* State Br. 19-20; *LaFave*, 2024 WL 3928883, at *10 (finding that a similar expert report by Dr. Young "provided extensive record evidence" of firearm restrictions in national parks "beginning in [the late 19th century] and continuing into the 20th century"). This cycle repeated as Congress created new parks through the early 20th century until, in 1936, the National Park Service adopted a prohibition applicable to all national parks and monuments. JA384; *see* State Br. 20.

As the State explains, "a similar trajectory" occurred with respect to state parks as well. *See* State Br. 20-21; *see also, e.g.*, *Campers May Enjoy Life in the Big Basin*, Santa Cruz Sentinel (July 15, 1904),

*available at* https://tinyurl.com/4zs6bdb6 (reporting rules for Big Basin

Redwoods State Park, including that "No visitor will be allowed to carry

firearms within the limits of the Park"); *Big Basin Redwoods State*

*Park*, California State Parks (2025), https://www.parks.ca.gov/bigbasin

("Established in 1902, Big Basin Redwoods is California's oldest state

park.").

Completely ignoring this tradition, Plaintiffs contend that there is

no "[h]istorical [p]rinciple" or "basis" supporting the restriction of

firearms in rural parks such as "hiking trails, [and] wooded and open

nature areas." Pls. Br. 51-52. To the extent Plaintiffs disregard these

laws because they consider them "too late," *see* Pls. Br. 18, they

contravene *Antonyuk*, as discussed above. *See supra* Section I.B. And if

they consider hiking areas or large nature areas to be ones where guns

cannot possibly be prohibited, the national parks prohibitions show

their error; when Yellowstone's regulations prohibited firearms, for

example, the park covered approximately 2.2 million acres. *See* JA382-

83; *see also United States v. Masciandaro*, 648 F. Supp. 2d 779, 790

(E.D. Va. 2009) (in applying *Heller*'s sensitive-places principle,

observing that "National Parks are public properties where large

23

numbers of people, often strangers (and including children), congregate for recreational, educational, and expressive activities"), *aff'd on other grounds*, 638 F.3d 458 (4th Cir. 2011).

In light of the history of national and state parks, it makes sense that regulations restricting firearms in rural or wilderness parks did not appear until the late-nineteenth century. "'States adopt laws to address the problems that confront them,'" and are not expected to "'regulate for problems that do not exist.'" *McCullen v. Coakley*, 573 U.S. 464, 481 (2014) (citation omitted); *see supra* pp. 14-16. Thus, as one court recently put it, "[i]f a societal condition did not exist in the relevant period a court is examining, then self-evidently there will be no historical firearms laws addressing that condition in that period— making the consideration of later history particularly crucial." *LaFave*, 2024 WL 3928883, at *7; *see also Wolford*, 116 F.4th at 980 (explaining that "it is illogical to expect a government to regulate a place before it existed in its modern form").

In sum, the historical record in this case—including scores of historical regulations and historical context explaining why firearms

restrictions in parks emerged when they did—demonstrates that New York's parks provision is constitutional.

## CONCLUSION

This Court should affirm the district court's judgment.

Dated: May 9, 2025          Respectfully submitted,

/s/ Janet Carter
Janet Carter
William J. Taylor, Jr.
Priyanka Gupta Sen
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163
(646) 324-8174
jcarter@everytown.org

Freya Jamison
Sana S. Mesiya
Everytown Law
P.O. Box 14780
Washington, D.C. 20044

*Counsel for amicus curiae*
*Everytown for Gun Safety*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) and Local Rules 29.1(c) and 32.1(a)(4)(A) because this brief contains 4,695 words, excluding the portions exempted by Fed. R. App. P. 32(f), and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: May 9, 2025                         /s/ Janet Carter

                                          Janet Carter
                                          *Counsel for amicus curiae*
                                          *Everytown for Gun Safety*