# 25-384

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

BRETT CHRISTIAN; FIREARMS POLICY COALITION, INC.;
SECOND AMENDMENT FOUNDATION,

*Plaintiffs-Appellants*,

JOHN BORON,

*Plaintiff*,

v.

STEVEN G. JAMES, in his official capacity as Superintendent of the
New York State Police, MICHAEL J. KEANE, in his official capacity as
District Attorney for the County of Erie, New York,

*Defendants-Appellees*,

On Appeal from the U.S. District Court
for the Western District of New York

**BRIEF OF AMICI CURIAE GIFFORDS LAW CENTER TO PREVENT GUN
VIOLENCE, BRADY CENTER TO PREVENT GUN VIOLENCE, AND
MARCH FOR OUR LIVES IN SUPPORT OF DEFENDANTS-APPELLEES**

P. Benjamin Duke
COVINGTON & BURLING LLP
620 Eighth Ave.
New York, NY 10018
Tel: (212) 841-1000
pbduke@cov.com

*Counsel for Amici Curiae Giffords Law
Center to Prevent Gun Violence, Brady*

*Center to Prevent Gun Violence, and
March For Our Lives*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

INTEREST OF *AMICI CURIAE* ........................................................................ v

INTRODUCTION ............................................................................................... 1

ARGUMENT ........................................................................................................ 3

I.     The District Court Correctly Held That This Court's Decision in *Antonyuk* Was Determinative in The State's Favor. ........................................................... 3

II.    The Parks Ban is Strongly Supported By the American Historical Tradition of Firearms Regulation. ...................................................................................... 5

      A.    Reconstruction-Era Regulations of Public Parks Can and Should Be Considered Under *Bruen* and *Rahimi*. ............................................... 6

      B.    Under *Rahimi*'s Nuanced Approach, The State Identified Founding-Era Analogues Sufficient to Validate the Constitutionality of the Parks Ban............ 10

III.   The Historical Tradition of Firearms Regulation Encompasses Both Urban and Rural Parks.......................................................................................................... 14

CONCLUSION..................................................................................................... 17

CERTIFICATE OF COMPLIANCE ................................................................... 18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Antonyuk v. Chiumento,*
    89 F.4th 271 (2d Cir. 2023) ................................................................ *passim*

*Antonyuk v. James,*
    120 F.4th 941 (2d Cir. 2024), *cert denied*, No. 24-795, 2025 WL 1020368
    (U.S. Apr. 7, 2025)................................................................................1, 2, 4, 8

*Association of New Jersey Rifle & Pistol Clubs v. Attorney General New Jersey,*
    910 F.3d 106 (3d Cir. 2018).................................................................... iv

*Christian v. James,*
    No. 22-cv-695 (JLS), 2025 WL 50413 (W.D.N.Y. Jan. 8, 2025)........................2, 5

*Christian v. James,*
    No. 24-2847 (filed Oct. 28, 2024)................................................... iv, v, vi

*District of Columbia v. Heller,*
    554 U.S. 570 (2008)................................................................... iv, v, 5, 7

*Duncan v. State of Louisiana,*
    391 U.S. 145 (1968)................................................................................8

*Garland v. Cargill,*
    602 U.S. 406 (2024) (Sotomayor, J., Dissenting) .................................... iv

*Hanson v. District of Columbia,*
    671 F. Supp. 3d 1 (D.D.C. 2023), *aff'd sub nom. Hanson v. Smith*, 120 F.4th
    223 (D.C. Cir. 2024) ...............................................................................v

*Hanson v. Smith,*
    120 F.4th 223 (D.C. Cir. 2024).................................................................v

*Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms & Explosives,*
    417 F. Supp. 3d 747 (W.D. Va. 2019) .......................................................v

*Libertarian Party v. Cuomo,*
    970 F.3d 106 (2d Cir. 2020).................................................................. iv

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) ........................................................................ iv, 8

*Maryland Shall Issue v. Hogan,*
    353 F. Supp. 3d 400 (D. Md. 2018) ..........................................................v

*New York State Rifle & Pistol Association v. Bruen*,
    597 U.S. 1 (2022)............................................................................*passim*

*New York State Rifle & Pistol Association v. City of New York*,
    590 U.S. 336 (2020)................................................................................ vi

*National Association for Gun Rights, Inc. v. Lamont*,
    685 F. Supp. 3d 63 (D. Conn. 2023)........................................................v

*Peruta v. County of San Diego*,
    824 F.3d 919 (9th Cir. 2016) ....................................................................v

*Ramos v. Louisiana*,
    590 U.S. 83 (2020)..............................................................................8, 9

*Stimmel v. Sessions*,
    879 F.3d 198 (6th Cir. 2018) ...................................................................v

*United States v. Hayes*,
    555 U.S. 415 (2009)..................................................................................v

*United States v. Rahimi*,
    602 U.S. 680 (2024) .......................................................................*passim*

*Wade v. University of Michigan*,
    981 N.W.2d 56 (Mich. 2022)................................................................. vi

*Washington State Grange v. Washington State Republican Party*,
    552 U.S. 442 (2008)..................................................................................1

**Statutes**

New York's Concealed Carry Improvement Act § 265.01-e(2)(d) ...........................1, 4

**Other Authorities**

Fᴇᴅ. R. Aᴘᴘ. P. 29 ..................................................................................... iv

Fed. R. App. P. 32(f)...................................................................................18

