# 25-384

## United States Court of Appeals

*for the*

## Second Circuit

BRETT CHRISTIAN, FIREARMS POLICY COALITION,
SECOND AMENDMENT FOUNDATION,

*Plaintiffs-Appellants,*

JOHN BORON,

*Plaintiff,*

— v. —

STEVEN G. JAMES, MICHAEL J. KEANE, ACTING DISTRICT ATTORNEY,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF NEW YORK,
No. 1:22-cv-00695 (Sinatra, Jr., J.)

### REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

Nicolas J. Rotsko
FLUET & ASSOCIATES PLLC
1751 Pinnacle Drive, Suite 1000
Tysons, VA 22102
(703) 590-1234
nrotsko@fluet.law

David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, DC 20036
(202) 220-9600
dthompson@cooperkirk.com

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................ii

INTRODUCTION ................................................................................ 1

ARGUMENT ...................................................................................... 4

  I.  The Parks Ban Is Unconstitutional. ............................................. 4

    A. *Antonyuk* Does Not Control This Case ................................... 4

    B. None of New York's Alleged Historical Principles Can Justify the Parks Ban. ....................................................................... 6

      1.  Parks Are Not Constitution-Free Zones. .......................... 6

      2.  *Bruen* Rejects the Notion That Crowds Can Make A Place Sensitive. ................................................................ 16

      3.  Firearms Cannot Be Banned Wherever Children May Be Present. ................................................................... 24

  II.  There Is No Historical Support for Banning Firearms in Parks Outside Urban Areas. ............................................................... 25

    A. The Lack of Historical Support for Banning Firearms In Non-Urban Parks Is A Reason to Hold the Ban Facially Unconstitutional. ................................................................ 26

    B. In the Alternative, The Parks Ban Is Unconstitutional At Least As Applied to the Parks Where Christian Wants to Carry. .............................................................................. 29

CONCLUSION .................................................................................. 33

# TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*,
651 F.3d 218 (2d Cir. 2011) .............................................................. 30

*Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ........................................................................... 30

*Andrews v. State*,
50 Tenn. 165 (1871) ........................................................................... 22

*Antonyuk v. Chiumento*,
89 F.4th 271 (2d Cir. 2023) ............................................................... 30

*Antonyuk v. James*,
120 F.4th 941 (2d Cir. 2024) .................................. 5, 15, 17, 19, 32

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ........................................................................... 30

*Cayuga Indian Nation of N.Y. v. Seneca County*,
978 F.3d 829 (2d Cir. 2020) ................................................................ 5

*Citizens United v. FEC*,
558 U.S. 310 (2010) ........................................................................... 29

*City of Los Angeles v. Patel*,
576 U.S. 409 (2015) ........................................................................... 26

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .................................................................... 13, 16

*English v. State*,
35 Tex. 473 (1871) ............................................................................. 22

*Espinoza v. Mont. Dep't of Rev.*,
591 U.S. 464 (2020) ..................................................................... 21, 22

*Ex parte Young*,
209 U.S. 123 (1908) ........................................................................... 30

*Hague v. Comm. for Indus. Org.*,
307 U.S. 496 (1939) ............................................................................. 9

*Hill v. Georgia*,
53 Ga. 472 (1874) .............................................................................. 24

*Morse v. Frederick,*
    551 U.S. 393 (2007) ...................................................... 25

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    597 U.S. 1 (2022) ...................... 1, 2, 3, 6, 7, 8, 15, 16, 17, 18, 19, 22,
                        24, 25, 26, 27, 28

*Reese v. BATFE,*
    127 F.4th 583 (5th Cir. 2025) ...................................... 25

*State v. Shelby,*
    90 Mo. 302 (1886) ...................................................... 22

*State v. Wilforth,*
    74 Mo. 528 (1881) ...................................................... 23

*United States v. Rahimi,*
    602 U.S. 680 (2024) ............................................ 6, 28, 30

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,*
    535 U.S. 635 (2002) .................................................... 30

*Worth v. Jacobson,*
    108 F.4th 677 (8th Cir. 2024) ...................................... 25

## Statutes

N.Y. ENVT'L CONSERVATION L.
    § 9-0101(6) ................................................................ 31

N.Y. PENAL L.
    § 265.01(1) ................................................................. 10
    § 265.01-e(2)(d) ......................................................... 31
    § 265.01-e(3)(i) .......................................................... 32
    § 265.20(a)(3) ............................................................ 10

## Other Authorities

87 Eng. Rep. 75 (K.B. 1686) ............................................... 18

CESARE BECCARIA, AN ESSAY ON CRIMES AND PUNISHMENTS (1764) ........ 15

Benjamin Boyd, *Take Your Guns to Church: The Second Amendment
    and Church Autonomy*, 8 LIBERTY UNIV. L. REV. 653 (2014) ......... 16

Br. of Amici Curiae Angus Kirk McClellan, et al. In Support of
    Appellees and Affirmance, *Wolford v. Lopez*, No. 23-16164 (9th
    Cir. Nov. 9, 2023), Doc. 48-2 ....................................... 15

*Frequently Asked Questions and Answers on Hunting and Hunting-Related Activities in Response to Recent Changes to New York State Firearms Laws*, N.Y. STATE DEP'T ENV'T CONSERVATION (Sept. 1, 2022), https://perma.cc/VGX8-QT8M .............................31

*The Minutes of the Senate Academicus, 1799-1842*, UNIV. OF GA. LIBRS. (1976), https://perma.cc/J3ZV-XMEC ...........................................25

## INTRODUCTION

New York's chief argument in favor of upholding its ban on firearms in public parks throughout the state is that, in the late 1850s, Frederick Law Olmsted and his followers began banning them in large, urban parks first in New York and Philadelphia, and then gradually through other communities across the country. This conscious attempt at, as the State's expert puts it, "social transformation," was "backed by [the] Romantic ideology" of the time. J.A. 363.

