24-2847; 25-384
*Christian v. James*

MENASHI, *Circuit Judge*, concurring in part and dissenting in part:

I agree with the majority that as applied to private property open to the public, the Private Property Provision, N.Y. Penal Law § 265.01-d(1), infringes the right to keep and bear arms codified in the Second Amendment. I concur insofar as the majority opinion concludes that the Private Property Provision is not relevantly similar to historical laws that form a national tradition of firearms regulation. I write separately to add that—because it applies to all types of private property open to the public—the Private Property Provision does not reflect a determination that particular circumstances create a specific risk implicating firearms but instead disapproves of the carriage of firearms itself. New York cannot disfavor the bearing of arms in general because "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008).

I disagree with the majority that the Public Parks Provision, N.Y. Penal Law § 265.01-e(2)(d), is consistent with the nation's historical tradition of firearms regulation. Regulations during the founding period restricted the misuse of firearms and the manner of carriage but did not prohibit carriage in public parks or other places reserved for recreation and public gatherings. The majority disregards this history on the ground that contemporary public parks are so different from founding-era public parks that the principles of firearms regulation from the founding period cannot be applied to current circumstances. Instead, the majority identifies a regulatory tradition of restricting the carriage of firearms in parks that emerged in the late nineteenth century.

In my view, the historical evidence from the founding period cannot be discounted. The public parks of that period were not so

different from contemporary parks that it is impossible to identify relevant principles of firearms regulation. The Second Amendment was "intended to endure for ages to come," *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 415 (1819), and our task is to apply its "fixed" meaning even "to circumstances beyond those the Founders specifically anticipated," *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 28 (2022).

The majority is correct that in the late nineteenth century, a new practice of restricting carriage in public parks emerged. That new practice, however, means that unlike in prior cases, the regulatory traditions relevant to this case diverged between 1791 and 1868. I would resolve the conflict in favor of 1791. "[I]ndividual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 597 U.S. at 37. To determine the scope of the Second Amendment as against the federal government, "we look to the prevailing understanding of the right to bear arms in 1791," *United States v. Vereen*, 152 F.4th 89, 99 (2d Cir. 2025) (internal quotation marks and alteration omitted), because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," *Heller*, 554 U.S. at 634-35. The scope of the right to keep and bear arms is the same as against the federal and state governments. We therefore prioritize the understanding of the right that prevailed in 1791. Here, the tradition of firearms regulation in 1791 did not prohibit the carriage of firearms in public parks. I would reverse the judgment of the district court declining to enjoin the enforcement of the Public Parks Provision. I dissent from the majority opinion insofar as it refuses to do so.

**I**

The Private Property Provision violates the Second Amendment. The Second Amendment "presumptively guarantees … a right to 'bear' arms in public for self-defense." *Bruen*, 597 U.S. at 33. The New York law reverses that presumption by creating a default rule that a person may not carry a gun on "private property," even property open to the public, unless the "owner or lessee" has "permitted such possession by clear and conspicuous signage indicating that the carrying of firearms, rifles, or shotguns on their property is permitted or has otherwise given express consent." N.Y. Penal Law § 265.01-d(1). The law applies to any type of private property the public might visit, such as "a gas station or grocery store," *ante* at 15, or a church or plaza. Our court previously estimated that the Private Property Provision covers "over 91 percent of land in New York." *Antonyuk v. James* (*Antonyuk II*), 120 F.4th 941, 1044 (2d Cir. 2024). Other provisions of the law apply to a specific "sensitive location," such as a polling place or a court. *See* N.Y. Penal Law § 265.01-e(2). The Private Property Provision, by contrast, applies "broadly to all property, including property open to the public," in order to "protect public safety and to vindicate the rights of property owners." State Appellant's Br. 2.

The history of American firearm regulations includes laws that aimed to protect public safety, *see United States v. Rahimi*, 602 U.S. 680, 698 (2024) (discussing "surety and going armed laws"), or property rights, *see ante* at 18-23 (discussing founding-era laws prohibiting unlicensed hunting and trespass). But those "focused regulations" addressed particular circumstances in which the introduction of a firearm might create a specific "credible threat to the physical safety of others." *Rahimi*, 602 U.S. at 700. These regulations do not support "a broad prohibitory regime" aimed at firearms in general. *Id.*

The Private Property Provision treats the firearm itself—in all circumstances—as the risk to be avoided. The vast sweep of the Private Property Provision means that the law does not regulate the bearing of arms in certain specified circumstances. Instead, New York has concluded that across all the varied types of property the public might frequent, the carrying of a firearm should be restricted because guns are dangerous.