Fed. R. App. P. 32(g)(1) .............................................................................18

Kari Still, et al., *The History and Tradition of Regulating Guns in Parks, 19*Harv.
    L. & Pol's Rev. 222 (Oct. 14, 2024), https://tinyurl.com/yckyst9m ...................9, 15

*Niagara Falls: A Global Attraction with 22.5 Million Annual Visitors*, Niagra
    Action https://www.niagaraaction.com/niagara-falls-a-global-attraction-with-
    22-5-million-annual-visitors? (last visited May 7, 2025) .........................13

*Origin of the National Park Idea*, National Park Service,
  https://www.nps.gov/articles/npshistory-origins.htm (last visited May 3, 2025)...................15

## INTEREST OF *AMICI CURIAE*[1]

*Amicus curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is a nonprofit policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others who seek to reduce gun violence and improve the safety of their communities. The organization was founded more than 30 years ago following a gun massacre at a San Francisco law firm and was renamed Giffords Law Center in 2017 after joining forces with the gun-safety organization led by former Congresswoman Gabrielle Giffords. Today, through partnerships with gun violence researchers, public health experts, and community organizations, Giffords Law Center researches, drafts, and defends the laws, policies, and programs proven to effectively reduce gun violence. Giffords Law Center also advocates for the interests of gun owners and law enforcement officials who understand that Second Amendment rights have always been consistent with gun safety legislation and community violence prevention strategies. Giffords Law Center has contributed technical expertise and informed analysis as an *amicus* in numerous cases involving firearm regulations and constitutional principles affecting gun policy. *See, e.g.*, *United States v. Rahimi*, 602 U.S. 680 (2024); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *District of Columbia v. Heller*, 554 U.S. 570 (2008); *Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023); *Christian v. James*, No. 24-2847 (filed Oct. 28, 2024); *Libertarian Party v. Cuomo*, 970 F.3d 106 (2d Cir. 2020). Several courts have cited research and information from Giffords Law Center's *amicus* briefs in Second Amendment rulings. *See, e.g.*, *Garland v. Cargill*, 602 U.S. 406, 432–33 (2024) (Sotomayor, J., dissenting); *Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. N.J.*, 910 F.3d 106, 121–22 (3d Cir.

---

[1] No counsel for a party wrote this brief in whole or in part, and no one other than *amici* or their counsel contributed money to fund the preparation or submission of this brief. The parties have consented to its filing. Fᴇᴅ. R. Aᴘᴘ. P. 29.

2018); *Stimmel v. Sessions*, 879 F.3d 198, 204, 208, 210 (6th Cir. 2018); *Peruta v. County of San Diego*, 824 F.3d 919, 943 (9th Cir. 2016) (en banc) (Graber, J., concurring); *Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 417 F. Supp. 3d 747, 754, 759 (W.D. Va. 2019); *Md. Shall Issue v. Hogan*, 353 F. Supp. 3d 400, 403–05 (D. Md. 2018).*Amicus curiae* Brady Center to Prevent Gun Violence ("Brady") is the nation's most longstanding nonpartisan, nonprofit organization dedicated to reducing gun violence through education, research, and legal advocacy. Brady works to free America from gun violence by passing and defending gun violence prevention laws, reforming the gun industry, and educating the public about responsible gun ownership. Brady has a substantial interest in ensuring that the U.S. Constitution is construed to protect Americans' fundamental right to live. Brady also has a substantial interest in protecting the authority of democratically elected officials to address the nation's gun violence epidemic. Brady has filed *amicus* briefs in many cases involving the regulation of firearms, including *Rahimi*, 602 U.S. 680; *Bruen*, 597 U.S. 1; *Heller*, 554 U.S. 570; *Antonyuk*, 89 F.4th 271; and *Christian*, No. 24-2847 (filed Oct. 28, 2024). Multiple courts have cited Brady's expertise on these issues. *See, e.g.*, *United States v. Hayes*, 555 U.S. 415, 427 (2009); *Hanson v. Smith*, 120 F.4th 223, 248–49 (D.C. Cir. 2024); *Nat'l Ass'n for Gun Rights, Inc. v. Lamont*, 685 F. Supp. 3d 63, 85, 96, 97 n.30, 104, 110 & n.52 (D. Conn. 2023); *Hanson v. District of Columbia*, 671 F. Supp. 3d 1, 14, 19 n.10, 20, 23 (D.D.C. 2023), *aff'd sub nom. Hanson v. Smith*, 120 F.4th 223 (D.C. Cir. 2024).*Amicus curiae* March For Our Lives Foundation ("MFOL") is a youth-led nonprofit organization dedicated to promoting civic engagement, education, and direct action by youth to achieve sensible gun violence prevention policies that will save lives. Formed after the mass shooting at Marjory Stoneman Douglas High School in Parkland, Florida, MFOL organized the largest single day of protest against gun violence in the nation's history. From its Road to Change initiative that

registered 50,000 new voters in 2018, to its successful advocacy for dozens of state, local, and federal laws, MFOL uses the power of youth voices to create safe and healthy communities and livelihoods for all. These young people—all too familiar with mass shootings and other forms of gun violence—have a vital interest in ensuring that the U.S. Constitution is correctly interpreted to allow for the enactment of reasonable gun violence prevention measures, including public carry licensing regimes, to protect all Americans. MFOL has participated as *amicus curiae* in other cases that affect its core interest in preventing gun violence. It has filed *amicus* briefs in *Antonyuk*, 89 F.4th 271; *Bruen*, 597 U.S. 1; *Christian*, No. 24-2847 (filed Oct. 28, 2024); *N.Y. State Rifle & Pistol Ass'n v. City of New York*, 590 U.S. 336 (2020); and *Wade v. Univ. of Mich.*, 981 N.W.2d 56 (Mich. 2022).