But an attempt at "social transformation" in the latter half of the 19th century is, by definition, not a manifestation of a "well-established and representative" historical tradition that can inform our understanding of the scope of the Second Amendment. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 30 (2022). The State's chief argument in favor of the Ban is, effectively, that it has the right to create "new" types of old spaces, with the difference being that firearms are not allowed under the new rules—but that is precisely the type of change the Second Amendment is designed to prevent, and the State's argument must be rejected.

In the alternative, the State argues that the Parks Ban is valid because parks (at least some parks) are crowded places where people congregate. But again, the only laws the State has that even arguably support this tradition come from much too late: every single one of them postdates the ratification of the Fourteenth Amendment in 1868. The State attempts ground its argument in the common law prohibition on affrays at the Founding, as exemplified by the Statute of Northampton, but the Supreme Court has already explained that the Statute of Northampton did not prevent mere carriage of firearms in crowded public spaces, but only carriage in a terrifying manner. *Id.* at 43. These belated laws are, therefore, disconnected from historical restrictions on the right from any relevant time and must also be rejected.

Finally, the State argues that because children sometimes use parks, firearms can be banned merely because of their presence, but this argument both proves too much and is underexplained. If firearms can be banned where children are present, they can be banned anywhere. And it is not at all clear why the presence of a law-abiding adult citizen with a valid permit for carrying a gun poses any risk to children recreating (the same is true, for that matter, for adults).

2

The Parks Ban is, therefore, facially unconstitutional and should be enjoined in its entirety. The State takes issue with Plaintiffs' alternative argument that, even if there is some basis to find that the State has authority to ban firearms in public parks in urban areas, there is no basis to find that that authority extends to non-urban areas as well. It claims that Plaintiffs lack standing to raise this "as-applied" challenge to the Parks Ban. There is, as is explained below, nothing to that claim. Plaintiffs undoubtedly have standing to challenge the application of the Parks Ban in non-urban parks. But more importantly, that challenge is not limited to an attempt to show that the Parks Ban is unconstitutional "as-applied." Under *Bruen*, a modern law is justified only if it imposes a "comparable burden on the right of armed self-defense" that is "comparably justified" to historical restrictions. *Id.* at 29. A law that covers a broad range of places, some of which might be "sensitive" in a historically relevant sense for reasons not specified in the law, imposes an incomparable burden and should therefore be held unconstitutional in its entirety. In other words, applying the Parks Ban to a specific type of park where firearms could be banned (here, for example, an urban park—although Plaintiffs dispute that premise) is no more constitutional

3

than applying a flat handgun ban to a particular type of handgun that can be banned (*Heller* suggested automatic handguns). In any event, since the facial/as-applied distinction at bottom is a question of remedial scope, at a minimum, Plaintiffs are entitled to an injunction with respect to non-urban parks.

## ARGUMENT

### I. The Parks Ban Is Unconstitutional.

#### A. *Antonyuk* Does Not Control This Case

The State opens by suggesting that this Court has already decided the constitutionality of the Parks Ban in *Antonyuk*, and though it recognizes that a preliminary injunction opinion is not "binding as 'law of the case,' " the State nevertheless suggests *Antonyuk* is binding as a matter of *precedent*, faulting plaintiffs for "cit[ing] no authority for the proposition that the conclusions reached in a prior published panel opinion may be disregarded by a subsequent panel … absent an adequate reason, such as a relevant change in the record or applicable law." Appellee State Br., Doc. 34 at 13 (May 2, 2025) ("State Br.").

The State notably did not adopt this position in its brief on the no-carry default rule, where it lost in *Antonyuk. See* Appellants' Br., Doc. 38.1 at 9, *Christian v. James*, No. 24-2847 (Jan. 3, 2025) ("In its review,

this Court is not bound by its previous decision affirming the district court's preliminary injunction."). In any event, as this Court has made clear, a "preliminary injunction order is, by its very nature, 'tentative.'" *Cayuga Indian Nation of N.Y. v. Seneca County.*, 978 F.3d 829, 834 (2d Cir. 2020) (citation omitted). It would be particularly "anomalous" in this case to treat *Antonyuk* as "foreclosing the subsequent, more thorough consideration of the merits that the preliminary injunction expressly envisions," *id.,* since, contrary to New York's characterization, the record now before the Court is significantly different than the one present in *Antonyuk*. That record demonstrates that the "cornerstone" of this Court's analysis of the Parks Ban, Pls.'-Appellants Br., Doc. 26 at 23 (Mar. 21, 2025) ("Pls.' Br."), an alleged North Carolina statute on which the brunt of this Court's analysis regarding "quintessentially crowded places," rested, *see Antonyuk v. James*, 120 F.4th 941, 1020 (2d Cir. 2024), was not enacted by the North Carolina legislature. Moreover, as Plaintiffs have explained, there is now additional evidence that outdoor recreation spaces were known at the Founding and firearms were carried in them. *See, e.g.* Pls.' Br. at 42–43. These developments demonstrate the

wisdom of treating a preliminary decision as just that, as the record now before this Court compels a ruling in Plaintiffs' favor on the Parks Ban.