But the Second Amendment does not tolerate regulations that merely disapprove of firearms. "When the people ratified the Second Amendment, they surely understood an arms-bearing citizenry posed some risks. But just as surely they believed that the right protected by the Second Amendment was itself vital to the preservation of life and liberty," and "[w]e have no authority to question that judgment." *Rahimi*, 602 U.S. at 709 (Gorsuch, J., concurring). At oral argument, New York agreed that the state cannot "restrict firearms ownership if you just disagree with the value of the Second Amendment."[1] That concession makes sense. A state cannot "restrict a right simply out of disagreement with the value of the right"[2] because the codification of a constitutional right "excludes some government interests as impermissible," namely those interests "based on government hostility toward or unwillingness to value the constitutional interest."[3] The Supreme Court has emphasized that "the enshrinement of constitutional rights necessarily takes certain

---

[1] Oral Argument Audio Recording in No. 24-2847 at 1:30.

[2] William Baude & Robert Leider, *The General-Law Right to Bear Arms*, 99 Notre Dame L. Rev. 1467, 1491 (2024).

[3] Stephanie Hall Barclay, *Constitutional Rights as Protected Reasons*, 92 U. Chi. L. Rev. 1179, 1190, 1243 (2025).

policy choices off the table." *Heller*, 554 U.S. at 636.[4] "The Second Amendment 'is the very *product* of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." *Bruen*, 597 U.S. at 26 (quoting *Heller*, 554 U.S. at 635). As a result, the guarantee of the Second Amendment imposes "*limits*" on the ability of a state "to devise solutions to social problems that suit local needs and values." *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) (plurality opinion).

The nation's tradition of firearms regulation does not include regulations designed to disfavor the right to keep and bear arms. To evaluate the constitutionality of a contemporary firearms regulation, we identify historical regulations that are "relevantly similar" by examining "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29.[5] That analysis might reveal an historically permissible justification for burdening the right in a particular way. *See Rahimi*, 602 U.S. at 692 (explaining that a law must "regulate[] arms-bearing for a permissible reason"). But our tradition has never permitted pretextual regulations intended to inhibit the right to keep and bear arms. A constitutional right might historically have been regulated in the name of the public good, but "[c]oncern for the public good had to be genuine; it could

---

[4] *Cf. United States v. Stevens*, 559 U.S. 460, 470 (2010) ("The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs. Our Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it.").

[5] *See also* Oral Argument Audio Recording in No. 24-2847 at 1:40 (the state agreeing that, to defend a contemporary law, "the how and why have to be consistent with the how and why of the historical law").

not be a mere formal recitation that served as pretext for an illegitimate end."[6] St. George Tucker observed, for example, that "[i]n England, the people have been disarmed, generally, under the *specious pretext* of preserving the game: a never failing lure to bring over the landed aristocracy to support any measure, under that mask, though calculated for very different purposes."[7] Joseph Story explained that "under various pretences" the right to keep and bear arms had been rendered "more nominal than real" in England.[8] And William Rawle wrote that "[a]n arbitrary code for the preservation of game in that country has long disgraced them," repeating the observation of Blackstone that "the prevention of popular insurrections and resistance to government by disarming the people, is oftener *meant* than *avowed*, by the makers of forest and game laws."[9] These authorities reflect the principle that a regulation of firearms cannot serve "a pretextual repressive purpose."[10]

The Supreme Court has recognized that a constitutional right "protects against governmental hostility which is masked, as well as overt." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993).[11] "Apart from the text, the effect of a law in its real

---

[6] Daniel D. Slate, *Infringed*, 3 J. Am. Const. Hist. 381, 391 (2025).

[7] St. George Tucker, View of the Constitution of the United States 165 (1803) (Liberty Fund 2010) (emphasis added).

[8] 3 Joseph Story, Commentaries on the Constitution of the United States § 1891, at 747 (1833).

[9] William Rawle, A View of the Constitution of the United States of America 126 (2d ed. 1829) (emphasis added).

[10] Slate, *supra* note 6, at 441.

[11] This is as true for the Second Amendment as for other constitutional guarantees. *See, e.g.*, *Lukumi*, 508 U.S. at 533 (explaining that when "the object or purpose of a law is the suppression of religion or religious

operation is strong evidence of its object." *Lukumi*, 508 U.S. at 535. In this case, the sweeping Private Property Provision acts "to prohibit one from exercising the Second Amendment's central component nearly everywhere that ordinary human action occurs, and wherever 'people typically congregate.'" *Koons v. Att'y Gen.*, 156 F.4th 210, 276 (3d Cir. 2025) (Porter, J., concurring in the judgment part and dissenting in part) (quoting *Bruen*, 597 U.S. at 30-31), *reh'g en banc granted*, 162 F.4th 100 (3d Cir. 2025). I agree with the historical analysis of the majority opinion, but I would additionally conclude that the Private Property Provision—as applied to private property open to the public—is unconstitutional because it reflects an impermissible purpose to disapprove of arms-bearing in general.