## INTRODUCTION

In *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024), *cert denied*, No. 24-795, 2025 WL 1020368 (U.S. Apr. 7, 2025),[2] this Court rejected Plaintiffs' facial challenge to § 265.01-e(2)(d) of New York's Concealed Carry Improvement Act (CCIA), which prohibits (subject to certain exceptions) the carrying of a firearm, rifle, or shotgun in "public parks" (the "Parks Ban"). *Antonyuk* concluded that Defendants (collectively, the "State" or "Defendants") had presented a "wealth of evidence" demonstrating "a well-established, representative, and longstanding tradition of regulating firearms in places that serve as public forums and, as a result, tend to be crowded"—including public parks. 120 F.4th at 1023. This tradition is grounded in a plethora of state, municipal, and territorial regulations dating from the pre-Founding colonial era through the post-Reconstruction era, when modern public parks were first established. *See id.* at 1020–23. The court rejected Plaintiffs' reliance upon the Founding-era use of Boston Common and similar spaces by state militias as contrary analogues, reasoning that such spaces were typically common grazing areas unlike modern recreational parks, and their use for organized militia exercises and mustering did not otherwise sanction firearms carrying by ordinary individuals. *Id.* at 1024. The State's "relevantly similar" analogues demonstrated that the Parks Ban has "a plainly legitimate sweep," *Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 449 (2008), sufficient to overcome Plaintiffs' facial challenge under the Second Amendment.

---

[2] This Court issued its original decision in *Antonyuk v. Chiumento*, 89 F.4th 271 (2023). Thereafter, the Court issued a revised decision in *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024), *cert denied*, No. 24-795, 2025 WL 1020368 (U.S. Apr. 7, 2025), following the U.S. Supreme Court's remand for reconsideration of one of the other consolidated appeals in *Antonyuk,* in light of *United States v. Rahimi*, 602 U.S. 680 (2024). *Antonyuk v. James* reaffirmed the Court's prior conclusions and analysis as to that appeal, while also incorporating a comprehensive restatement of its decision as to all four consolidated appeals, including this case. This brief cites the Court's revised opinion. *See* Br. for Def.-Appellees (Defs.' Br.) at 4 n.2.

*Antonyuk*, 120 F.4th at 1025–26.

On remand, the district court in this case granted summary judgment in favor of Defendants, concluding that "the Second Circuit's extensive consideration of the parks issue" in *Antonyuk* was determinative as to the constitutionality of the Parks Ban. *Christian v. James*, No. 22-cv-695 (JLS), 2025 WL 50413, at *1–2 (W.D.N.Y. Jan. 8, 2025). *Amici* respectfully submit this amicus brief to make three points in support of the State's position that the district court's entry of judgment in the State's favor should be affirmed.[3]

*First*, following the remand in *Antonyuk*, the State materially strengthened its original evidence demonstrating the Parks Ban's constitutionality, including as to rural parks, by supplementing the preliminary injunction record with substantial additional expert witness and supporting documentary evidence. In contrast, Plaintiffs added no admissible evidence of any weight, instead focusing on a baseless last-ditch attempt to fashion an alternative as-applied challenge that they did not plead and had never before pursued. In light of this record, and as the district court correctly recognized, this Court's legal rulings in *Antonyuk* foreclosed Plaintiffs' challenge to the Parks Ban and required entry of summary judgment in the State's favor.

*Second,* the U.S. Supreme Court's decision in *Rahimi*, 602 U.S. 680, strongly reinforces *Antonyuk*'s conclusion (reached prior to *Rahimi*) that the Parks Ban is consistent with this nation's historical tradition of firearms regulation. Applying *Rahimi*'s nuanced approach to

---

[3] *Amici* previously filed an amicus brief in support of the State defendants in the four appeals (including this case) consolidated in *Antonyuk*, before the U.S. Supreme Court issued its decision in *Rahimi*. *See* Brief for Giffords, et al. as Amici Curiae Supporting Defendants-Appellants in *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2023) (No. 190). Plaintiffs here did not appeal this Court's original decision in *Antonyuk*, and the Supreme Court's vacatur and remand for reconsideration in light of *Rahimi* did not apply to or affect the original judgment as to Plaintiffs' appeal. This Court's revised opinion in *Antonyuk v. James* thus incorporates in full its original pre-*Rahimi* analysis and ruling as to the Parks Ban. *See* note 2 above.

2

historical analogues, the *Antonyuk* court was clearly correct in concluding that the Parks Ban falls within a longstanding tradition of regulating firearms in "quintessentially crowded places" and other sensitive areas.  Plaintiffs' crabbed reading of the historical record attempts to cast aside the vast majority of Defendants' proffered analogues by reading each in isolation through an overly narrow lens that the Supreme Court in *Rahimi* expressly rejected.  It should be rejected here as well.