### B. None of New York's Alleged Historical Principles Can Justify the Parks Ban.

#### 1. Parks Are Not Constitution-Free Zones.

Under *Bruen* and *Rahimi*, this Court's task is to analyze history to determine what historical principle or principles supported *valid* historical locational bans on firearm carriage, and then extend those principles to today, to determine whether a modern restriction is "consistent with the Second Amendment." *United States v. Rahimi*, 602 U.S. 680, 689–90 (2024); *see* Pls.' Br. at 17–22.

But one key here is that analogies can only be made to *valid* historical restrictions. In the past, just as today, legislatures sometimes enacted laws that were contrary to the Constitution. The Court must, therefore, ignore aberrations in its historical analysis by focusing only on laws that are part of an unbroken, well-established history of regulation that existed at the relevant time. *See, e.g. Bruen*, 597 U.S. at 65.

In *Bruen*, the Supreme Court suggested that there is *some* valid and well-established history of regulation limiting where firearms may lawfully be carried, noting a history of arms restrictions in certain

"legislative assemblies, polling places, and courthouses," *id.* at 30, but New York does not analogize the Parks Ban to those restrictions. Instead, it stakes its claim on a much more dubious ground, suggesting that historical limitations on carrying firearms in parks that arose for the first time in the late 1850s and were still extremely rare at the time of the ratification of the Fourteenth Amendment in 1868 evidence a tradition of restricting carriage specifically in public city parks and, later, in state and national parks as a means "to protect public safety and order and to ensure that public parks remain peaceable spaces for contemplation of nature and recreation." State Br. at 17–18.

The core problem with this argument is that the parks regulations the State relies upon were, in the State's own description, self-consciously *deviations* from the practices relating to parks that had reigned since the Founding, when there were *zero* restrictions on carrying firearms in parks and similar settings. *See* Pls.' Br. at 40–46. . The State's response to this criticism, that these parks from the mid-to-late-19th century were different than the "commons" and other outdoor recreational spaces that came before them because they were consciously designed as "places of recreation and peaceful contemplation," does not so much resolve the

criticism as it restates it. State Br. at 15. This Court should reject the State's argument for three reasons.

First, there really is nothing new about "parks" being used for recreation and peaceful contemplation. As Plaintiffs have demonstrated, people used parks and commons for that purpose long before the State claims. Boston Common, for instance, was intentionally landscaped to offer shaded walks in the 1700s. Pls.' Br. at 43–44. The State has no answer to this other than to note that earlier parks were also used for *other* purposes in addition to recreation and contemplation, but even those cited uses subsided long before 1858, *see* State Br. at 29, without any corresponding restriction on carrying firearms. In any event, the State effectively concedes (as it must) that those early parks were *also* used for contemplation and recreation.

Second, while the *Bruen* analysis accounts for changing societal circumstances, *see* 597 U.S. at 27, the State's logic is circular. Its claim is that these places are different from previous green spaces in large part *because* firearms were banned there. *See, e.g.*, State Br. at 15. If the State has the power to invent a "new" kind of place, and the defining, "new" feature of that place is that the right to keep and bear arms, which has

always before been respected and accepted in similar places, is not respected in that "new" place, then the Second Amendment is a dead letter. Certainly, at the Founding, people often carried firearms on highways or when traveling, but could the State conceive of a "new" type of highway, one where firearms are not allowed, and ban carrying firearms while driving? There are laws in our history affirmatively *compelling* individuals to bear arms when attending church. But perhaps New York wishes to invent a "new" type of church, one that, unlike its predecessors, it wishes to set aside for "peaceful contemplation." The distortions such an argument, if accepted, would bring to our law are easy to recognize. Consider how the analysis would play out in the First Amendment. The Supreme Court has held that public parks, from "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939); Pls.' Br. at 45. But under the State's argument, that is true only until some modern Frederick Law Olmsted invents a "new" type of public park where such activities are forbidden.

9

Third, the State's argument is flawed because it is not at all clear how the Parks Ban is even loosely related to the aim of preserving parks for "peaceful contemplation." Central Park is a far cry from a place of peaceful contemplation today–boomboxes and other boisterous activities are common features. Plaintiff Christian desires to lawfully and peaceably carry a concealed handgun for self-defense. And New York already has laws against the unlicensed possession of firearms or their illegal use. *See, e.g.*, N.Y. PENAL L. §§ 265.01(1), 265.20(a)(3). A person who wishes to use his firearm to carry out a serious crime in a park will not be dissuaded by the risk of committing an additional class E felony by violating the Parks Ban. *See* Pls.' Br. at 35–36 (discussing Enlightenment-era thinker Cesare Beccaria). Precisely how a peaceable and licensed individual possessing a firearm concealed upon his person intrudes upon the peacefulness of a public park, the State never says.