## II

The Public Parks Provision also violates the Second Amendment. In evaluating the constitutionality of the law on a preliminary record, earlier panels in this litigation determined that the state was likely to demonstrate that the banning of "firearms in often-crowded public squares, including, specifically, city parks," is consistent with a tradition reflected in medieval English laws, carried through to the founding period, and further expressed in parks regulations in the nineteenth century. *Antonyuk v. Chiumento* (*Antonyuk I*), 89 F.4th 271, 363 (2d Cir. 2023); *Antonyuk II*, 120 F.4th at 1026. Our court made sure to "emphasize," however, that it was "reviewing facial challenges to these provisions at a very early stage of this litigation," that it had not reached "a full merits decision" that

---

conduct," it violates the Free Exercise Clause); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011) (explaining that the First Amendment forbids laws with the "purpose to suppress speech"); *Kelo v. City of New London*, 545 U.S. 469, 478 (2005) (explaining that the Takings Clause does not allow a taking "under the mere pretext of a public purpose").

would "determine the ultimate constitutionality of the challenged … provisions," and that a final decision would "await further briefing, discovery, and historical analysis." *Antonyuk I*, 89 F.4th at 388 n.116; *Antonyuk II*, 120 F.4th at 1048 n.126.

Since then, another panel of our court has concluded that *Antonyuk* misinterpreted the statutes from England and the founding period. *See Frey v. City of New York*, 157 F.4th 118, 133 n.6 (2d Cir. 2025) ("Although *Antonyuk* read the Northampton and North Carolina statues 'to have prohibited firearm carriage in general at fairs and markets regardless of conduct,' *Bruen* undermines that interpretation.") (citation omitted) (quoting *Antonyuk II*, 120 F.4th at 1020 n.82). The majority in this case similarly concludes that the evidence from the early English and founding periods does not support the Public Parks Provision.[12] Yet the majority sustains the Public Parks Provision based entirely on a "tradition" of firearms regulation in public parks that emerged "in the latter half of the 19th century." *Ante* at 42.

I agree with the majority that regulations of public parks from "the latter half of the 19th century," *id.*, "flat out prohibited gun carriage inside those parks," *id.* at 38. But these prohibitions reflected

---

[12] I agree that it is appropriate for the merits panel to reevaluate earlier conclusions made in a preliminary posture. *See Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 107 (2d Cir. 2012) ("A decision on a preliminary injunction is, in effect, only a prediction about the merits of the case; thus, findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding and do not preclude reexamination of the merits.") (internal quotation marks and citations omitted); *see also Rezzonico v. H & R Block, Inc.*, 182 F.3d 144, 149 (2d Cir. 1999) ("[T]he law of the case doctrine does not deprive an appellate court of discretion to reconsider its own prior rulings, even when the ruling constituted a final decision in a previous appeal.").

a conscious departure from an earlier tradition that allowed the carriage of firearms in parks and analogous public spaces. The evidence from the founding period indicates that a prohibition on such carriage would be impermissible. In short, the historical evidence from the eighteenth and nineteenth centuries offers conflicting answers to the constitutional question in this case.

The Supreme Court has acknowledged "an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope" or on "the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 597 U.S. at 37. It has not entered that debate because in prior cases "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same." *Id.* at 38. In this case, however, the public understanding was not the same in 1791 and in 1868. A flat-out prohibition of firearms in a park was unknown to the public of 1791. But by the late nineteenth century, a new tradition allowing such a prohibition had emerged. The question therefore arises as to whether the tradition in 1791 or in 1868 should govern.

Despite the scholarly debate, the case law provides an answer. The Supreme Court has "abandoned 'the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights'" and has instead decided "that it would be 'incongruous' to apply different standards 'depending on whether the claim was asserted in a state or federal court.'" *McDonald*, 561 U.S. at 765 (majority opinion) (quoting *Malloy v. Hogan*, 378 U.S. 1, 10-11 (1964)). The Court has "decisively held that incorporated Bill of Rights protections 'are all to be enforced against the States under the Fourteenth Amendment according to the

same standards that protect those personal rights against federal encroachment.'" *Id.* (quoting *Malloy*, 378 U.S. at 10). Indeed, even as it noted a debate among legal scholars, the Supreme Court in *Bruen* reiterated that it had "made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 597 U.S. at 37.

And our court has recognized that the understanding in 1791 determines the scope of the Second Amendment as against the federal government. Because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," *Heller*, 554 U.S. at 634-35, we have said that "we look to the prevailing understanding of the right to bear arms in 1791 and time periods in close proximity to 1791," *Vereen*, 152 F.4th at 99 (internal quotation marks and alteration omitted). The right to keep and bear arms has the same scope against a state government as against the federal government, so we must prioritize the understanding in 1791. Other circuits agree.[13]