*Third,* as reflected in the voluminous additional historical materials submitted by Defendants on remand, the broad tradition of firearms regulation in public parks extends not only to urban parks but also to large rural parks, including iconic wilderness parks in New York and other states.  Indeed, the widespread public acceptance of such regulations—without constitutional objections—following the advent of large rural parks in the late nineteenth century further confirms the deep roots of that well-established tradition.  Even if Plaintiffs had raised a cognizable challenge to the Parks Ban "as applied" to the vague category of "rural parks," any such challenge would fail as a matter of law.

## ARGUMENT

## I. THE DISTRICT COURT CORRECTLY HELD THAT THIS COURT'S DECISION IN *ANTONYUK* WAS DETERMINATIVE IN THE STATE'S FAVOR.

On remand pursuant to this Court's decision in *Antonyuk*, the district court appropriately allowed the parties to supplement the preliminary injunction record with additional evidence in support of their cross-motions for summary judgment.  In that context, Defendants substantially buttressed their evidentiary support for the Parks Ban by introducing, *inter alia*, additional expert declarations providing dozens more historical examples of laws restricting firearms carriage in public parks.  *See* J.A. 397–1171, 1284–1526, 1565–92.  In particular, responding to the *Antonyuk* panel's suggestion that the preliminary injunction record might not establish the State's

likelihood of success on the constitutionality of § 265.01-e(2)(d) as to rural public parks, *see* 120 F.4th at 1025, Defendants submitted the expert declaration of Prof. Terence Young, opining on the robust historical tradition of firearms restriction in rural public parks and attaching 116 exhibits substantiating his opinion. *See* J.A. 361–90 (Young Decl. ¶¶ 1–58). Plaintiffs submitted no evidence challenging or contradicting Prof. Young's declaration or the voluminous body of statutory and other historical evidence accompanying it.

In contrast, Plaintiffs submitted little more than a hodge-podge of inadmissible documents relating to a handful of selected parks, in an attempt to belatedly conjure up an alternative, as-applied challenge to § 265.01-e(2)(d)—one that Plaintiffs did not allege in their complaint and had not previously advanced. For example, Plaintiffs submitted lawyers' affidavits attaching, *inter alia*, miscellaneous documents purporting to contain U.S. Census data, internet screenshots of roads and park maps, and street view photographs of a few parks.[4] On the issues relevant to the *facial* constitutionality of the Parks Ban, Plaintiffs attempted to re-argue legal points already considered by this Court in *Antonyuk*, but failed to meaningfully supplement the evidence in the preliminary injunction record.

The district court in this case was thus presented with a summary judgment record in which the State had materially *strengthened* the proof previously considered by the panel in *Antonyuk*, while Plaintiffs had added little or nothing in support of their facial challenge to the

---

[4] *See, e.g.*, J.A. 1649–58 (census data for Cheektowaga, NY, New York, NY, and Buffalo City, NY); J.A. 1662–64, 1667–69 (screenshots of Bing map directions); J.A. 1665–66, 1670–71 (Bing street view of Como park Blvd. and Losson Rd.); J.A. 1672–73, 1682–83 (Bing map of Stiglmeier Park and Cheektowaga Town Clerk); J.A. 1674–81, 1684–89 (screenshots of the Harris Hill State Forest and Cheektowaga Town Hall websites); J.A. 1703–10 (population density maps of Stiglmeier Park, Harris Hill State Forest, Ellicott Creek Park, Niawanda, Veterans, Isle View Park, Black Rock Canal Park, Buffalo Harbor State Park, and Main Street Town Park, from the U.S. Census Bureau in 2020).

4

Parks Ban. As shown in the State's opening brief here, *see* Defs.' Br. at 36–40, Plaintiffs' attempt to fashion a last-minute as-applied challenge to the Parks Ban is both procedurally barred and legally deficient. As a result, the only summary judgment issue properly before the district court was a facial challenge to the constitutionality of the Parks Ban, on a record that was only more favorable to the Defendants than it had been before. On that basis, the district court correctly concluded that "the Second Circuit's extensive consideration of the parks issue" in *Antonyuk* was determinative and summary judgment in favor of the State must be granted. *Christian*, 2025 WL 50413, at *1–2.

Plaintiffs were entitled to (and afforded) an opportunity to develop the evidentiary record further on remand—*not* to a second bite at the apple on legal issues that this Court previously decided in *Antonyuk*. While this Court's prior rulings on a preliminary injunction record may not technically be binding as the "law of the case," *see* Defs.' Br. at 13, the legal analysis and conclusions in *Antonyuk* remain sound and are dispositive in light of the full record developed here. Summary judgment in the State's favor should be affirmed on that basis.

## II. THE PARKS BAN IS STRONGLY SUPPORTED BY THE AMERICAN HISTORICAL TRADITION OF FIREARMS REGULATION.

The Supreme Court has recognized that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). For example, the Supreme Court found that the Second Amendment does not bar the government from regulating guns in "sensitive places," such as schools and government buildings. *Id.* at 626–27 & n.26; *see Bruen*, 597 U.S. at 30. In *Bruen*, the Supreme Court explained that courts evaluating the constitutionality of firearm regulations under the Second Amendment should begin with a threshold inquiry to determine if the relevant course of conduct falls within the "plain text" of the Second Amendment. 597 U.S. at 24. If, and only if, the regulated conduct is

protected by the plain text of the Second Amendment, courts should then engage in analogical reasoning to determine whether the "hows" (the mechanism of restriction) and the "whys" (the societal problem motivating the regulation) of the modern regulation have historical analogues. The relevant inquiry is whether a modern regulation is "consistent" with the original understanding of the Second Amendment's reach, not whether the modern regulation has a "historical twin." *Id.* at 30 (emphasis in original).