There are other reasons to disregard these laws. Just as they deviated from what came before them, they come too late. The State notes just three parks in two states that enacted restrictions by 1868—Central Park in 1858, Prospect Park in 1867, and Fairmount Park in 1868. As Plaintiffs explained in their opening brief, Founding-era evidence has

controlling weight, *see id.* at 17, and an uninterrupted history of permitting the carry of firearms in public parks and outdoor recreational spaces (whatever the name by which they were called) from the Founding to 1858, *see id.* at 45–46, cannot be overcome by three belated aberrations. The State counters that *Antonyuk* forecloses this objection, because it said that "the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points" in the analysis. State Br. at 28 (quoting *Antonyuk*, 120 F.4th at 972). But *Antonyuk* never held that evidence from the period surrounding ratification of the 14th Amendment *alone* could be sufficient to establish a tradition, and the most probative period for understanding what the Amendment meant in 1868, the decade leading up to it, reveals just two cities with such restrictions and zero statewide restrictions. It is entirely consistent with *Antonyuk* to discount these laws.

That is especially true given that the laws were often differently motivated than New York's modern park ban. For instance, the State tries to buttress its case by referencing historical state park or national park firearm restrictions. The timing of these laws is even worse than the municipal restrictions; the earliest regulation the State has identified

11

does not appear until 1882 and it notes just four before 1900. *See id.* at 19. But more importantly, these were hunting restrictions, and there is evidence that they were not applied to prevent the carriage of handguns for self-defense. For instance, the 1897 Yellowstone Annual Report justified the firearm ban there as "essential to the protection of *the park*" and a response to "a certain sentiment of hostility toward the park and antagonism toward the efforts of the authorities to protect the wild animals from destruction [that] has existed and continues to exist among the ranchers and the people of the settlements near the park boundaries." J.A. 884–85 (emphasis added). The 1905 Annual Report for Yosemite explained that experience showed that "[t]he carrying of firearms in the Yosemite National Park, or any national park, means that the person so carrying them is on a hunting trip; and it is so recognized throughout this part of the country." J.A. 899; *see also id.* ("The spectacle of from five to seven men arriving on the park limits on the first day of the 'open' season, each provided with a rifle, and the majority of them with shotguns also, all for the purpose of 'protection,' would be an amusing one were it not for the fact that it meant the slaughter of the game within the park."). But small arms, unsuitable for hunting, but used for personal protection,

were allowed where it was apparent they were carried for a defensive purpose. *See id.* ("Permits were given for the carrying of revolvers by men when they were accompanied by women, but in no other cases.").

And there is evidence that the municipal park restrictions that the State relies upon were similarly motivated. *See* Pls.' Br. at 50. The State responds that many of the restrictions do not reference hunting, State Br. at 31, but that hardly carries the State's burden. The fact is that several historical laws that the State cites *were* explicitly targeted at unlawful hunting, and they imposed the same or similar restrictions as the other regulations the State cites that were not so explicit. *See* Pls.' Br. at 50. It is fair to assume that the same restrictions imposed elsewhere were similarly motivated. And hunting laws, in addition to being obviously disanalogous to the Parks Ban, are a particularly poor basis on which to restrict the right to armed self-defense. *See District of Columbia v. Heller*, 554 U.S. 570, 606–07 (2008) (noting the history of "English game laws … violating the right codified in the Second Amendment").

The State criticizes Plaintiffs for focusing "primarily on the eight regulations addressed in *Antonyuk*, failing to recognize that the State has

13

since adduced evidence of more than one hundred regulations from more than twenty States." State Br. at 27. But that is not true, as Plaintiffs addressed a large number of the State's purported analogues throughout its brief. *See, e.g.*, Pls.' Br. at 49–50. And the deficiencies in those regulations were representative of the State's evidence as a whole. Again, the State has the burden here, and it has not offered any basis on which to distinguish these historical laws from the Central Park or Fairmount Park bans—indeed, its whole theory is that they are *the same*, so if the Court rejects reliance on the Central Park regulation, it should reject reliance on these much later and less historically significant regulations as well.

Finally, even *if* the Court accepts that the Central Park regulation is informative, the State is wrong to assert that it justifies the Parks Ban. Central Park, in prescribing these regulations, had gates and it forbade entrance by any other means. *See* J.A. 406, 408. In this respect, at least, its restrictions were arguably consistent with the historical tradition of restricting certain "sensitive places." As noted above, *Bruen* directs courts reviewing these laws to analogize to Founding-era limitations on carrying at polling places, legislatures, and courthouses. *The* unifying

feature of those places was that, at the Founding, they were protected by government-provided security. Perhaps the most probative law is Virginia's 1786 Statute of Northampton analog, which *Bruen* said practically codified the common law. 597 U.S. at 49 n.14. As this Court recognized in *Antonyuk*, it generally barred only terrorizing carry. 120 F.4th at 1020 n.82. But the first part of the law barred all carry before courts, *except* for judges and the officials assisting them. Legislatures and polling places were also secured by officials such as doorkeepers and sheriffs. *See, e.g.*, Br. of Amici Curiae Angus Kirk McClellan, et al. In Support of Appellees and Affirmance at 9–18, *Wolford v. Lopez*, No. 23-16164 (9th Cir. Nov. 9, 2023), Doc. 48-2. The Founders were not fools, they knew that a "paper barrier" like the Parks Ban would not prevent *anyone* bent on committing crimes from carrying firearms where they should not. *See* CESARE BECCARIA, AN ESSAY ON CRIMES AND PUNISHMENTS 87–88 (1764); *see also* Pls.' Br. at 35–36. Just as today the U.S. Marshals Service makes federal courthouses secure, the Founders secured the places where they banned firearms. And when they did not secure them, they did not ban but rather *mandated* arms bearing in vulnerable and crowded locations. In the time leading up to the