---

[13] *See Lara v. Comm'r Penn. State Police*, 125 F.4th 428, 441 (3d Cir. 2025) ("[T]he constitutional right to keep and bear arms should be understood according to its public meaning in 1791, as that meaning is fixed according to the understandings of those who ratified it.") (internal quotation marks and alteration omitted); *Hirschfeld v. ATF*, 5 F.4th 407, 419 (4th Cir. 2021) ("When evaluating the original understanding of the Second Amendment, 1791—the year of ratification—is 'the critical year for determining the amendment's historical meaning.'") (quoting *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012)), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021); *United States v. Connelly*, 117 F.4th 269, 281 (5th Cir. 2024) ("[B]ecause post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.") (internal quotation marks omitted) (quoting *Bruen*, 597 U.S. at 36); *Worth v. Jacobson*, 108 F.4th

In this case, the state has failed to establish that the Public Parks Provision is consistent with the nation's history and tradition of firearms regulation based on analogous laws from the founding period. A late-nineteenth-century understanding that contradicted the earlier tradition does not suffice. Accordingly, I would reverse the judgment insofar as the district court declined to enjoin the enforcement of the Public Parks Provision.

## A

The historical evidence from the founding period shows that the Public Parks Provision is inconsistent with the tradition of firearms regulation. Contrary to the suggestion of the majority that public parks were unknown to the founding generation, "there is ample historical evidence of public parks used for recreational purposes in the colonial and Founding eras." *Wolford v. Lopez*, 125 F.4th 1230, 1242 (9th Cir. 2025) (VanDyke, J., dissenting from the denial of rehearing en banc). Boston Common was established in 1634. It "was used for drilling militiamen, but it 'also served as a site for informal socializing and recreation,' including 'strolling,' 'horse-and-carriage riding,' 'sports,' 'entertainment,' and 'raucous celebrations.'" *Id.* (alterations omitted) (quoting Anne Beamish, *Before Parks: Public Landscapes in Seventeenth-and Eighteenth-Century Boston, New York, and Philadelphia*, 40 Landscape J. 1, 4-6 (2021)). One traveler

---

677, 692-96 (8th Cir. 2024) (noting that "*Bruen* strongly suggests that we should prioritize Founding-era history" and that "it is questionable whether the Reconstruction-era sources have much weight"); *United States v. Harrison*, 153 F.4th 998, 1010 (10th Cir. 2025) ("Evidence from the founding era—or the years surrounding 1791, when the Second Amendment was first ratified—is most probative."); *NRA v. Bondi*, 133 F.4th 1108, 1116 (11th Cir. 2025) ("The Second Amendment was ratified, and its meaning fixed, in 1791.").

in the eighteenth century described Boston Common "as a place where 'every afternoon, after drinking tea, the gentlemen and ladies walk, and from thence adjourn to one another's houses to spend the evening. It is a fine green common with two rows of young trees planted opposite to each other, with a fine footway between, in imitation of St. James Park; and part of the bay forms a beautiful canal, in view of the walk.'" *Kipke v. Moore*, 165 F.4th 194, 239 n.14 (4th Cir. 2026) (Agee, J., concurring in part and dissenting in part) (alterations omitted) (quoting Carl Bridenbaugh, Cities in the Wilderness: The First Century of Urban Life in America 1625-1742, at 325 (1964)). "[F]rom time immemorial," Boston Common has been "used as a place of public resort for the recreation of the people." *Steele v. City of Boston*, 128 Mass. 583, 583 (1880).

There are other examples. "In 1733 New York joined the other northern towns in setting aside a tract of land for its first public park," Bridenbaugh, *supra*, at 325, when "Bowling Green was established as a place for the 'Recreation & Delight of the Inhabitants of this City,'" *Wolford*, 125 F.4th at 1242 (VanDyke, J., dissenting from the denial of rehearing en banc) (quoting N.Y.C. Dep't of Parks and Recreation, *The Earliest New York City Parks*, https://perma.cc/MBM5-FWRZ). There were also public parks in Philadelphia, Newark, Savannah, and Charleston. *See id.*; *Kipke*, 165 F.4th at 240-41 (Agee, J., concurring in part and dissenting in part); *Koons*, 156 F.4th at 306 (Porter, J., concurring in the judgment in part and dissenting in part).

Visitors used these public parks for different purposes—as parkgoers do today—but a common purpose was recreation. In 1797, Trinity Church sold New York City the land that would become Duane Park "specifically for use as a public park" with the express "condition that it be fenced and landscaped 'as promotive of health and recreation.'" N.Y.C. Dep't of Parks, *supra*. The notion that

contemporary parks are so unique as to have no analogue in the founding period "is counterfactual and nonsensical." *Kipke*, 165 F.4th at 239 n.14 (Agee, J., concurring in part and dissenting in part).

Public parks in the founding period did not feature prohibitions on the carriage of firearms. Visitors to Boston Common could carry arms. A municipal ordinance provided that "no person shall hereafter fire or discharge any Gun or Pistol from … the Commons … unless in the just and legal defence of himself," his family, or his property.[14] That ordinance shows both that a firearm generally could be carried in Boston Common for self-defense and that the restriction was limited to an offensive discharge; it was not a flat-out prohibition on carriage.