In *Rahimi*, the Supreme Court clarified *Bruen's* interpretive framework, chiding lower courts for having "misunderstood the methodology of our recent Second Amendment cases" and emphasizing that *Bruen* was "not meant to suggest a law trapped in amber." 602 U.S. at 691. The focus of *Bruen*'s historical inquiry is not a rigid matching exercise, but rather requires courts to consider "whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Id.* at 692 (emphasis added). The *Rahimi* Court reiterated that a valid analogue does not have to be a "historical twin," and that it may be sufficient to demonstrate the constitutionality of the challenged regulation if its "how" and "why" are consistent with the Second Amendment's animating principles. *Id.* at 692; *see Bruen*, 597 U.S. at 30.

## A. RECONSTRUCTION-ERA REGULATIONS OF PUBLIC PARKS CAN AND SHOULD BE CONSIDERED UNDER *BRUEN* AND *RAHIMI.*

Plaintiffs contend that analogues from the Reconstruction era cannot "establish the historical tradition of regulation" unless there is a Founding-era regulation that they "confirm." Pls.' Br. at 28. They contend that no valid historical analogues for the Parks Ban exist from the Founding era, and the *Antonyuk* panel therefore erred in holding that the understanding of Second Amendment rights at the time of the Fourteenth Amendment's ratification in 1868 could serve as a "'focal point'" of its analysis. *Id.* at 18 (quoting *Antonyuk*, 120 F.4th at 972, 974). Plaintiffs' contention that Reconstruction-era evidence is relevant only if it "*confirms* evidence

6

of the 1791 understanding," *id.* (emphasis in original), fails in two fundamental respects. First, their argument that Reconstruction-era regulations are relevant only to the extent that they can be tethered to specific Founding-era analogues misconstrues the meaning of historical silences and is at odds with the *Bruen* test, as clarified by *Rahimi*. Second, as discussed in part II.B. below, the Founding-era analogues identified by the State firmly establish a "relevantly similar" groundwork of historical regulation consistent with the Second Amendment, during a period before modern public parks had been created.

Contrary to Plaintiffs' suggestion, the Supreme Court has never rejected consideration of laws from the Reconstruction era as historical reference points in Second Amendment analysis. *See Heller*, 554 U.S. at 605 ("We now address how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century."); *Bruen*, 597 U.S. at 27 ("Following the course charted by *Heller*, we will consider whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation."). The Court in *Bruen* considered whether Reconstruction-era regulations can establish a historical tradition and declined to resolve that issue. *Bruen*, 597 U.S. at 38. The *Rahimi* Court also considered the issue and declined to foreclose reliance on laws from the Reconstruction era. *See* 602 U.S. at 742 n.1. Moreover, the absence of matching historical regulations from the Founding era or later is not dispositive of a modern law's constitutionality because courts should not "assume[] that founding-era legislatures maximally exercised their power to regulate" or that the Second Amendment imposes a "'use it or lose it' view of legislative authority." *Id.* at 739–40 (Barrett, J., concurring). Legislative silence on firearm regulations at a particular point may indicate only that there was not an explicit need for regulation at that time and does not preclude the constitutionality of a regulation that came years later. This logic has particular force when—

as in the case of modern public parks—the type or category of regulated sites did not exist during the Founding era.

As this Court observed in *Antonyuk*, it is also logically inconsistent to construe the Second Amendment's "scope and limitations exclusively by [Founding-era] standards" in evaluating the constitutionality of state regulations, given the historical fact that the Second Amendment right to keep and bear arms did not apply to the States until the Fourteenth Amendment was adopted in 1868. *See* 120 F.4th at 973; *see also McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 806 (2010) (Thomas, J., concurring) (recognizing that "the right to keep and bear arms is a privilege of American citizenship that applies to the States through the Fourteenth Amendment's Privileges or Immunities Clause"). The Supreme Court has specifically considered evidence from the Reconstruction era as relevant in determining whether the Second Amendment is a fundamental right. *See McDonald*, 561 U.S. 742 (noting that Second Amendment rights were viewed as critical for newly-freed enslaved people). Since the Second Amendment was not incorporated, and therefore not enforceable, against the States until 1868, the content of that right as it relates to state regulations must be informed by the traditions and prevailing understanding from that time.

Indeed, in evaluating the meaning of incorporated rights under other amendments contained in our Bill of Rights, the Supreme Court has regularly looked to the Reconstruction era as the relevant historical focal point. *See, e.g.*, *Duncan v. State of La.*, 391 U.S. 145 (1968) (reviewing the historical understanding of the right to a jury trial in serious criminal cases at the time of the Fourteenth Amendment). In *Ramos v. Louisiana*, Justice Thomas considered the right to a unanimous jury verdict in state criminal trials in light of how the public "generally understood" that right in the late 1870s, during the Reconstruction era when the Bill of Rights

8

was incorporated to the states. 590 U.S. 83, 136–37 (2020) (Thomas, J., concurring) (citing to an 1876 treatise in explicating the meaning of the phrase "by a jury") (citing G. Paschal, The Constitution of the United States 210 (1876)). The majority in *Ramos* similarly made clear that the doctrine of Fourteenth Amendment incorporation implies a focus on the rights enumerated in the first ten amendments as understood at the time such incorporation took effect. *See Ramos*, 590 U.S. at 137–38. There is simply no reason to treat the Second Amendment differently.