Founding, a majority of the original 13 colonies enacted laws requiring law-abiding citizens to bring arms to public assemblies such as churches. *See* Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 LIBERTY UNIV. L. REV. 653, 696–99 (2014) (citing laws from Georgia, Virginia, Connecticut, Massachusetts, Rhode Island, Maryland, and South Carolina); *see also Heller*, 554 U.S. at 601 (discussing the Georgia law). If there is any basis on which to think Central Park's regulation of firearms was valid it is that it too actually prevented individuals from entering the parks in violation of its rules. But of course, the same cannot be said for all the parks at which New York now seeks to ban firearms, so the historical laws fail, one way or the other, to justify the Parks Ban.

## 2. *Bruen* Rejects the Notion That Crowds Can Make A Place Sensitive.

As an alternative "principle," the State argues that bans on firearms in public parks fit into a history of restrictions in "public forums and quintessentially crowded places." State Br. at 22 (quoting *Antonyuk*, 120 F.4th at 1019). But *Bruen* specifically cautioned that "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of

'sensitive places' far too broadly." 597 U.S. at 31. And as Plaintiffs explained at length in their brief, *Antonyuk*'s endorsement of this alleged historical tradition rested entirely on the claim that "at least two states—Virginia and North Carolina—passed statutes at the Founding that replicated the medieval English law prohibiting firearms in fairs and markets, *i.e.,* the traditional, crowded public forum," and while the Virginia law only proscribed carrying a firearm "in 'terror' of the county,' the North Carolina law, "appears to have prohibited firearm carriage in general at fairs and markets regardless of conduct." *Antonyuk*, 120 F.4th at 1019–20 & n.82. The problem with that, as the record now shows, was that North Carolina never enacted such a statute. *At most*, it recognized the 1328 Statute of Northampton as part of the law it had inherited from England. *See* Pls.' Br. at 24–30.

Indeed, New York now concedes that the law in question was never an enactment of the North Carolina legislature, but claims that there is no difference between that and North Carolina recognizing the medieval statute as part of its inherited law. *See* State Br. at 33 ("Such an argument is no bar to considering North Carolina's practice as historical evidence."). But the difference is transformative in this case. If North

17

Carolina merely recognized the medieval Statute of Northampton as part of its law, then the critical feature that *Antonyuk* turned on—its lack of a "terror element"—is as absent as it would be if North Carolina did not recognize the Statute of Northampton at all. As *Bruen* has explained, at least since *Sir John Knight's Case*, the Statute of Northampton was recognized merely as having affirmed a common law crime of "go[ing] armed *to terrify* the King's subjects." 87 Eng. Rep. 75, 76 (K.B. 1686) (emphasis added). As a result, an influential 1716 treatise correctly read the Statute of Northampton as "no obstacle to public carry for self-defense," explaining that " 'no wearing of Arms is within the meaning of [the Statute of Northampton], unless it be accompanied with such Circumstances as are apt to terrify the People.' " *Bruen*, 597 U.S. at 45 (citation omitted).

*Bruen* was clear that this was the *only* interpretation that Americans gave to the Statute of Northampton at the Founding, as the analogues they enacted were united in that "they merely codified the existing common-law offense of bearing arms to terrorize the people, as had the Statute of Northampton itself." *Id.* at 47. Indeed, *Bruen* specifically noted that the North Carolina Supreme Court's

18

interpretation of the Statute of Northampton was itself, "consistent with the Statute's long-settled interpretation," and "acknowledged 'that the carrying of a gun' for a lawful purpose '*per se* constitutes no offence.'" *Bruen*, 597 U.S. at 51 (quoting *State v. Huntly*, 25 N.C. 418, 422–23 (1843).

The *only* reason the *Antonyuk* court did not follow this binding construction of Founding-era law by the Supreme Court in *Bruen* was because it believed it had a specific piece of evidence before it that the Supreme Court had not had: an actual enactment of the North Carolina legislature *omitting* the "terror" element, showing that there were in fact laws in place at the Founding that "prohibit[ed] … carriage without any reference to conduct." *Antonyuk*, 120 F.4th at 1020 n.82. By recognizing that North Carolina never enacted such a statute, the State necessarily concedes that there was *no* law on the books at the Founding that flatly banned mere carriage in public or crowded places. Rather, *Bruen*'s binding interpretation of the Statute of Northampton as prohibiting *only* bad "conduct" with firearms and not mere carriage, *see* 597 U.S. at 43–44, applies as fully in this case as it did in *Bruen*, and New York is left

19

entirely lacking in any Founding-era support for its alleged historical principle that mere *carriage* could be banned in crowded places.

The State's criticisms of Plaintiffs' reading of North Carolina law on this point are irrelevant. The State criticizes Plaintiffs' sources as insufficient to show, for certain, that the Statute of Northampton was not *any* part of North Carolina's law. *See* State Br. at 33–34. But Plaintiffs do not need to show that. For *Antonyuk*'s reasoning to be valid, North Carolina must not merely have recognized the Statute of Northampton, but *expanded it*, in its own legislative enactment. The uncontradicted evidence in the record shows that it did not. The State similarly charges Plaintiffs with misrepresenting *Huntly* as "cast[ing] doubt on the conclusion that the Statute of Northampton was in effect in North Carolina prior to 1838" by quoting a portion of the opinion that was merely relating one party's arguments. *Id.* at 34–35. But *Huntly*'s relation of those arguments demonstrates, even in 1843, that whether the Statute of Northampton was recognized at all was at least an arguable point, which would not have been the case if North Carolina had itself enacted it as its own statute (a fact that *Huntly* surely would have mentioned). *Cf.* Pls.' Br. at 28–29 (discussing North Carolina's arguable

statutory analogue to the Statute of Northampton prohibited only going or riding armed "offensively" (emphasis omitted)).