The laws during this period "regulated the discharge of firearms within city limits and the storage of gunpowder to prevent fires" but did not prohibit carriage.[15] The "[l]aws restricted where a person could *shoot* a gun."[16] The state identifies three statutes from the founding period that purportedly restricted carriage in "crowded public forums like 'fairs' and 'markets.'" State Appellee's Br. 23. Each of the statutes mirrored the Statute of Northampton, which posed "no obstacle to public carry for self-defense in the decades leading to the founding." *Bruen*, 597 U.S. at 45. Instead, the statutes provided that "conduct 'will come within the Act'" only when marked by "evil

---

[14] By-Laws and Town-Orders of the Town of Boston 50 (1786), *available at* https://perma.cc/HA9T-ST5M.

[15] Robert Leider, *Our Non-Originalist Right to Bear Arms*, 89 Ind. L. J. 1587, 1598 (2014).

[16] Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 515 (2004) (emphasis added).

intent or malice." *Id.* at 44 (quoting *Rex v. Sir John Knight*, 90 Eng. Rep. 330, 330 (K.B. 1686)). The North Carolina Supreme Court "acknowledged 'that the carrying of a gun' for a lawful purpose '*per se* constitutes no offence.' Only carrying for a 'wicked purpose' with a 'mischievous result constituted a crime.'" *Id.* at 51 (citation and alterations omitted) (quoting *State v. Huntly*, 25 N.C. 418, 422-23 (1843)). Other decisions reflected the same "authoritative interpretation" that the Statute of Northampton "only applied to arms carriers who deliberately terrorized the public."[17] The restriction applied to "the manner of bearing arms, and not on the place for bearing arms."[18] These founding-era laws did not categorically prohibit the carriage of firearms in parks and crowded areas.

Nor did the founding-era laws restrict carriage in places of religious assembly. Like parks, churches served as places for public gathering and reflection. But "[m]any colonial statutes *required* individual arms bearing" at religious gatherings, "such as the 1770 Georgia law that … required those men who qualified for militia duty individually 'to carry fire arms' 'to places of public worship.'" *Heller*, 554 U.S. at 601 (emphasis added) (quoting 19 Colonial Records of the State of Georgia 137-39 (Allen D. Candler ed., 1911 (pt. 1))).[19] "[T]he historical evidence demonstrates that six out of the thirteen original colonies required their citizens to go armed when attending religious services or public assemblies." *Koons v. Platkin*, 673 F. Supp. 3d 515,

---

[17] David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 241-42 (2018).

[18] *Id.* at 242.

[19] *See also* Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 Liberty Univ. L. Rev. 653, 697 (2014) (identifying other "colonial laws that required men to bear arms to church").

629 (D.N.J. 2023). Although "a carry mandate is distinct from a permissive right to carry," the history shows that "a public assembly where people are required to be armed is not a place so 'sensitive' that arms can be prohibited." *Koons*, 156 F.4th at 304 (Porter, J., concurring in the judgment in part and dissenting in part).

"For Founding-era Americans, armed assembly was typical." *Id.* The laws of the founding period regulated the conduct of those bearing arms but did not prohibit the bearing of arms in parks, markets, fairs, or religious spaces. There might have been some "'sensitive places' where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses." *Bruen*, 597 U.S. at 30. But neither public parks nor spaces resembling parks were included in that category. Despite the existence of parks and other gathering places, founding-era regulations did not impose a blanket ban on carriage but rather "aimed at the 'manner' of bearing arms."[20]

**B**

The majority opinion jumps about seventy years past the adoption of the Second Amendment to collect "more than sixty regulations from cities and towns in more than twenty States, spanning from 1858 to the early 1900s, that expressly forbade carriage of firearms in public parks." *Ante* at 32. These laws, the majority says, "are 'dead ringers' that evidence such a robust historical tradition" of "prohibiting firearms in those parks." *Id.* at 38. These regulations were enacted with the introduction of "the modern urban public parks in the mold of Olmstead's Central Park," parks that "were principally

---

[20]  Kopel & Greenlee, *supra* note 17, at 244 ("Of course *misconduct* with arms could be prohibited.") (emphasis added).

created as dedicated spaces for peaceful recreation and quiet contemplation of natural scenery." *Id.* at 41-42.

The expert testimony in the record explains that "the American public park movement arose with the appearance of Romanticism and urban expansion." J. App'x 368. Early proponents of the movement believed that "American urban society was flawed and that parks could repair and reform it." *Id.* at 363. In this way, "urban parks were devices for social reform" that could affect the norms of a "public [that] did not necessarily know how to behave in their new park[s]." *Id.* at 371, 375. As part of the reform agenda, "the commissioners adopted rules to prompt proper behavior and decorum," including a prohibition on carrying firearms. *Id.* at 375. Municipal governments prohibited "carrying firearms for self-defense in urban parks" because "[s]uch encouragement would have been inconsistent with romantic and rationalist ideals and antithetical to the social purpose of urban parks as promoted by those ideals." *Id.* at 380.