With respect to the Parks Ban, regulations from the Reconstruction era are particularly salient in elucidating the principles underpinning our Second Amendment tradition, because modern public parks were created in response to increasing population density and urbanization and had no direct equivalents during the Founding era. *See* J.A 363 (Young Decl. ¶ 8); *cf. Bruen*, 597 U.S. at 27 (cases involving social and technological changes "require a more nuanced approach"). Public parks as we know them were conceived and created beginning in the 1850s to serve as places of refuge, serenity, and communion with nature. *See* J.A 371–73 (Young Decl. ¶ ¶ 26–29). These first modern parks "embraced firearms prohibitions shortly after they came into existence." *Id.* at ¶ 30; *see also* Kari Still, et al., *The History and Tradition of Regulating Guns in Parks*, 19 Harv. L. & Pol'y Rev. 222 (Oct. 14, 2024), https://tinyurl.com/yckyst9m (noting that "when parks were created, prohibitions on carrying guns were adopted at the same time"). Large rural public parks also emerged contemporaneously with urban parks. In 1864, President Lincoln established the basis for the first national park by ceding approximately 30,000 acres of federal land in Yosemite Valley and Mariposa Big Tree Grove to the state of California for public use and recreation. *See* J.A. 380 (Young Decl. ¶ 36). The first officially designated national park soon followed: in 1872 Yellowstone was created, encompassing 2.2 million acres.

*See id.* at ¶ 38.  Restrictions on firearms in these rural parks were introduced contemporaneously with their creation and were integral to the recreational purpose that inspired them.

As *Rahimi* emphasized, unprecedented societal changes necessitate a nuanced approach that considers historical responses to new societal problems when they arose and recognizes that historical "twins" from the Founding era are not required.  The State has introduced ample evidence that regulating firearms in parks was understood to be constitutional when the modern phenomenon of parks arose, which is also around the time of Second Amendment incorporation to the states.  For example, during the very same year in which the Fourteenth Amendment was adopted, Pennsylvania's legislature prohibited the carrying of firearms in Philadelphia's New Fairmount Park.  Pls.' Br. at 22–23; J.A. 418.  Shortly thereafter, Chicago, San Francisco, Buffalo, St. Louis, and Boston followed suit.  J.A. 424 (S.F., Cal., 1872), 429 (Chi., Ill., 1866), 436 (Buff., N.Y., 1874), 463 (St. Louis, Mo., 1883), 472 (Bos., Mass., 1886).  There is no evidence in the record that anyone considered these restrictions to be constitutionally suspect, let alone that any of these regulations was challenged in court or struck down on Second Amendment grounds.  Nothing in *Bruen* or *Rahimi* requires courts to turn a blind eye toward such compelling evidence of Second Amendment constitutional understanding and tradition in evaluating the constitutionality of state regulation of firearms in public parks.

### B.    UNDER *RAHIMI*'S NUANCED APPROACH, THE STATE IDENTIFIED FOUNDING-ERA ANALOGUES SUFFICIENT TO VALIDATE THE CONSTITUTIONALITY OF THE PARKS BAN.

Although this Court can and should consider nineteenth-century park regulations as valid historical analogues on their own, Defendants also presented amply sufficient evidence of an unbroken tradition extending back to relevantly similar analogues from the Founding era and earlier.  The State introduced evidence of regulations from that period prohibiting carrying arms in public forums deemed to be sensitive places, such as fairs and markets.  Defs.' Br. at 42.

10

These analogues demonstrate a historical tradition of firearms regulation in sites relevantly similar to crowded urban public parks and areas of high-density usage within rural parks. As the State demonstrates, Plaintiffs' effort to pick apart the legislative status of the Statute of Northampton of 1328 in colonial and Founding-era North Carolina fails on its merits, *see* Defs.' Br. at 29–30, 39–42, and in any event does not alter the relevant Second Amendment analysis under *Bruen* and *Rahimi*. Even if "a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 30). As *Antonyuk* recognized, that standard is clearly met here.

Plaintiffs argue that the CCIA does not impose a "comparable burden" on the right to bear arms as regulations from the Founding era, because modern and Founding-era laws arose "in different contexts, and for different reasons." Pls.' Br. at 30 (quoting *Bruen*, 597 U.S. at 29). But the Court in *Rahimi* expressly acknowledged that relevantly similar analogues may be found in different contexts, especially when modern regulations address social problems or types of public sites and institutions that did not develop until long after the Founding. *See Rahimi*, 602 U.S. at 739 (Barrett, J., concurring) (explaining that any "test that demands overly specific analogues has serious problems"). Moreover, *Rahimi* stressed that the reasons underlying contemporary regulations need not be perfectly identical to those that led to analogous regulations in the eighteenth century; they only need be "*consistent* with the *principles* that underpin our regulatory tradition." *Id.* at 692 (emphases added). The State met that burden at the preliminary injunction stage in *Antonyuk* and materially supplemented the record on remand with additional relevantly similar analogues. Both the "how" and the "why" of the State's proffered historical analogues—*i.e.*, restricting the carrying of firearms in "quintessentially

11

crowded places" to preserve public safety and order—are consistent with the animating legislative motive for the Parks Ban, which was intended to protect public safety and preserve public parks as sanctuaries for recreation and relaxation. The Parks Ban falls squarely within the tradition of regulating firearms in quintessentially crowded places that has existed "throughout the history of our Nation." 89 F.4th at 357–58.