Without the alleged North Carolina law, the State's whole case falls apart. Because there is *nothing* from the Founding in which to ground this principle, the State is left with "seven States and territories" that adopted prohibitions on carrying firearms in certain specified places, at the earliest in 1869. *See* State Br. at 23. But as Plaintiffs have explained, in *Antonyuk* this Court held that the critical dates for understanding the scope of the Second Amendment were 1791 and 1868, and even if both were accorded *equal* weight, contrary to the Supreme Court's instruction, *see* Pls.' Br. at 17–18, then the State still has *zero* laws from before the adoption of the Fourteenth Amendment in 1868 that purported to restrict the mere carriage of firearms in places of public assembly. It is difficult to understand how these belated laws could suffice to show a "well-established" historical tradition that sheds light on the understanding of the people when they made the Second Amendment applicable to the states. *Cf. Espinoza v. Mont. Dep't of Rev.*, 591 U.S. 464, 482 (2020) (rejecting more than 30 state laws from "the second half of the 19th century" as analogues in a First Amendment case because "[s]uch a

development, of course, cannot by itself establish an early American tradition").

There are other reasons to reject these laws as outliers. There is the number: there are just seven states *and territories* with these restrictions by 1900 when there were 45 states in the union. Furthermore, *Bruen* expressly cautions against relying on laws from the Western territories to guide our understanding of the scope of the Second Amendment because such laws were irrelevant to the vast majority of the country and largely untested in the courts. 597 U.S. at 66. And then there are the specific states involved. Texas and Tennessee, adopters of the two laws closest in time to the Fourteenth Amendment, have specifically been noted by the Supreme Court as having aberrant views of the right to keep and bear arms at this time. *See id.* at 64–65 (Texas); *Heller*, 554 U.S. at 613–14 (Tennessee).

The State counters that "state courts repeatedly affirmed the constitutionality of these laws" and cites to *English v. State*, 35 Tex. 473 (1871), *State v. Shelby*, 90 Mo. 302 (1886), and *Andrews v. State*, 50 Tenn. 165 (1871) as confirming that such restrictions were considered constitutional in Texas, Missouri, and Tennessee. State Br. at 24. But as

22

noted above, two of these states were singled out by *Bruen* as unreliable guides, and Plaintiffs have already explained that none of these decisions support the principle that firearms may be banned in "crowded" locations consistent with the Second Amendment. *See* Pls.' Br. at 38–39. The only response the State offers to Plaintiffs' argument on this score is to claim that Plaintiffs erred in "argu[ing] that Missouri's law applied only to concealed carry," because *Shelby* noted that "concealment is made no part" of the prohibitions on carrying firearms into certain crowded places. State Br. at 24 n. 11 (quoting *State*, 90 Mo. at 305). But that statement was dicta in *Shelby*, which was about carrying firearms while intoxicated or concealed generally, and the case that actually assessed the constitutionality of the carry restrictions in public places expressly upheld them by construing them "as intending only to interdict the carrying of weapons concealed." *State v. Wilforth*, 74 Mo. 528, 531 (1881).

Finally, New York faults Plaintiffs for "ignoring" similar prohibitions from Idaho and Georgia. *See* State Br. at 36 n.14 (citing J.A. 1575, 1583). But the same criticisms Plaintiffs have leveled at the other laws are applicable here too. They are both too late to meaningfully inform our understanding of the Second Amendment, especially without

23

a related Founding-era tradition. Indeed, Idaho's law comes from 1901, J.A. 1583, which is so late that *Bruen* did not even consider laws from that period as worthy of discussion, 597 U.S. at 66 n.28, and it was so broad that it banned firearms in any "city, town or village" in Idaho, which is obviously inconsistent with *Bruen*, J.A. 1583. And the Georgia Supreme Court,  in upholding the constitutionality of its law in a prosecution for carrying a firearm into a court, reasoned that in such settings the government had "a high constitutional duty … to protect them," *Hill v. Georgia*, 53 Ga. 472, 478 (1874), as Plaintiffs insist must be the case if the government is to deprive its citizens of the right to bear arms.

### 3. Firearms Cannot Be Banned Wherever Children May Be Present.

Finally, the State suggests that the Parks Ban could be justified by a "tradition of prohibiting firearms in schools and other locations frequented by children." State Br. at 25. But the rationale for historic laws restricting firearms at schools was not merely that children were present—after all, children are present almost everywhere, and *Bruen* has made clear that we are not to read historical principles at such a broad level that they obliterate the right. *See* 597 U.S. at 30–31.