The ban on carriage was one of several prohibitions designed "to control and direct visitors in order to allow nature to reform society." *Id.* at 375. In Boston in 1886, it was "forbidden" in the public parks "to play musical instruments; to have any intoxicating beverages; to sell, offer or expose for sale, any goods or wares; to post or display signs, placards, flags, or advertising devices; … to make orations, harangues or loud outcries; to enter into political canvassing of any kind; to utter profane, threatening, abusive, or indecent language," and "to solicit the acquaintance of, or follow, or otherwise annoy other visitors." *Id.* at 472. In New York in 1903, it was "forbidden" for parkgoers to "play upon any musical instrument" and to "take into, carry or display any flag, banner, target, or transparency." *Id.* at 632. The ordinance stated that "[n]o one shall fire

16

or carry any firearm" but added in the same sentence: "nor make any oration, nor conduct any religious or other ceremony within any of the parks … in The City of New York." *Id.* at 633. In 1909, Memphis similarly made it illegal "[t]o fire or carry any firearms … or make any oration, or conduct any religious or other meeting or ceremony within any of the parks … without special permission." *Id.* at 747.

The emergence of these "romantic and rationalistic ideals" that defined a new "social purpose of urban parks," *id.* at 380, leads to two conclusions. First, the late-nineteenth-century urban park is not actually a "dead ringer" for contemporary parks. While public parks during the founding period might have featured some uses that are unfamiliar to contemporary parkgoers, the reformed public park of the nineteenth century featured *restrictions* that are unfamiliar: bans on instruments, flags, religious meetings, and introducing oneself to others. The public parks of the founding period and the public parks of the nineteenth century are both imperfect analogues that help to ground an historical tradition. There is no justification for dismissing the parks of the founding period as different in kind from contemporary parks.

Second, the nineteenth-century regulations represented a self-conscious *departure* from an earlier regulatory tradition. In particular, the emergence of regulations prohibiting the carriage of firearms in public parks reflected a changed attitude toward the right to keep and bear arms. In the antebellum period, state supreme courts responded to "the public clamor[] for legislative solutions to high crime rates" by "compromising on the scope of the right to bear arms. … Most courts recognized a robust right to carry arms in public … but nevertheless recognized the state's police power to regulate the right for public

safety."[21]  At this time, some states enacted constitutional provisions that emphasized the authority of the legislature to regulate the right.[22] In the "post-Civil War period," when "[f]aced with *new* pressures to allow legislatures to regulate guns more extensively, courts largely *altered* the scope of the right to bear arms."[23]  The understanding of "[t]he right to bear arms following the Civil War" involved "a broad right to keep arms in the home, but a very limited right to have arms in public."[24]  In this environment, prohibitions on carriage in places such as parks emerged:

> Courts also reconstructed the "regulation/prohibition" distinction to fit the new legislative framework. Total prohibitions on carrying guns in certain places would be "regulations"—not prohibitions—provided they were not overbroad. This supplanted the old theory that prohibitions on concealed weapons did not restrict the

---

[21] Leider, *supra* note 15, at 1601-06.

[22] *See* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 192, 195-204 (2006); *see also Andrews v. State*, 50 Tenn. 165, 177 (1871) ("That the citizens of this State have a right to keep and bear arms for their common defense. *But the Legislature shall have power by law, to regulate the wearing of arms, with a view to prevent crime.*") (emphasis added) (quoting Tenn. Const. of 1870, art. I, § 26); *English v. State*, 35 Tex. 473, 478 (1872) ("Every person shall have the right to keep and bear arms in the lawful defense of himself or the state, *under such regulations as the legislature may prescribe.*'") (emphasis added) (quoting Tex. Const. of 1868, art. I, § 13); Ga. Const. of 1868, art. I, § 14 ("A well-regulated militia being necessary to the security of a free people, the right of the people to keep and bear arms shall not be infringed; *but the general assembly shall have power to prescribe by law the manner in which arms may be borne.*") (emphasis added).

[23] Leider, *supra* note 15, at 1619.

[24] *Id.*

right to bear arms because such laws merely prescribed the manner in which arms were borne.[25]

The "modern collective rights argument also began to take hold in the late-1870s," alongside "[n]ew legislation [that] strictly regulat[ed] guns," including "prohibitions on … the possession of guns in certain locations." [26] As our court recounted in *Antonyuk II*, during this period "new institutions and ideas" about policing and governance "shaped the response to increasingly lethal guns in increasingly populous cities" and "reflected the developing philosophy of proactive local government." 120 F.4th at 993. And as part of those changing norms "courts held that complete bans on the possession of firearms in narrowly defined areas, such as … public gatherings, were permissible regulations of the right to bear arms, not complete prohibitions on exercising the right."[27] These developments provide support for a late-nineteenth-century regulatory tradition, but that tradition supplanted the regulatory principles that had previously prevailed.