As they did in *Antonyuk,* Plaintiffs continue to insist that the State's analogues are merely "outliers" that do not establish a national historical tradition of regulation. Pls.' Br. at 21, 54. But Plaintiffs' effort to dismiss historical state and territorial regulations as "unrepresentative" would put Second Amendment jurisprudence in precisely the type of narrow "straightjacket" that the *Bruen* Court rejected. *See Bruen*, 597 U.S. at 30; *cf. Antonyuk*, 89 F.4th at 339 ("Disqualifying proffered analogues based only on strict quantitative measures such as population size absent any other indication of historical deviation would turn *Bruen* into the very 'regulatory straightjacket' the Court warned against."). Plaintiffs' logic would effectively dismiss the relevance of any law from small towns and rural areas merely because such areas were diffuse and had small populations. Such an approach would ignore the historical reality that a high percentage of legislative jurisdictions in our nation's early history comprised small towns and rural areas that may seem quaint by today's standards. *Bruen* and *Rahimi* instruct courts to delve into that history and acknowledge relevantly similar analogues among those traditional sources—not to discount them.

The fallacy of Plaintiffs' approach is starkly apparent in their discussion of Stiglmeier Park in the town of Cheektowaga, which they claim is not analogous to places where firearms were historically prohibited because it is not densely populated. Plaintiffs state that Stiglmeier Park has a population density of 3,027 per square mile, far less dense than an urban center such

as New York City. *See* J.A 1649–51. But the population density of the area *surrounding* a particular park is not dispositive, nor even particularly informative, in a Second Amendment analysis. Counties are not uniformly dense, and the density of the county does not reflect the density in the park. For example, Niagara Falls State Park is in Niagara County, which has a 2020 U.S. Census population density of 407 people per square mile. But Niagara Falls State Park receives over 22 million visitors per year.[5] Areas within Stiglmeier Park may be crowded and subject to high-intensity usage even though the surrounding area outside the park is not densely populated.

Indeed, many parks, both rural and urban, have visitor centers and sports fields, host camps for young people, and have structural features such as playgrounds that may accommodate dense gatherings of people, including children, on a regular basis. As set forth in the Joseph Barill Declaration, Stiglmeier Park has numerous facilities where dozens or hundreds of people may congregate to recreate. J.A. 1191 (Barill Decl. ¶ 7) ("Stiglmeier Park contains the following structures and improvements: Five (5) Tennis Courts, One (1) outdoor hockey rink, Two (2) full sized basketball courts, Two (2) half-court basketball courts, Six (6) baseball diamonds, Three (3) softball diamonds, One (1) football field, Fourteen (14) shelters, Six (6) children's playgrounds, [and] various hiking and walking trails."); *cf.* Pls.' Opp. Stmt. of Mat. Facts ¶¶ 3, 26 (interposing no objection to factual statement that "Shoreline Trail bisects several parks, including Elliot Creek park, which includes Nineteen (19) rentable picnic shelters, Two (2) rentable buildings, Nine (9) children's playgrounds, tennis/pickleball courts, Six (6) restroom facilities, soccer/football fields, cricket fields, an Eighteen (18) hole disc golf course; Niawanda

---

[5] *See Niagara Falls: A Global Attraction with 22.5 Million Annual Visitors*, Niagra Action https://www.niagaraaction.com/niagara-falls-a-global-attraction-with-22-5-million-annual-visitors? (last visited May 7, 2025).

Park, which includes a rentable banquet hall, band shell (concert venue), bathrooms, playground, picnic tables; Veterans Memorial Park, which includes Six (6) rentable shelters, bathroom facilities, children's playgrounds, volleyball courts; and Isle View Park, which includes a rentable gazebo, overlook gazebo, [and] Two (2) children's playgrounds, and picnic tables.").

Public parks such as Stiglemeier, which contains six playgrounds, are also often frequented by children and used for educational purposes, and the historical analogues introduced by the State restricted or prohibited firearms based on the same rationale. Regardless of the density of their surrounding areas, parks are "sensitive places" where large numbers of adults and children congregate, and firearms may be constitutionally regulated.

## III. THE HISTORICAL TRADITION OF FIREARMS REGULATION ENCOMPASSES BOTH URBAN AND RURAL PARKS.

Firearms restrictions governing both urban and rural public parks were implemented by federal and state legislatures and other state-level regulatory bodies contemporaneous with the creation of such parks beginning in the 1850s. Indeed, as discussed above, exclusion of firearms was integral to the design and conception of early urban parks, which were developed to provide safe and peaceful places for relaxation away from city life. J.A. 375–76 (Young Decl. ¶ 31). The summary judgment record in this case provides ample historical evidence demonstrating that this exclusion was not limited to urban parks: in fact, from the very inception of our national park system and states' establishment of large rural wilderness parks, firearms restrictions or outright prohibitions were implemented to effectuate their central recreational purpose. The complete absence of any contemporaneous evidence of constitutional objection to such regulations makes clear that, even with respect to rural parks, such restrictions were understood to be consistent with longstanding principles underpinning our Second Amendment tradition.