24

Rather, the historical justification for school restrictions—which around the Founding applied only to students, *see, e.g.*, *The Minutes of the Senate Academicus, 1799-1842* at 86, UNIV. OF GA. LIBRS. (1976), https://perma.cc/J3ZV-XMEC (restriction dating to 1810), was that the schools exercised *in loco parentis* authority over their students, *see Morse v. Frederick*, 551 U.S. 393, 413 n.3 (2007) (Thomas, J. concurring); *id.* at 416. Indeed, these restrictions were often accompanied by other limitations on students' freedoms that, absent *in loco parentis* authority, would certainly have been unconstitutional, *see The Minutes of the Senate Academicus*, *supra*, at 38, 85 (restricting student speech). They therefore "say little about the general scope of Constitutional rights and protections." *Reese v. BATFE*, 127 F.4th 583, 596 (5th Cir. 2025); *see Worth v. Jacobson*, 108 F.4th 677, 695 (8th Cir. 2024).

## II. There Is No Historical Support for Banning Firearms in Parks Outside Urban Areas.

Even if this Court were to conclude, contrary to the evidence discussed above, that the record in this case supports banning firearms in urban parks like Central Park because they are "quintessentially crowded places," the Parks Ban is still unconstitutional because it is not so limited. The State claims, in response, that Plaintiffs' have failed to

25

plead an as-applied challenge so that the Court should blind itself to the manifest disconnect between the historical tradition the State seeks to use for cover for its Ban, and the scope of the Ban itself. This misunderstands the depth of the State's problem.

### A. The Lack of Historical Support for Banning Firearms In Non-Urban Parks Is A Reason to Hold the Ban Facially Unconstitutional.

First, leaving aside whether Plaintiffs have pleaded an as-applied claim for the moment, the fact that the Parks Ban exceeds in its scope any possible historical justification, including as to parks that Plaintiff Christian wishes to visit, is a reason to hold it *facially* unconstitutional. In *Heller*, the Supreme Court upheld a facial challenge to the District of Columbia's ban on handguns. *See City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015) (stating that *Heller* was a facial challenge). In so doing, *Heller* held that "handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." 554 U.S. at 629. As a result, the historical tradition the Court identified—of restricting "dangerous and unusual weapons," *id.* at 627 (citation omitted)—could not lawfully be extended to cover the District of Columbia's ban. That was true *even though* there are some

26

handguns, those that are fully automatic, that the Court at least implied could be banned under that tradition. *See id.* (discussing automatic weapons like the M-16 rifle). In other words, the fact that there were *certain* handguns that might have been lawfully banned by D.C. consistent with history did not save the law in *Heller* from facial invalidation because its restrictions were not tied to that history.

In this case, the fact that there might be (again, accepting for the sake of argument that there is such a tradition as the "quintessentially crowded places" one) *some* parks where New York could ban firearms, does not permit the State to use those few acceptable applications of its law to justify hundreds of ahistorical bans in non-urban parks. Such an analysis flies in the face of *Bruen*, which requires that a modern law and its historical predecessors both "impose a comparable burden on the right of armed self-defense" and that the "burden is comparably justified." 597 U.S. at 29. If a historical law banned firearms in a few discrete "quintessentially crowded places," a modern law that bans firearms in a host of other locations that *are not crowded*, imposes an *incomparable* burden that is not be comparably justified, even if it also covers, almost by accident, a few crowded locations. Put another way, if the "historical

27

principle" is that firearms may be banned in "quintessentially crowded places," the Parks Ban is not "consistent with the principles that underpin our regulatory tradition" unless it is focused on only those places. *Rahimi*, 602 U.S. at 692. *Bruen* itself indicates this is how the analysis must run in its rejection of the argument that the proper-cause requirement was a type of "sensitive-place" law. *Bruen* held that, although there are discrete locations that may be "sensitive" such that firearms may be banned there, New York's law could not be justified by treating all of Manhattan as such a place because that would "define[] the category of 'sensitive places' far too broadly." 597 U.S. at 31. That was true even though there were certain locations in Manhattan (this Court, for instance) that are indisputably "sensitive" where firearms could be banned. The State's argument is precisely the type that *Bruen* itself rejected.

## B. In the Alternative, The Parks Ban Is Unconstitutional At Least As Applied to the Parks Where Christian Wants to Carry.

In any event, the State is wrong to suggest that Plaintiffs cannot bring an as-applied challenge. First, the State objects that Plaintiffs did not plead an as-applied challenge and claim "it is well established that

parties may not amend their complaint to seek new forms of relief in briefing a motion for summary judgment." State Br. at 37. But Plaintiffs are not asking for a new form of relief, they are asking for the same relief they requested in their complaint—a declaration of the Parks Ban's unconstitutionality and an injunction from enforcing it against them. That Plaintiffs did not specifically say in their complaint that they would accept either a broad injunction covering all applications of the Parks Ban, or a narrow one, covering the specific circumstances in which Plaintiff Christian wishes to carry, does not foreclose this Court considering such a challenge. *See Citizens United v. FEC*, 558 U.S. 310, 331 (2010).