## C

The majority addresses the divergence in historical traditions between 1791 and 1868 by asserting that there is "an *absence* of Founding-era evidence supporting a historical tradition," which justifies the exclusive reliance on later history. *Ante* at 13 (emphasis added). To support that assertion, the majority assumes that public parks in the founding period were so unlike parks today that no

---

[25] *Id.* at 1620.

[26] *Id.* at 1622-23; *see also* Michael P. O'Shea, *The Second Amendment Wild Card: The Persisting Relevance of the "Hybrid" Interpretation of the Right to Keep and Bear Arms*, 81 Tenn. L. Rev. 597, 614-17 (2014).

[27] Leider, *supra* note 15, at 1628.

lessons can be drawn from the founding-era history. But, as explained above, that is not true. Contemporary public parks are not so unique as to be unknown to the founding generation. Their parks were at least analogous to ours:

> In principle, there is no difference between Colonial-era park-goers fishing, watching cockfighting, or playing whist; Victorian-era park-goers playing tennis, riding horse-drawn carriages, or doing whatever one does to foster solidarity across social classes; and modern park-goers playing pickleball, hiking, or riding hoverboards. Each is engaged in a type of recreation or leisure in a public location that sometimes doubles as a place of public assembly.

*Koons*, 156 F.4th at 307 (Porter, J., concurring in the judgment in part and dissenting in part). Moreover, the excessively regulated environment of the romantic "public park movement" of the nineteenth century also does not exactly match contemporary practices. J. App'x 368. Earlier practices, however, "need not be a 'dead ringer' or a 'historical twin'" in order to illustrate "the principles underlying the Second Amendment." *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 30).

The premise of the history-and-tradition approach is that we can "look[] at historical gun regulations to identify the contours of the right" that "the people enshrined in our fundamental law." *Rahimi*, 602 U.S. at 739 (Barrett, J., concurring). "Traditions are *reflected in* practices, but they are not *reducible to* practices," so "practices can change while still being continuous with a tradition" as long as "the new practices are consistent with the principle(s) undergirding the

previous practices."[28] "[I]t is the principles, not the practices, that constitute the tradition."[29] We must decide "whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692 (emphasis added).

The history of firearm regulation in parks and similar spaces during the founding period is not so alien that it is impossible to identify relevant principles. As described above, the regulatory tradition of that period featured restrictions on the misuse of firearms in certain public spaces but no prohibitions on carriage. The majority insists that "modern urban public parks" are so different from the public parks of the founding period that such parks were "unimaginable at the founding." *Ante* at 41. Instead of identifying the principles that animated founding-era firearm regulations in recreational and gathering places, the majority sees only "silence in the Founding-era," *id.* at 24, "an absence of Founding-era evidence," *id.* at 13, and a "dearth of evidence," *id.*, due to the "absence of the particular issue during those time periods," *id.* at 12.

The majority therefore concludes that current problems are so unlike those of the founding period as to make the founding-era principles inapplicable to contemporary legal questions. That conclusion repackages the familiar criticism that an original understanding of the Constitution is unable to address current problems.[30] Our court has sometimes assumed that founding

---

[28] J. Joel Alicea, *Bruen Was Right*, 174 U. Pa. L. Rev. 13, 35-36 (2025).

[29] *Id.* at 36.

[30] *See, e.g.*, William J. Brennan Jr., *The Constitution of the United States: Contemporary Ratification*, 27 S. Tex. L. Rev. 433, 435-36 (1986) ("[O]ur distance of two centuries cannot but work as a prism refracting all we perceive. … Those who would restrict claims of right to the values of 1789

principles have been rendered obsolete by such innovations as a "new urban environment," an "increased lethality of firearms," an "increasing complexity of government," or "a degree of administrative sophistication typical of the late-nineteenth century cities but unusual in the Founding Era." *Antonyuk II*, 120 F.4th at 992-94. Our job, however, is to decide how "the Second Amendment's historically fixed meaning applies to new circumstances." *Bruen*, 597 U.S. at 28. That inquiry requires us to accept both that the Second Amendment's "meaning is fixed according to the understandings of those who ratified it" and that it "can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.*

Applying that analysis here, I disagree that the historical record reflects "silence" in 1791 and a "robust historical tradition" in 1868 that might have reflected the original meaning of the Second Amendment or served to "liquidate the meaning of an ambiguous constitutional term." *Ante* at 24, 38. Instead, the regulatory tradition of 1791 allowed restrictions on the misuse of firearms or the manner of bearing arms but did not categorically prohibit carriage in a recreational or gathering place such as a public park. In 1868, however, an emergent ideological movement led to a new tradition