14

Although this Court in *Antonyuk* held that Defendants had already established a robust tradition of regulating firearms in urban public parks, *see* 89 F.4th at 359, on remand Defendants nonetheless built upon the preliminary injunction record by introducing evidence of more than "one hundred regulations from more than twenty States" reflecting the widespread adoption of firearms prohibitions in early urban parks. Defs.' Br. at 34. In Manhattan and Brooklyn, both Central Park and Prospect Park, which were created in 1858 and 1867 respectively, imposed strict firearms restrictions from their start. Defs.' Br. at 22; J.A. 399; J.A. 374; J.A. 375, 413. By the 1870s, numerous cities and towns in over twenty states had enacted ordinances prohibiting carrying firearms in public parks. Defs.' Br. at 23.

This regulatory tradition was not limited to urban parks, as the wealth of additional evidence submitted by the State on remand fully demonstrates. Early rural parks also commonly prohibited firearms, and the practice of prohibiting firearms in national parks dates back to their inception. In 1872, Yellowstone National Park was designated as the first national park. However, because the park had not yet been surveyed, was difficult to access, and lacked regulation, Yellowstone did not function as a park for many years. In 1894, the federal government responded to the lack of administration and organization in the park and adopted regulations prohibiting the carrying of firearms in the park without written permission from the park superintendent or the Secretary of the Interior.[6] *See* Kari Still, et al., *The History and Tradition of Regulating Guns in Parks*, 19 Harv. L. & Pol'y Rev. 201, 218 (2024) (noting that "[a]t the time of its creation, it had not been surveyed, and it was only accessible by "saddle and pack trains, a mode of travel attended with many privations and inconveniences" and "[o]nly in 1894 did the federal government respond to ongoing chaos in the park by requiring the

---

[6] *Origin of the National Park Idea*, National Park Service, https://www.nps.gov/articles/npshistory-origins.htm (last visited May 3, 2025).

enforcement of regulations with criminal sanctions, rather than merely ejection from the park"); J.A. 383 (Young Decl. ¶ 40) (also noting that in 1897, Yellowstone Park "made clear that there were already rules against carrying firearms in [the Park]"). *Id.* at ¶ 41. In 1875, Mackinac National Park in Michigan was designated the second official national park. *Id.* at ¶ 39. By 1882, the park rules included an explicit prohibition on firearms that clearly recalled the simple, declarative prohibitions in numerous urban parks. *Id.* In 1890, Sequoia National Park adopted similar restrictions. *Id.*

Throughout the twentieth century, as new national parks were created, they concurrently adopted firearms regulations, including Crater Lake National Park in 1902, Mount Rainier National Park in 1903, Mesa Verde National Park in 1908, Platt National Park in 1908, Wind Cave National Park in 1908, Glacier National Park in 1910, Rocky Mountain National Park in 1915, Grand Canyon National Park in 1928, Hawaii Volcanos National Park in or before 1929, Acadia National Park in or before 1929, Lassen Volcanic National Park in or before 1929, Mount McKinley National Park in or before 1929, Grand Teton National Park in or before 1929, Zion and Bryce Canyon National Parks in 1929, Great Smoky Mountains National Park in 1932, and Carlsbad Caverns National Park in 1933. J.A 1201–07 (Belka Decl. ¶¶ 15–64). "In 1936, in the first volume of the Federal Register, the Department of the Interior banned firearms in the entire National Park System by regulation." Defs.' Mem. of Law in Opp'n to Pls.' Mot. for Summ. J & in Supp. of Cross-Mot., at 18 (citing 1 Fed. Reg. 672, 674 (1936)). These myriad examples bespeak a longstanding practice of prohibiting firearms in large rural parks across the nation, without any evidence of constitutional challenge or objection that such regulations violated the Second Amendment or cut against the grain of traditional firearms regulations.

In sum, the State's evidence of early firearm regulations as to both urban and rural public parks demonstrates a historical tradition of prohibiting firearms in such places for as long as they have existed. There is simply no historical basis for Plaintiffs' claim that "rural parks" deserve categorically different constitutional treatment under *Bruen* and *Rahimi*. While *Antonyuk* rejected Plaintiffs' facial challenge to the Parks Ban principally based on the State's showing as to urban public parks, the more comprehensive record here demonstrates that the Parks Ban's plainly legitimate sweep encompasses rural public parks as well.

## CONCLUSION

For the reasons set forth above, *Amici* respectfully submit that this Court should affirm the district court's order granting Defendants' motion for summary judgment and denying Plaintiffs' motion for summary judgment.

> */s/ P. Benjamin Duke*
> P. Benjamin Duke
> COVINGTON & BURLING LLP
> 620 Eighth Ave.
> New York, NY 10018
> Tel: (212) 841-1000
> pbduke@cov.com
>
> *Counsel for Giffords Law Center to*
> *Prevent Gun Violence, Brady Center to*
> *Prevent Gun Violence, and*
> *March For Our Lives*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned certifies that this brief contains 6,477 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), and has been prepared in proportionally spaced typeface using 12-point Times New Roman font. As permitted by Federal Rule of Appellate Procedure 32(g)(1), the undersigned has relied upon the word count feature of this word-processing system in preparing this certificate.

Dated: May 9, 2025

*/s/ P. Benjamin Duke*
P. Benjamin Duke

**CERTIFICATE OF SERVICE**

I hereby certify that on May 9, 2025, an electronic copy of the foregoing was filed with the Clerk of Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished on them via the appellate CM/ECF system.

Dated: May 9, 2025

*/s/ P. Benjamin Duke*
P. Benjamin Duke