Second, the State claims that Plaintiffs lack standing to challenge the Parks Ban as to non-urban parks because the only parks where Christian wishes to carry *are* urban.[1] Christian has alleged an intent to

---

[1] The State also argues that FPC and SAF lack standing to bring Section 1983 claims on behalf of their members at all. At a minimum, FPC and SAF have standing under *Ex parte Young*, 209 U.S. 123 (1908) to bring this challenge on behalf of their members in New York. *See All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 228 (2d Cir. 2011) (holding organizations had standing to assert First Amendment claims of their members), *aff'd sub nom. Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015) (noting that

visit several non-urban parks, and the State's contrary arguments are meritless. First, Christian wishes to carry at Harris Hill State Forest. *See* J.A. 302. The State does not dispute that this park is non-urban, no matter how that term is defined, but rather claims that "the public-parks provision does not apply to state forests," and it notes that state guidance "make[s] clear that hunting and target shooting continue to be expressly permitted at state forests, including Harris Hill." State Br. at 38. But that is not true—only state forests in certain designated counties are exempt from the Parks Ban, and Chautauqua, the county in which Harris Hill is situated, is not one of them. N.Y. ENVT'L CONSERVATION L. § 9-0101(6) (defining "forest preserve"); *see also* N.Y. PENAL L. § 265.01-e(2)(d) (incorporating this definition). By specifically exempting other

---

under *Ex parte Young*, courts have equitable authority to enjoin ongoing violations of federal law). Plaintiffs have pleaded a valid *Ex parte Young* claim here. *See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) ("In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." (cleaned up)). In any event, because the issue of whether Plaintiffs have standing to challenge the Parks Ban as-applied to non-urban parks hinges on Christian's stated desires, Plaintiffs focus on whether Christian has standing. *See Antonyuk v. Chiumento*, 89 F.4th 271, 344 (2d Cir. 2023), *vacated in light of Rahimi*, 144 S. Ct. 2709 (2024).

state forests, the Parks Ban indicates that Harris Hill is, in fact, a covered "park." The State's argument that a different state agency manages state forests than the one that manages state parks, *see* State Br. at 38, is a non sequitur, and the State offers no reason why it is relevant under the Parks Ban. Finally, the guidance documents the State cites, *see id.* at 38–39, do not purport to exempt Harris Hill from the restriction either, but merely state that "possession of a firearm, rifle, or shotgun in 'sensitive locations' " is permissible "when 'lawfully engaged in hunting activity,' " *Frequently Asked Questions and Answers on Hunting and Hunting-Related Activities in Response to Recent Changes to New York State Firearms Laws* at 3, N.Y. STATE DEP'T ENV'T CONSERVATION (Sept. 1, 2022), https://perma.cc/VGX8-QT8M. Indeed, the statute itself exempts persons "lawfully engaged in taking of wildlife or attempts to take wildlife pursuant to a hunting permit" or who are engaged in marksmanship practice or competition from its restrictions. N.Y. PENAL L. § 265.01-e(3)(i). But Christian does not wish to hunt or target shoot in Harris Hill, he wishes to carry a firearm for self-defense there. *See* J.A. 302. The Parks Ban forbids precisely that activity and he therefore has standing to challenge it.

31

The State also dismisses Christian's desire to carry on bike paths in Clarence and the Shoreline Trail as irrelevant, claiming those places are not parks. State Br. at 39–40. It cites nothing for this claim, but signage along the trails indicates otherwise, prominently indicating that "Park Rules [A]pply." *See* J.A. 1624–25.

The State finally argues that, although it agrees that Stiglmeier Park is, in fact, a park that is fully subject to the Ban, it should be classed as "urban" because it is near roads, and "residential housing developments," and because a state investigator once visited it when there were more than 50 cars in the parking lot. State Br. at 39. If a parking lot with 50 cars is enough to make a park "urban," then *any* park that hosts swimming lessons or baseball and basketball games likely qualifies as an "urban" park. *See id.* at 40 (claiming the parks along the bike trails Christian wishes to use are "urban" because they are "replete with playgrounds, band shells, and ball fields"). In fact, Stiglmeier Park comprises 308 acres that include several large wooded and open areas that are akin to "wilderness parks, forests, and reserves." *Antonyuk*, 120 F.4th at 1019; *see also* J.A. 1620.

Finally, the State objects that it is not clear what Plaintiffs' proposed injunction would entail. State Br. at 40. But Plaintiffs have pleaded an intention to engage in a course of conduct that New York prohibits but the Constitution permits. They are entitled to an injunction that extends, *at least*, to every non-urban public park in the State.

## CONCLUSION

The Court should reverse the district court's decision and hold the Parks Ban unconstitutional.

Dated: May 19, 2025                    Respectfully submitted,

Nicolas J. Rotsko                     */s/ David H. Thompson*
FLUET & ASSOCIATES PLLC               David H. Thompson
1751 Pinnacle Drive, Suite 1000       Peter A. Patterson
Tysons, VA 22102                      William V. Bergstrom
(703) 590-1234                        COOPER & KIRK, PLLC
nrotsko@fluet.law                     1523 New Hampshire Avenue, N.W.
                                      Washington, D.C. 20036
                                      Telephone: (202) 220-9600
                                      Facsimile: (202) 220-9601
                                      dthompson@cooperkirk.com
                                      ppatterson@cooperkirk.com
                                      wbergstrom@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

33

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitations of L.R. 32.1(a)(4)(B) because this brief contains 6,988 words.

Pursuant to FED. R. APP. P. 32, this brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: May 19, 2025                        /s/ David H. Thompson
                                           David H. Thompson

                                           *Counsel for Plaintiffs-Appellants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of May 2025, I filed the foregoing via the Court's ACMS appellate system, which will electronically notify all counsel requiring notice.

Dated: May 19, 2025

/s/ David H. Thompson
David H. Thompson

*Counsel for Plaintiffs-Appellants*