---

specifically articulated in the Constitution turn a blind eye to social progress and eschew adaption of overarching principles to changes of social circumstance."); Lawrence Lessig, *Fidelity in Translation*, 71 Tex. L. Rev. 1165, 1266 (1993) ("'Language' is more than words people use; it is their ideals, their hopes, their prejudices, their enlightenments—in short, it is their world. As the distance to that world increases, so too does the difficulty of the task of translation, not just in the sense that it becomes more and more difficult to understand who the Framers were, but also in the sense that it becomes more and more difficult to accept what they were about.").

of restricting carriage and other conduct in public parks. At that time, "courts reconceptualized the purpose and scope of the right to keep and bear arms."[31] At least some of the laws in the record that emerged from this later tradition clearly violate the Second Amendment.[32]

In the context of other constitutional guarantees, the Supreme Court has rejected the suggestion that an historical tradition that first emerged in the late 1800s reflects the original meaning of the Constitution. In a First Amendment challenge to the exclusion of religious private schools from a state scholarship program, the Supreme Court addressed the contention that "a tradition *against* state support for religious schools arose in the second half of the 19th century, as more than 30 States—including Montana—adopted no-aid provisions." *Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 482 (2020). The Supreme Court explained that "[s]uch a development, of course, cannot by itself establish an early American tradition." *Id.* Instead, "such evidence may reinforce an early practice but cannot create one." *Id.* In *Espinoza*, as in this case, the Supreme Court interpreted a provision of the Bill of Rights that "applies to the States under the Fourteenth Amendment." *Id.* at 475. But even though the

---

[31] Leider, *supra* note 15, at 1623.

[32] *See, e.g.*, J. App'x 1523 (a provision of the penal code of Idaho of 1901 that criminalized the carrying of arms "within the limits or confines of any city, town or village or in any public assembly of the State of Idaho"); *id.* at 1586 (a law adopted by the Legislative Assembly of the Territory of Arizona in 1889 making it a punishable offense for "any person within any settlement, town, village or city within this Territory" to "carry on or about his person … any pistol").

Fourteenth Amendment was adopted in 1868, that was not the time in which the scope of the right was fixed.[33]

In this case, I would reach the same conclusion the Supreme Court has reached with respect to the First Amendment: A tradition of regulation that arose in the late nineteenth century cannot restrict the scope of the right to keep and bear arms as it was understood when the Second Amendment was adopted in 1791. The regulatory tradition of prohibiting carriage in public parks that emerged in the late nineteenth century contradicted the understanding of the Second Amendment in 1791 as reflected in analogous regulations during the

---

[33] Some scholars focus on the understanding of the right as of 1868 rather than 1791 because "the Privileges or Immunities Clause is the more plausible textual vehicle for the incorporation of the Bill of Rights" and the scope of the rights protected by that clause turns on what was meant "when the people of 1868 declared that states cannot abridge 'the privileges or immunities of citizens of the United States.'" Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L. J. 1439, 1448 (2022). Doctrinally, however, "the question of the rights protected by the Fourteenth Amendment against state infringement has been analyzed under the Due Process Clause of that Amendment and not under the Privileges or Immunities Clause," *McDonald*, 561 U.S. at 758 (plurality opinion), and under that process of incorporation, "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government," *Bruen*, 597 U.S. at 37. There is an alternative scholarly argument which accords with that approach. *See* William Baude, Jud Campbell & Stephen E. Sachs, *General Law and the Fourteenth Amendment*, 76 Stan. L. Rev. 1185, 1249 (2024) ("[I]t may be that Fourteenth Amendment privileges or immunities—and, indeed, many of the first eight amendments—were inherently backward-looking. … [T]he general-law privileges or immunities the Fourteenth Amendment secures may be a closed set—a somewhat *Washington-v.-Glucksberg*-like category of rights, 'deeply rooted in this Nation's history and tradition,' stretching from the Founding through Reconstruction to today.") (footnote omitted).

founding period. Accordingly, I would hold that the state has failed to carry its burden of establishing that the Public Parks Provision is consistent with the relevant historical tradition of firearms regulation. "[E]vidence of 'tradition' unmoored from original meaning is not binding law." *Rahimi*, 602 U.S. at 738 (Barrett, J., concurring) (quoting *Vidal v. Elster*, 602 U.S. 286, 324 (2024) (Barrett, J., concurring in part)).

\*      \*      \*

"[T]he right to keep and bear arms is among the 'fundamental rights necessary to our system of ordered liberty.'" *Rahimi*, 602 U.S. at 690 (quoting *McDonald*, 561 U.S. at 778 (majority opinion)). Such "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller*, 554 U.S. at 634-35. In this case, I would adhere to the Second Amendment as it was understood when adopted in 1791. Accordingly, I would hold that (1) the state may not enforce a restriction on carriage that reflects disapproval of the right to keep and bear arms, and (2) the state may not enforce a restriction on carriage in public parks that conflicts with the regulatory tradition during the founding period. Because the majority reaches a different conclusion on the second issue, I concur in part and dissent in part.